## DOWNES *v.* BIDWELL.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 507.   Argued January 8, 9, 10, 11, 1901.—Decided May 27, 1901.[1]

By MR. JUSTICE BROWN, in announcing the conclusion and judgment of the court.

The Circuit Courts have jurisdiction, regardless of amount, of actions against a collector of customs for duties exacted and paid under protest upon merchandise alleged not to have been imported.

The island of Porto Rico is not a part of the United States within that provision of the Constitution which declares that "all duties, imposts, and excises shall be uniform throughout the United States."

---

[1] In announcing the conclusion and judgment of the court in this case, MR. JUSTICE BROWN delivered an opinion. MR. JUSTICE WHITE delivered a concurring opinion which was also concurred in by MR. JUSTICE SHIRAS and MR. JUSTICE MCKENNA. MR. JUSTICE GRAY also delivered a concurring opinion. The Chief Justice, MR. JUSTICE HARLAN, MR. JUSTICE BREWER, and MR. JUSTICE PECKHAM dissented. Thus it is seen that there is no opinion in which a majority of the court concurred. Under these circumstances I have, after consultation with MR. JUSTICE BROWN, who announced the judgment, made headnotes of each of the sustaining opinions, and placed before each the names of the justices or justice who concurred in it.

There is a clear distinction between such prohibitions of the Constitution as go to the very root of the power of Congress to act at all, irrespective of time or place, and such as are operative only throughout the United States, or among the several States.

A long continued and uniform interpretation, put by the executive and legislative departments of the government, upon a clause in the Constitution should be followed by the judicial department, unless such interpretation be manifestly contrary to its letter or spirit.

By MR. JUSTICE WHITE, with whom MR. JUSTICE SHIRAS and MR. JUSTICE McKENNA concurred.

The government of the United States was born of the Constitution, and all powers which it enjoys or may exercise must be either derived expressly or by implication from that instrument. Ever then, when an act of any department is challenged, because not warranted by the Constitution, the existence of the authority is to be ascertained by determining whether the power has been conferred by the Constitution, either in express terms or by lawful implication, to be drawn from the express authority conferred or deduced as an attribute which legitimately inheres in the nature of the powers given, and which flows from the character of the government established by the Constitution. In other words, whilst confined to its constitutional orbit, the government of the United States is supreme within its lawful sphere.

Every function of the government being thus derived from the Constitution, it follows that that instrument is everywhere and at all times potential in so far as its provisions are applicable.

Hence it is that wherever a power is given by the Constitution and there is a limitation imposed on the authority, such restriction operates upon and confines every action on the subject within its constitutional limits.

Consequently it is impossible to conceive that where conditions are brought about to which any particular provision of the Constitution applies its controlling influence may be frustrated by the action of any or all of the departments of the government. Those departments, when discharging, within the limits of their constitutional power, the duties which rest on them, may of course deal with the subjects committed to them in such a way as to cause the matter dealt with to come under the control of provisions of the Constitutions which may not have been previously applicable. But this does not conflict with the doctrine just stated, or presuppose that the Constitution may or may not be applicable at the election of any agency of the government.

The Constitution has undoubtedly conferred on Congress the right to create such municipal organizations as it may deem best for all the territories of the United States whether they have been incorporated or not, to give to the inhabitants as respects the local governments such degree of representation as may be conducive to the public well-being, to deprive such territory of representative government if it is considered just to do so, and to change such local governments at discretion.

As Congress in governing the territories is subject to the Constitution, it

results that all the limitations of the Constitution which are applicable to Congress in exercising this authority necessarily limit its power on this subject. It follows also that every provision of the Constitution which is applicable to the territories is also controlling therein. To justify a departure from this elementary principle by a criticism of the opinion of Mr. Chief Justice Taney in *Scott* v. *Sandford*, 19 How. 393, is unwarranted. Whatever may be the view entertained of the correctness of the opinion of the court in that case, in so far as it interpreted a particular provision of the Constitution concerning slavery and decided that as so construed it was in force in the territories, this in no way affects the principle which that decision announced, that the applicable provisions of the Constitution were operative.

In the case of the territories, as in every other instance, when a provision of the Constitution is invoked, the question which arises is, not whether the Constitution is operative, for that is self-evident, but whether the provision relied on is applicable.

As Congress derives its authority to levy local taxes for local purposes within the territories, not from the general grant of power to tax as expressed in the Constitution, it follows that its right to locally tax is not to be measured by the provision empowering Congress " To lay and collect Taxes, Duties, Imposts, and Excises," and is not restrained by the requirement of uniformity throughout the United States. But the power just referred to, as well as the qualification of uniformity, restrains Congress from imposing an impost duty on goods coming into the United States from a territory which has been incorporated into and forms a part of the United States. This results because the clause of the Constitution in question does not confer upon Congress power to impose such an impost duty on goods coming from one part of the United States to another part thereof, and such duty besides would be repugnant to the requirement of uniformity throughout the United States.

By MR. JUSTICE GRAY.

The civil government of the United States cannot extend immediately, and of its own force, over territory acquired by war. Such territory must necessarily, in the first instance, be governed by the military power under the control of the President as commander in chief. Civil government cannot take effect at once, as soon as possession is acquired under military authority, or even as soon as that possession is confirmed by treaty. It can only be put in operation by the action of the appropriate political department of the government, at such time and in such degree as that department may determine.

In a conquered territory, civil government must take effect, either by the action of the treaty-making power, or by that of the Congress of the United States. The office of a treaty of cession ordinarily is to put an end to all authority of the foreign government over the territory; and to subject the territory to the disposition of the Government of the United States.

The government and disposition of territory so acquired belong to the Government of the United States, consisting of the President, the Senate,

elected by the States, and the House of Representatives, chosen by and immediately representing the people of the United States.

So long as Congress has not incorporated the territory into the United States, neither military occupation nor cession by treaty makes the conquered territory domestic territory, in the sense of the revenue laws. But those laws concerning "foreign countries" remain applicable to the conquered territory, until changed by Congress.

If Congress is not ready to construct a complete government for the conquered territory, it may establish a temporary government, which is not subject to all the restrictions of the Constitution.

THIS was an action begun in the Circuit Court by Downes, doing business under the firm name of S. B. Downes & Co., against the collector of the port of New York, to recover back duties to the amount of $659.35 exacted and paid under protest upon certain oranges consigned to the plaintiff at New York, and brought thither from the port of San Juan in the Island of Porto Rico during the month of November, 1900, after the passage of the act temporarily providing a civil government and revenues for the Island of Porto Rico, known as the Foraker act.

The District Attorney demurred to the complaint for the want of jurisdiction in the court, and for insufficiency of its averments. The demurrer was sustained, and the complaint dismissed. Whereupon plaintiff sued out this writ or error.

*Mr. Frederic R. Coudert, Jr.,* and *Mr. John G. Carlisle* for plaintiff in error. *Mr. Paul Fuller* was on Mr. Coudert's brief.

*Mr. Solicitor General* and *Mr. Attorney General* for defendants in error.

MR. JUSTICE BROWN, after making the above statement, announced the conclusion and judgment of the court.

This case involves the question whether merchandise brought into the port of New York from Porto Rico since the passage of the Foraker act, is exempt from duty, notwithstanding the third section of that act, which requires the payment of "fif-

teen per centum of the duties which are required to be levied, collected and paid upon like articles of merchandise imported from foreign countries."

1. The exception to the jurisdiction of the court is not well taken. By Rev. Stat. sec. 629, subdivision 4, the Circuit Courts are vested with jurisdiction ",of all suits at law or equity arising under any act providing for a revenue from imports or tonnage," irrespective of the amount involved. This section should be construed in connection with sec. 643, which provides for the removal from state courts to Circuit Courts of the United States of suits against revenue officers "on account of any act done under color of his office, or of any such [revenue] law, or on account of any right, title or authority claimed by such officer or other person under any such law." Both these sections are taken from the act of March 2, 1833, c. 57, 4 Stat. 632, commonly known as the Force Bill, and are evidently intended to include all actions against customs officers acting under color of their office. While, as we have held in *De Lima* v. *Bidwell*, actions against the collector to recover back duties assessed upon non-importable property are not "customs cases" in the sense of the Administrative Act, they are, nevertheless, actions arising under an act to provide for a revenue from imports, in the sense of section 629, since they are for acts done by a collector under color of his office. This subdivision of sec. 629 was not repealed by the Jurisdictional Act of 1875, or the subsequent act of August 13, 1888, since these acts were "not intended to interfere with the prior statutes conferring jurisdiction upon the Circuit or District Courts in special cases, and over particular subjects." *United States* v. *Mooney*, 116 U. S. 104, 107. See also *Ins. Co.* v. *Ritchie*, 5 Wall. 541; *Philadelphia* v. *The Collector*, 5 Wall. 720; *Hornthall* v. *The Collector*, 9 Wall. 560. As the case "involves the construction or application of the Constitution" as well as the constitutionality of a law of the United States, the writ of error was properly sued out from this court.

2. In the case of *De Lima* v. *Bidwell*, just decided, we held that upon the ratification of the treaty of peace with Spain, Porto Rico ceased to be a foreign country, and became a terri-

tory of the United States, and that duties were no longer collectible upon merchandise brought from that island. We are now asked to hold that it became a part of the *United States* within that provision of the Constitution which declares that "all duties, imposts and excises shall be uniform throughout the United States." Art. I, sec. 8. If Porto Rico be a part of the United States, the Foraker act imposing duties upon its products is unconstitutional, not only by reason of a violation of the uniformity clause, but because by section 9 "vessels bound to or from one State" cannot "be obliged to enter, clear or pay duties in another."

The case also involves the broader question whether the revenue clauses of the Constitution extend of their own force to our newly acquired territories. The Constitution itself does not answer the question. Its solution must be found in the nature of the government created by that instrument, in the opinion of its contemporaries, in the practical construction put upon it by Congress and in the decisions of this court.

The Federal government was created in 1777 by the union of thirteen colonies of Great Britain in "certain articles of confederation and perpetual union," the first one of which declared that "the stile of this confederacy shall be the United States of America." Each member of the confederacy was denominated a *State*. Provision was made for the representation of each State by not less than two nor more than seven delegates; but no mention was made of territories or other lands, except in Art. XI, which authorized the admission of Canada, upon its "acceding to this confederation," and of other colonies if such admission were agreed to by nine States. At this time several States made claims to large tracts of land in the unsettled West, which they were at first indisposed to relinquish. Disputes over these lands became so acrid as nearly to defeat the confederacy, before it was fairly put in operation. Several of the States refused to ratify the articles, because the convention had taken no steps to settle the titles to these lands upon principles of equity and sound policy; but all of them, through fear of being accused of disloyalty, finally yielded their claims, though Maryland held out until 1781. Most of these States in the

mean time having ceded their interests in these lands, the confederate Congress, in 1787, created the first territorial government northwest of the Ohio River, provided for local self-government, a bill of rights, a representation in Congress by a delegate, who should have a seat "with a right of debating, but not of voting," and for the ultimate formation of States therefrom, and their admission into the Union on an equal footing with the original States.

The confederacy, owing to well-known historical reasons, having proven a failure, a new Constitution was formed in 1787 by "the people of the United States" "for the United States of America," as its preamble declares. All legislative powers were vested in a Congress consisting of representatives from the several States, but no provision was made for the admission of delegates from the territories, and no mention was made of territories as separate portions of the Union, except that Congress was empowered "to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States." At this time all of the States had ceded their unappropriated lands except North Carolina and Georgia. It was thought by Chief Justice Taney in the *Dred Scott* case, 19 How. 393, 436, that the sole object of the territorial clause was "to transfer to the new government the property then held in common by the States, and to give to that government power to apply it to the objects for which it had been destined by mutual agreement among the States before their league was dissolved;" that the power "to make needful rules and regulations" was not intended to give the powers of sovereignty, or to authorize the establishment of territorial governments—in short, that these words were used in a proprietary and not in a political sense. But, as we observed in *De Lima* v. *Bidwell*, the power to establish territorial governments has been too long exercised by Congress and acquiesced in by this court to be deemed an unsettled question. Indeed, in the *Dred Scott* case it was admitted to be the inevitable consequence of the right to acquire territory.

It is sufficient to observe in relation to these three fundamental instruments that it can nowhere be inferred that the

territories were considered a part of the United States. The Constitution was created by the people of the *United States,* as a union of *States,* to be governed solely by representatives of the *States;* and even the provision relied upon here, that all duties, imposts, and excises shall be uniform "throughout the United States," is explained by subsequent provisions of the Constitution, that "no tax or duty shall be laid on articles exported from any *State,*" and "no preference shall be given by any regulation of commerce or revenue to the ports of one *State* over those of another; nor shall vessels bound to or from one *State* be obliged to enter, clear or pay duties in another." In short, the Constitution deals with *States,* their people, and their representatives.

The Thirteenth Amendment to the Constitution, prohibiting slavery and involuntary servitude "within the United States, or in any place subject to their jurisdiction," is also significant as showing that there may be places within the jurisdiction of the United States that are no part of the Union. To say that the phraseology of this amendment was due to the fact that it was intended to prohibit slavery in the seceded States, under a possible interpretation that those States were no longer a part of the Union, is to confess the very point in issue, since it involves an admission that, if these States were not a part of the Union they were still subject to the jurisdiction of the United States.

Upon the other hand, the Fourteenth Amendment, upon the subject of citizenship, declares only that "all persons born or naturalized *in the United States,* and subject to the jurisdiction thereof, are citizens of the United States, and of the *State* wherein they reside." Here there is a limitation to persons born or naturalized in the United States which is not extended to persons born in any place "subject to their jurisdiction."

The question of the legal relations between the States and the newly acquired territories first became the subject of public discussion in connection with the purchase of Louisiana in 1803. This purchase arose primarily from the fixed policy of Spain to exclude all foreign commerce from the Mississippi. This restriction became intolerable to the large number of immigrants who were leaving the Eastern States to settle in the fertile val-

ley of that river and its tributaries. After several futile attempts to secure the free navigation of that river by treaty, advantage was taken of the exhaustion of Spain in her war with France, and a provision inserted in the treaty of October 27, 1795, by which the Mississippi River was opened to the commerce of the United States. 8 Stat. 138, 140, Art. IV. In October, 1800, by the secret treaty of San Ildefonso, Spain retroceded to France the territory of Louisiana. This treaty created such a ferment in this country that James Monroe was sent as minister extraordinary with discretionary powers to coöperate with Livingston, then minister to France, in the purchase of New Orleans, for which Congress appropriated $2,000,000. To the surprise of the negotiators, Bonaparte invited them to make an offer for the whole of Louisiana at a price finally fixed at $15,000,000. It is well known that Mr. Jefferson entertained grave doubts as to his power to make the purchase, or, rather, as to his right to annex the territory and make it part of the United States, and had instructed Mr. Livingston to make no argeement to that effect in the treaty, as he believed it could not be legally done. Owing to a new war between England and France being upon the point of breaking out, there was need for haste in the negotiations, and Mr. Livingston took the responsibility of disobeying his instructions, and, probably owing to the insistence of Bonaparte, consented to the third article of the treaty, which provided that "the inhabitants of the ceded territory shall be incorporated in the Union of the United States, and admitted as soon as possible, according to the principles of the Federal Constitution, to the enjoyment of all the rights, advantages and immunities of citizens of the United States; and in the meantime they shall be maintained and protected in the free enjoyment of their liberty, property and the religion which they profess." This evidently committed the government to the ultimate, but not to the immediate, admission of Louisiana as a State, and postponed its incorporation into the Union to the pleasure of Congress. In regard to this, Mr. Jefferson, in a letter to Senator Breckinridge of Kentucky, of August 12, 1803, used the following language: "This treaty must, of course, be laid before both houses, because

both have important functions to exercise respecting it. They, I presume, will see their duty to their country in ratifying and paying for it, so as to secure a good which would otherwise probably be never again in their power. But I suppose they must then appeal to the nation for an additional article to the Constitution approving and confirming an act which the nation had not previously authorized. The Constitution has made no provision for holding foreign territory, still less for incorporating foreign nations into our Union. The Executive, in seizing the fugitive occurrence which so much advances the good of their country, has done an act beyond the Constitution."

To cover the questions raised by this purchase Mr. Jefferson prepared two amendments to the Constitution, the first of which declared that "the province of Louisiana is incorporated with the United States and made part thereof;" and the second of which was couched in a little different language, viz.: "Louisiana, as ceded by France to the United States, is made a part of the United States. Its white inhabitants shall be citizens, and stand, as to their rights and obligations, on the same footing as other citizens in analogous situations." But by the time Congress assembled, October 17, 1803, either the argument of his friends or the pressing necessity of the situation seems to have dispelled his doubts regarding his power under the Constitution, since in his message to Congress he referred the whole matter to that body, saying that "with the wisdom of Congress it will rest to take those ulterior measures which may be necessary for the immediate occupation and temporary government of the country; for its incorporation into the Union." Jefferson's Writings, vol. 8, p. 269.

The raising of money to provide for the purchase of this territory and the act providing a civil government gave rise to an animated debate in Congress, in which two questions were prominently presented : First, whether the provision for the ultimate incorporation of Louisiana into the Union was constitutional; and, second, whether the seventh article of the treaty admitting the ships of Spain and France for the next twelve years "into the ports of New Orleans, and in all other legal ports of entry within the ceded territory, in the same manner as the ships of

the United States coming directly from France or Spain, or any of their colonies, without being subject to any other or greater duty on merchandise or other or greater tonnage than that paid by the citizens of the United States," was an unlawful discrimination in favor of those ports and an infringement upon Art. I, sec. 9, of the Constitution, that " no preference shall be given by any regulation of commerce or revenue to the ports of one State over those of another." This article of the treaty contained. the further stipulation that " during the space of time above mentioned no other nation shall have a right to the same privileges in the ports of the ceded territory ; . . . and it is well understood that the object of the above article is to favor the manufactures, commerce, freight and navigation of France and Spain."

It is unnecessary to enter into the details of this debate. The arguments of individual legislators are no proper subject for judicial comment. They are so often influenced by personal or political considerations, or by the assumed necessities of the situation, that they can hardly be considered even as the deliberate views of the persons who make them, much less as dictating the construction to be put upon the Constitution by the courts. *United States* v. *Union Pac. Railroad,* 91 U. S. 72, 79. Suffice it to say that the administration party took the ground that, under the constitutional power to make treaties, there was ample power to acquire territory, and to hold and govern it under laws to be passed by Congress ; and that as Louisiana was incorporated into the Union as a territory, and not as a State, a stipulation for citizenship became necessary ; that as a State they would not have needed a stipulation for the safety of their liberty, property and religion, but as territory this stipulation would govern and restrain the undefined powers of Congress to " make rules and regulations " for territories. The Federalists admitted the power of Congress to acquire and hold territory, but denied its power to incorporate it into the Union under the Constitution as it then stood.

They also attacked the seventh article of the treaty, discriminating in favor of French and Spanish ships, as a distinct violation of the Constitution against preference being given to the

ports of one State over those of another. The administration party, through Mr. Elliott of Vermont, replied to this that " the States, as such, were equal and intended to preserve that equality ; and the provision of the Constitution alluded to was calculated to prevent Congress from making any odious discrimination or distinctions between particular States. It was not contemplated that this provision would have application to colonial or territorial acquisitions." Said Mr. Nicholson of Maryland, speaking for the administration : " It [Louisiana] is in the nature of a colony whose commerce may be regulated without any reference to the Constitution. Had it been the Island of Cuba which was ceded to us, under a similar condition of admitting French and Spanish vessels for a limited time into Havana, could it possibly have been contended that this would be giving a preference to the ports of one State over those of another, or that the uniformity of duties, imposts and excises throughout the United States would have been destroyed? And because Louisiana lies adjacent to our own territory is it to be viewed in a different light?"

As a sequence to this debate two bills were passed, one October 31, 1803, 2 Stat. 245, authorizing the President to take possession of the territory, and to continue the existing government, and the other November 10, 1803, 2 Stat. 245, making provision for the payment of the purchase price. These acts continued in force until March 26, 1804, when a new act was passed providing for a temporary government, 2 Stat. 283, c. 38, and vesting all legislative powers in a governor and legislative council, to be appointed by the President. These statutes may be taken as expressing the views of Congress, first, that territory may be lawfully acquired by treaty, with a provision for its ultimate incorporation into the Union ; and, second, that a discrimination in favor of certain foreign vessels trading with the ports of a newly acquired territory is no violation of that clause of the Constitution, Art. 1, sec. 9, that declares that no preference shall be given to the ports of one State over those of another. It is evident that the constitutionality of this discrimination can only be supported upon the theory that ports of territories are not ports of States within the meaning of the Constitution.

The same construction was adhered to in the treaty with Spain for the purchase of Florida, 8 Stat. 252, the sixth article of which provided that the inhabitants should " be incorporated into the Union of the United States, as soon as may be consistent with the principles of the Federal Constitution ; " and the fifteenth article of which agreed that Spanish vessels coming directly from Spanish ports and laden with productions of Spanish growth or manufacture, should be admitted, for the term of twelve years, to the ports of Pensacola and St. Augustine, " without paying other or higher duties on their cargoes, or of tonnage, than will be paid by the vessels of the United States," and that " during the said term no other nation shall enjoy the same privileges within the ceded territories."

So, too, in the act annexing the Republic of Hawaii, there was a provision continuing in effect the customs relations of the Hawaiian Islands with the United States and other countries, the effect of which was to compel the collection in those islands of a duty upon certain articles, whether coming from the United States or other countries, much greater than the duty provided by the general tariff law then in force. This was a discrimination against the Hawaiian ports wholly inconsistent with the revenue clauses of the Constitution, if such clauses were there operative.

The very treaty with Spain under discussion in this case contains similar discriminative provisions, which are apparently irreconcilable with the Constitution, if that instrument be held to extend to these islands immediately upon their cession to the United States. By Art. IV the United States agree " for the term of ten years from the date of the exchange of the ratifications of the present treaty, to admit Spanish ships and merchandise to the ports of the Philippine Islands on the same terms as ships and merchandise of the United States "—a privilege not extending to any other ports. It was a clear breach of the uniformity clause in question, and a manifest excess of authority on the part of the commissioners, if ports of the Philippine Islands be ports of the United States.

So, too, by Art. XIII, " Spanish scientific, literary and artistic works . . . shall be continued to be admitted free of

duty in such territories, for the period of ten years, to be reckoned from the date of the exchange of the ratifications of this treaty." This is also a clear discrimination in favor of Spanish literary productions into particular ports.

Notwithstanding these provisions for the incorporation of territories into the Union, Congress, not only in organizing the territory of Louisiana by act of March 26, 1804, but all other territories carved out of this vast inheritance, has assumed that the Constitution did not extend to them of its own force, and has in each case made special provision, either that their legislatures shall pass no law inconsistent with the Constitution of the United States, or that the Constitution or laws of the United States shall be the supreme law of such territories. Finally, in Rev. Stat. sec. 1891, a general provision was enacted that "the Constitution and all laws of the United States which are not locally inapplicable shall have the same force and effect within all the organized territories, and in every territory hereafter organized, as elsewhere within the United States."

So, too, on March 6, 1820, 3 Stat. 545, c. 22, in an act authorizing the people of Missouri to form a state government, after a heated debate, Congress declared that in the territory of Louisiana north of 36° 30' slavery should be forever prohibited. It is true that, for reasons which have become historical, this act was declared to be unconstitutional in *Scott* v. *Sandford*, 19 How. 393, but it is none the less a distinct annunciation by Congress of power over property in the territories which it obviously did not possess in the several States.

The researches of counsel have collated a large number of other instances, in which Congress has in its enactments recognized the fact that provisions intended for the States did not embrace the territories, unless specially mentioned. These are found in the laws prohibiting the slave trade with "the United States or territories thereof;" or equipping ships "in any port or place within the *jurisdiction* of the United States;" in the internal revenue laws, in the early ones of which no provision was made for the collection of taxes in the territory not included within the boundaries of the existing States, and others of which extended them expressly to the territories, or " within

the exterior boundaries of the United States; " and in the acts extending the internal revenue laws to the Territories of Alaska and Oklahoma. It would prolong this opinion unnecessarily to set forth the provisions of these acts in detail. It is sufficient to say that Congress has or has not applied the revenue laws to the territories, as the circumstances of each case seemed to require, and has specifically legislated for the territories whenever it was its intention to execute laws beyond the limits of the States. Indeed, whatever may have been the fluctuations of opinion in other bodies, (and even this court has not been exempt from them,) Congress has been consistent in recognizing the difference between the States and territories under the Constitution.

The decisions of this court upon this subject have not been altogether harmonious. Some of them are based upon the theory that the Constitution does not apply to the territories without legislation. Other cases, arising from territories where such legislation has been had, contain language which would justify the inference that such legislation was unnecessary, and that the Constitution took effect immediately upon the cession of the territory to the United States. It may be remarked, upon the threshold of an analysis of these cases, that too much weight must not be given to general expressions found in several opinions that the power of Congress over territories is complete and supreme, because these words may be interpreted as meaning only supreme under the Constitution; nor upon the other hand, to general statements that the Constitution covers the territories as well as the States, since in such cases it will be found that acts of Congress had already extended the Constitution to such territories, and that thereby it subordinated not only its own acts, but those of the territorial legislatures, to what had become the supreme law of the land. "It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious. The question actually

before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated." *Cohens* v. *Virginia*, 6 Wheat. 264, 399.

The earliest case is that of *Hepburn* v. *Ellzey*, 2 Cranch, 445, in which this court held that, under that clause of the Constitution limiting the jurisdiction of the courts of the United States to controversies between citizens of different *States*, a citizen of the District of Columbia could not maintain an action in the Circuit Court of the United States. It was argued that the word "State," in that connection, was used simply to denote a distinct political society. "But," said the Chief Justice, "as the act of Congress obviously used the word 'State' in reference to that term as used in the Constitution, it becomes necessary to inquire whether Columbia is a State in the sense of that instrument. The result of that examination is a conviction that the members of the American confederacy only are the States contemplated in the Constitution, . . . and excludes from the term the signification attached to it by writers on the law of nations." This case was followed in *Barney* v. *Baltimore City*, 6 Wall. 280, and quite recently in *Hooe* v. *Jamieson*, 166 U. S. 395. The same rule was applied to citizens of territories in *New Orleans* v. *Winter*, 1 Wheat. 91, in which an attempt was made to distinguish a territory from the District of Columbia. But it was said that "neither of them is a *State* in the sense in which that term is used in the Constitution." In *Scott* v. *Jones*, 5 How. 343, and in *Miners' Bank* v. *Iowa*, 12 How. 1, it was held that under the Judiciary Act, permitting writs of error to the Supreme Court of a State, in cases where the validity of a *state statute* is drawn in question, an act of a territorial legislature was not within the contemplation of Congress.

*Loughborough* v. *Blake*, 5 Wheat. 317, was an action of trespass (or, as appears by the original record, *replevin*) brought in the Circuit Court for the District of Columbia to try the right of Congress to impose a direct tax for general purposes on that District. 3 Stat. 216, c. 60, Feb. 17, 1815. It was insisted that Congress could act in a double capacity: in one as legislating

for the States; in the other as a local legislature for the District of Columbia. In the latter character, it was admitted that the power of levying direct taxes might be exercised, but for District purposes only, as a state legislature might tax for state purposes; but that it could not legislate for the District under Art. I, sec. 8, giving to Congress the power " to lay and collect taxes, imposts and excises," which " shall be uniform throughout the United States," inasmuch as the District was no part of the United States. It was held that the grant of this power was a general one without limitation as to place, and consequently extended to all places over which the government extends; and that it extended to the District of Columbia as a constituent part of the United States. The fact that Art. I, sec. 20, declares that " representatives and direct taxes shall be apportioned among the several States . . . according to their respective numbers," furnished a standard by which taxes were apportioned; but not to exempt any part of the country from their operation. " The words used do not mean, that direct taxes shall be imposed on States only which are represented, or shall be apportioned to representatives; but that direct taxation, in its application to States, shall be apportioned to numbers." That Art. I, sec. 9, ¶ 4, declaring that direct taxes shall be laid in proportion to the census, was applicable to the District of Columbia, " and will enable Congress to apportion on it its just and equal share of the burden, with the same accuracy as on the respective States. If the tax be laid in this proportion, it is within the very words of the restriction. It is a tax in proportion to the census or enumeration referred to." It was further held that the words of the ninth section did not " in terms require that the system of direct taxation, when resorted to, shall be extended to the territories, as the words of the second section require that it shall be extended to all the States. They therefore may, without violence, be understood to give a rule when the territories shall be taxed without imposing the necessity of taxing them."

There could be no doubt as to the correctness of this conclusion, so far, at least, as it applied to the District of Columbia. This District had been a part of the States of Maryland and

Virginia. It had been subject to the Constitution, and was a part of the United States. The Constitution had attached to it irrevocably. There are steps which can never be taken backward. The tie that bound the States of Maryland and Virginia to the Constitution could not be dissolved, without at least the consent of the Federal and state governments to a formal separation. The mere cession of the District of Columbia to the Federal government relinquished the authority of the States, but it did not take it out of the United States or from under the ægis of the Constitution. Neither party had ever consented to that construction of the cession. If, before the District was set off, Congress had passed an unconstitutional act, affecting its inhabitants, it would have been void. If done after the District was created, it would have been equally void; in other words, Congress could not do indirectly by carving out the District what it could not do directly. The District still remained a part of the United States, protected by the Constitution. Indeed, it would have been a fanciful construction to hold that territory which had been once a part of the United States ceased to be such by being ceded directly to the Federal government.

In delivering the opinion, however, the Chief Justice made certain observations which have occasioned some embarrassment in other cases. "The power," said he, "to lay and collect duties, imposts, and excises may be exercised, and must be exercised, throughout the United States. Does this term designate the whole, or any particular portion of the American empire? Certainly this question can admit but of one answer. It is the name given to our great republic, which is composed of States and territories. The District of Columbia, or the territory west of the Missouri, is not less within the United States than Maryland and Pennsylvania; and it is not less necessary, on the principles of our Constitution, that uniformity in the imposition of imposts, duties and excises, should be observed in the one, than in the other. Since, then, the power to lay and collect taxes, which includes direct taxes, is obviously coextensive with the power to lay and collect duties, imposts and excises, and since the latter extends throughout the United States, it follows, that the power to impose direct taxes also extends through-

out the United States." So far as applicable to the District of Columbia, these observations are entirely sound. So far as they apply to the territories, they were not called for by the exigencies of the case.

In line with *Loughborough* v. *Blake* is the case of *Callan* v. *Wilson*, 127 U. S. 540, in which the provisions of the Constitution relating to trial by jury were held to be in force in the District of Columbia. Upon the other hand, in *Geofroy* v. *Riggs*, 133 U. S. 258, the District of Columbia, as a political community, was held to be one of "the States of the Union" within the meaning of that term as used in a consular convention of February 23, 1853, with France. The seventh article of that convention provided that in all the States of the Union, whose existing laws permitted it, Frenchmen should enjoy the right of holding, disposing of and inheriting property in the same manner as citizens of the United States; and as to the States of the Union, by whose existing laws aliens were not permitted to hold real estate, the President engaged to recommend to them the passage of such laws as might be necessary for the purpose of conferring this right. The court was of opinion that if these terms, "States of the Union," were held to exclude the District of Columbia and the territories, our government would be placed in the inconsistent position of stipulating that French citizens should enjoy the right of holding, disposing of and inheriting property in like manner as citizens of the United States, in States whose laws permitted it, and engaging that the President should recommend the passage of laws conferring that right in States whose laws did not permit aliens to hold real estate, while at the same time refusing to citizens of France, holding property in the District of Columbia and in some of the territories, where the power of the United States is in that respect unlimited, a like release from the disabilities of alienage, "thus discriminating against them in favor of citizens of France holding property in States having similar legislation. No plausible motive can be assigned for such discrimination. A right which the government of the United States apparently desires that citizens of France should enjoy in all the States it would hardly refuse to them in the district

embracing its capital, or in any of its own territorial dependencies."

This case may be considered as establishing the principle that, in dealing with foreign sovereignties, the term "United States" has a broader meaning than when used in the Constitution, and includes all territories subject to the jurisdiction of the Federal government, wherever located. In its treaties and conventions with foreign nations this government is a unit. This is so not because the territories comprised a part of the government established by the people of the States in their Constitution, but because the Federal government is the only authorized organ of the territories, as well as of the States, in their foreign relations. By Art. I, sec. 10, of the Constitution, "no State shall enter into any treaty, alliance or confederation, . . . or enter into any agreement or compact with another State, or with a foreign power." It would be absurd to hold that the territories, which are much less independent than the States, and are under the direct control and tutelage of the general government, possess a power in this particular which is thus expressly forbidden to the States.

It may be added in this connection that, to put at rest all doubts regarding the applicability of the Constitution to the District of Columbia, Congress by the act of February 21, 1871, c. 62, 16 Stat. 419, 426, sec. 34, specifically extended the Constitution and laws of the United States to this District.

The case of *American Ins. Co.* v. *Canter*, 1 Pet. 511, originated in a libel filed in the District Court of South Carolina, for the possession of 356 bales of cotton, which had been wrecked on the coast of Florida, abandoned to the insurance companies, and subsequently brought to Charleston. Canter claimed the cotton as *bona fide* purchaser at a marshal's sale at Key West, by virtue of a decree of a territorial court consisting of a notary and five jurors, proceeding under an act of the governor and legislative council of Florida. The case turned upon the question whether the sale by that court was effectual to divest the interest of the underwriters. The District Judge pronounced the proceedings a nullity, and rendered a decree from which both parties appealed to the Circuit Court. The Circuit Court

reversed the decree of the District Court upon the ground that the proceedings of the court at Key West were legal, and transferred the property to Canter, the alleged purchaser.

The opinion of the Circuit Court was delivered by Mr. Justice Johnson of the Supreme Court, and is published in full in a note in Peters' Reports. It was argued that the Constitution vested the admiralty jurisdiction exclusively in the general government; that the legislature of Florida had exercised an illegal power in organizing this court, and that its decrees were void. On the other hand, it was insisted that this was a court of separate and distinct jurisdiction from the courts of the United States, and as such its acts were not to be reviewed in a foreign tribunal, such as was the court of South Carolina; "that the District of Florida was not part of the United States, but only an acquisition or dependency, and as such the Constitution *per se* had no binding effect in or over it." "It becomes," said the court "indispensable to the solution of these difficulties, that we should conceive a just idea of the relation in which Florida stands to the United States. . . . And, first, it is obvious that there is a material distinction between the territory now under consideration, and that which is acquired from the aborigines (whether by purchase or conquest) *within* the acknowledged limits of the United States, as also that which is acquired by the establishment of a disputed line. As to both these there can be no question, that the sovereignty of the State or territory within which it lies, and of the United States, immediately attach, producing a complete subjection to all the laws and institutions of the two governments, local and general, unless modified by treaty. The question now to be considered, relates to territories previously subject to the acknowledged jurisdiction of another sovereign, such as was Florida to the crown of Spain. And on this subject, we have the most explicit proof, that the understanding of our public functionaries, is, that the government and laws of the United States do not extend to such territory by the mere act of cession. For, in the act of Congress of March 30, 1822, section nine, we have an enumeration of the acts of Congress, which are to be held in force in the territory; and in the tenth section an enumeration, in the nature of a bill

of rights, of privileges and immunities, which could not be denied to the inhabitants of the territory, if they came under the Constitution by the mere act of cession. . . . These States, this territory, and future *States* to be admitted into the Union are the sole objects of the Constitution; there is no express provision whatever made in the Constitution for the acquisition or government of territories beyond those limits." He further held that the right of acquiring territory was altogether incidental to the treaty-making power; that their government was left to Congress; that the territory of Florida did "not stand in the relation of a State to the United States;" that the acts establishing a territorial government were the constitution of Florida; that while, under these acts, the territorial legislature could enact nothing inconsistent with what Congress had made inherent and permanent in the territorial government, it had not done so in organizing the court at Key West.

From the decree of the Circuit Court the underwriters appealed to this court, and the question was argued whether the Circuit Court was correct in drawing a distinction between territories existing at the date of the Constitution and territories subsequently acquired. The main contention of the appellants was that the Superior Courts of Florida had been vested by Congress with exclusive jurisdiction in all admiralty and maritime cases; that salvage was such a case, and therefore any law of Florida giving jurisdiction in salvage cases to any other court was unconstitutional. On behalf of the purchaser it was argued that the Constitution and laws of the United States were not *per se* in force in Florida, nor the inhabitants citizens of the United States; that the Constitution was established by the people of the United States *for* the United States; that if the Constitution were in force in Florida it was unnecessary to pass an act extending the laws of the United States to Florida. "What is Florida?" said Mr. Webster. "It is no part of the United States. How can it be? How is it represented? Do the laws of the United States reach Florida? Not unless by particular provisions."

The opinion of Mr. Chief Justice Marshall in this case should be read in connection with Art. III, secs. 1 and 2, of the Con-

stitution, vesting " the judicial power of the United States " in
" one Supreme Court and in such inferior courts as Congress
may from time to time ordain and establish.   The judges both
of the Supreme Court and the inferior courts shall hold their
offices during good behavior," etc.   He held that the court
" should take into view the relation in which Florida stands to
the United States; " that territory ceded by treaty "becomes
a part of the nation to which it is annexed; either on the terms
stipulated in the treaty of cession, or upon such as its new mas-
ter shall impose."   That Florida, upon the conclusion of the
treaty, became a territory of the United States and subject to
the power of Congress under the territorial clause of the Con-
stitution.   The acts providing a territorial government for
Florida were examined in detail.   He held that the judicial
clause of the Constitution, above quoted, did not apply to Flor-
ida; that the judges of the Superior Courts of Florida held
their office for four years ; that " these courts are not constitu-
tional courts in which the judicial power conferred by the Con-
stitution on the general government, can be deposited; " that
" they are legislative courts, created in virtue of the general right
of sovereignty which exists in the government," or in virtue of
the territorial clause of the Constitution ; that the jurisdiction
with which they are invested is not a part of judicial power of
the Constitution, but is conferred by Congress, in the exercise
of those general powers which that body possesses over the
territories of the United States ; and that in legislating for them
Congress exercises the combined powers of the general and of a
state government.   The act of the territorial legislature, creat-
ing the court in question, was held not to be "inconsistent with
the laws and Constitution of the United States," and the decree
of the Circuit Court was affirmed.

As the only judicial power vested in Congress is to create
courts whose judges shall hold their offices during good be-
havior, it necessarily follows that, if Congress authorizes the
creation of courts and the appointment of judges for a limited
time, it must act independently of the Constitution, and upon
territory which is not part of the United States within the
meaning of the Constitution.   In delivering his opinion in this

case Mr. Chief Justice Marshall made no reference whatever to the prior case of *Loughborough* v. *Blake,* 5 Wheat. 317, in which he had intimated that the territories were part of the United States. But if they be a part of the United States, it is difficult to see how Congress could create courts in such territories, except under the judicial clause of the Constitution. The power to make needful rules and regulations would certainly not authorize anything inconsistent with the Constitution if it applied to the territories. Certainly no such court could be created within a State, except under the restrictions of the judicial clause. It is sufficient to say that this case has ever since been accepted as authority for the proposition that the judicial clause of the Constitution has no application to courts created in the territories, and that with respect to them Congress has a power wholly unrestricted by it. We must assume as a logical inference from this case that the other powers vested in Congress by the Constitution have no application to these territories, or that the judicial clause is exceptional in that particular.

This case was followed in *Benner* v. *Porter,* 9 How. 235, in which it was held that the jurisdiction of these territorial courts ceased upon the admission of Florida into the Union, Mr. Justice Nelson remarking of them (p. 242) that "they are not organized under the Constitution, nor subject to its complex distribution of the powers of government, as the organic law; but are the creations, exclusively, of the legislative department, and subject to its supervision and control. Whether, or not, there are provisions in that instrument which extend to and act upon these territorial governments, it is not now material to examine. We are speaking here of those provisions that refer particularly to the distinction between Federal and State jurisdiction. . . . (p. 244.) Neither were they organized by Congress under the Constitution, as they were invested with powers and jurisdiction which that body were incapable of conferring upon a court within the limits of a State." To the same effect are *Clinton* v. *Englebrecht,* 13 Wall. 434; *Good* v. *Martin,* 95 U. S. 90, 98, and *McAllister* v. *United States,* 141 U. S. 174.

That the power over the territories is vested in Congress

without limitation, and that this power has been considered the foundation upon which the territorial governments rest, was also asserted by Chief Justice Marshall in *McCulloch* v. *Maryland*, 4 Wheat. 316, 422, and in *United States* v. *Gratiot*, 14 Pet. 526. So, too, in *Mormon Church* v. *United States*, 136 U. S. 1, in holding that Congress had power to repeal the charter of the church, Mr. Justice Bradley used the following forceful language: "The power of Congress over the territories of the United States is general and plenary, arising from and incidental to the right to acquire the territory itself, and from the power given by the Constitution to make all needful rules and regulations respecting the territory or other property belonging to the United States. It would be absurd to hold that the United States has power to acquire territory, and no power to govern it when acquired. The power to acquire territory, other than the Territory northwest of the Ohio River, (which belonged to the United States at the adoption of the Constitution,) is derived from the treaty-making power and the power to declare and carry on war. The incidents of these powers are those of national sovereignty, and belong to all independent governments. The power to make acquisitions of territory by conquest, by treaty and by cession is an incident of national sovereignty. The territory of Louisiana, when acquired from France, and the territories west of the Rocky Mountains, when acquired from Mexico, became the absolute property and domain of the United States, subject to such conditions as the government, in its diplomatic negotiations, had seen fit to accept relating to the rights of the people then inhabiting those territories. Having rightfully acquired said territories, the United States government was the only one which could impose laws upon them, and its sovereignty over them was complete. . . . Doubtless Congress, in legislating for the territories would be subject to those fundamental limitations in favor of personal rights which are formulated in the Constitution and its amendments; but these limitations would exist rather by inference and the general spirit of the Constitution from which Congress derives all its powers, than by any express and direct application of its provisions." See also, to the same

effect, *National Bank* v. *County of Yankton,* 101 U. S. 129; *Murphy* v. *Ramsey,* 114 U. S. 15.

In *Webster* v. *Reid,* 11 How. 437, it was held that a law of the Territory of Iowa, which prohibited the trial by jury of certain actions at law, founded on contract to recover payment for services, was void; but the case is of little value as bearing upon the question of the extension of the Constitution to that Territory, inasmuch as the organic law of the Territory of Iowa, by express provision and by reference, extended the laws of the United States, including the ordinance of 1787, (which provided expressly for jury trials,) so far as they were applicable; and the case was put upon this ground. 5 Stat. 235, 239, sec. 12.

In *Reynolds* v. *United States,* 98 U. S. 145, a law of the Territory of Utah, providing for grand juries of fifteen persons, was held to be constitutional, though Rev. Stat. sec. 808 required that a grand jury empanelled before any Circuit or District Court of the United States shall consist of not less than sixteen nor more than twenty-three persons. Section 808 was held to apply only to the Circuit and District Courts. The territorial courts were free to act in obedience to their own laws.

In *Ross's Case,* 140 U. S. 453, petitioner had been convicted by the American Consular Tribunal in Japan, of a murder committed upon an American vessel in the harbor of Yokohama, and sentenced to death. There was no indictment by a grand jury, and no trial by a petit jury. This court affirmed the conviction, holding that the Constitution had no application, since it was ordained and established "for the United States of America," and not for countries outside of their limits. "The guarantees it affords against accusation of capital or infamous crimes, except by indictment or presentment by a grand jury, and for an impartial trial by a jury when thus accused, apply only to citizens and others within the United States, or who are brought there for trial for alleged offences committed elsewhere, and not to residents and temporary sojourners abroad."

In *Springville* v. *Thomas,* 166 U. S. 707, it was held that a verdict returned by less than the whole number of jurors was invalid, because in contravention of the Seventh Amendment to the Constitution and the act of Congress of April 7, 1874, c.

80, 18 Stat. 27, which provide " that no party has been or shall be deprived of the right of trial by jury in cases cognizable at common law." It was also intimated that Congress "could not impart the power to change the constitutional rule," which was obviously true with respect to Utah, since the organic act of that Territory had expressly extended to it the Constitution and laws of the United States. As we have already held, that provision once made could not be withdrawn. If the Constitution could be withdrawn directly, it could be nullified indirectly by acts passed inconsistent with it. The Constitution would thus cease to exist as such, and become of no greater authority than an ordinary act of Congress. In *American Pub. Co.* v. *Fisher*, 166 U. S. 464, a similar law providing for majority verdicts was put upon the express ground above stated, that the organic act of Utah extended the Constitution over that Territory. These rulings were repeated in *Thompson* v. *Utah*, 170 U. S. 343, and applied to felonies committed before the Territory became a State, although the state constitution continued the same provision.

Eliminating, then, from the opinions of this court all expressions unnecessary to the disposition of the particular case, and gleaning therefrom the exact point decided in each, the following propositions may be considered as established:

1. That the District of Columbia and the territories are not States, within the judicial clause of the Constitution giving jurisdiction in cases between citizens of different States;

2. That territories are not States, within the meaning of Revised Statutes, sec. 709, permitting writs of error from this court in cases where the validity of a *state* statute is drawn in question;

3. That the District of Columbia and the territories are States, as that word is used in treaties with foreign powers, with respect to the ownership, disposition and inheritance of property;

4. That the territories are not within the clause of the Constitution providing for the creation of a Supreme Court and such inferior courts as Congress may see fit to establish;

5. That the Constitution does not apply to foreign countries or to trials therein conducted, and that Congress may lawfully

provide for such trials before consular tribunals, without the intervention of a grand or petit jury;

6. That where the Constitution has been once formally extended by Congress to territories, neither Congress nor the territorial legislature can enact laws inconsistent therewith.

The case of *Dred Scott* v. *Sandford,* 19 How. 393, remains to be considered. This was an action of trespass *vi et armis* brought in the Circuit Court for the District of Missouri by Scott, alleging himself to be a citizen of Missouri, against Sandford, a citizen of New York. Defendant pleaded to the jurisdiction that Scott was not a citizen of the State of Missouri, because a negro of African descent, whose ancestors were imported as negro slaves. Plaintiff demurred to this plea and the demurrer was sustained; whereupon, by stipulation of counsel and with leave of the court, defendant pleaded in bar the general issue, and specially that the plaintiff was a slave and the lawful property of defendant, and, as such, he had a right to restrain him. The wife and children of the plaintiff were also involved in the suit.

The facts in brief were, that plaintiff had been a slave belonging to Dr. Emerson, a surgeon in the army; that, in 1834, Emerson took the plaintiff from the State of Missouri to Rock Island, Illinois, and subsequently to Fort Snelling, Minnesota, (then known as Upper Louisiana,) and held him there until 1838. Scott married his wife there, of whom the children were subsequently born. In 1838 they returned to Missouri.

Two questions were presented by the record: First, whether the Circuit Court had jurisdiction; and, second, if it had jurisdiction, was the judgment erroneous or not? With regard to the first question, the court stated that it was its duty " to decide whether the facts stated in the plea are or are not sufficient to show that the plaintiff is not entitled to sue as a citizen in a court of the United States," and that the question was whether " a negro, whose ancestors were imported into this country, and sold as slaves, became a member of the political community formed and brought into existence by the Constitution of the United States, and as such entitled to all the rights and privileges and immunities guaranteed by that instrument to the citizen, one of which rights is the privilege of suing in a court

of the United States." It was held that he was not, and was not included under the words "citizens" in the Constitution, and therefore could claim "none of the rights and privileges which that instrument provides for and secures to citizens of the United States;" that it did not follow because he had all the rights and privileges of a citizen of a State, he must be a citizen of the United States; that no State could by any law of its own "introduce a new member into the political community created by the Constitution;" that the African race was not intended to be included, and formed no part of the people who framed and adopted the Declaration of Independence. The question of the *status* of negroes in England and the several States was considered at great length by the Chief Justice, and the conclusion reached that Scott was not a citizen of Missouri, and that the Circuit Court had no jurisdiction of the case.

This was sufficient to dispose of the case without reference to the question of slavery; but, as the plaintiff insisted upon his title to freedom and citizenship by the fact that he and his wife, though born slaves, were taken by their owner and kept four years in Illinois and Minnesota, they thereby became free, and upon their return to Missouri became citizens of that State, the Chief Justice proceeded to discuss the question whether Scott was still a slave. As the court had decided against his citizenship upon the plea in abatement, it was insisted that further decision upon the question of his freedom or slavery was extrajudicial and mere *obiter dicta*. But the Chief Justice held that the correction of one error in the court below did not deprive the appellate court of the power of examining further into the record and correcting any other material error which may have been committed; that the error of an inferior court in actually pronouncing judgment for one of the parties, in a case in which it had no jurisdiction, can be looked into or corrected by this court, even though it had decided a similar question presented in the pleadings.

Proceeding to decide the case upon the merits, he held that the territorial clause of the Constitution was confined to the territory which belonged to the United States at the time the Con-

stitution was adopted, and did not apply to territory subsequently acquired from a foreign government.

In further examining the question as to what provision of the Constitution authorizes the Federal government to acquire territory outside of the original limits of the United States and what powers it may exercise therein over the person or property of a citizen of the United States, he made use of the following expressions, upon which great reliance is placed by the plaintiff in this case (p. 446): "There is certainly no power given by the Constitution to the Federal government to establish or maintain colonies bordering on the United States or at a distance, to be ruled and governed at its own pleasure; . . . and if a new State is admitted, it needs no further legislation by Congress, because the Constitution itself defines the relative rights and powers and duties of the State, and the citizens of the State, and the Federal government. But no power is given to acquire a territory to be held and governed permanently in that character."

He further held that citizens who migrate to a territory cannot be ruled as mere colonists, and that while Congress had the power of legislating over territories until States were formed from them, it could not deprive a citizen of his property merely because he brought it into a particular territory of the United States, and that this doctrine applied to slaves as well as to other property. Hence, it followed that the act of Congress which prohibited a citizen from holding and owning slaves in territories north of 36° 30' (known as the Missouri Compromise) was unconstitutional and void, and the fact that Scott was carried into such territory, referring to what is now known as Minnesota, did not entitle him to his freedom.

He further held that, whether he was made free by being taken into the free State of Illinois and being kept there two years, depended upon the laws of Missouri and not those of Illinois, and that by the decisions of the highest court of that State his *status* as a slave continued, notwithstanding his residence of two years in Illinois.

It must be admitted that this case is a strong authority in favor of the plaintiff, and if the opinion of the Chief Justice be

taken at its full value it is decisive in his favor. We are not, however, bound to overlook the fact that, before the Chief Justice gave utterance to his opinion upon the merits, he had already disposed of the case adversely to the plaintiff upon the question of jurisdiction, and that, in view of the excited political condition of the country at the time, it is unfortunate that he felt compelled to discuss the question upon the merits, particularly so in view of the fact that it involved a ruling that an act of Congress, which had been acquiesced in for thirty years, was declared unconstitutional. It would appear from the opinion of Mr. Justice Wayne that the real reason for discussing these constitutional questions was that "there had become such a difference of opinion" about them "that the peace and harmony of the country required the settlement of them by judicial decision." (p. 455.) The attempt was not successful. It is sufficient to say that the country did not acquiesce in the opinion, and that the civil war, which shortly thereafter followed, produced such changes in judicial, as well as public sentiment, as to seriously impair the authority of this case.

While there is much in the opinion of the Chief Justice which tends to prove that he thought all the provisions of the Constitution extended of their own force to the territories west of the Mississippi, the question actually decided is readily distinguishable from the one involved in the cause under consideration. The power to prohibit slavery in the territories is so different from the power to impose duties upon territorial products, and depends upon such different provisions of the Constitution, that they can scarcely be considered as analogous, unless we assume broadly that every clause of the Constitution attaches to the territories as well as to the States—a claim quite inconsistent with the position of the court in the *Canter* case. If the assumption be true, that slaves are indistinguishable from other property, the inference from the *Dred Scott* case is irresistible that Congress had no power to prohibit their introduction into a territory. It would scarcely be insisted that Congress could with one hand invite settlers to locate in the territories of the United States, and with the other deny them the right to take their property and belongings with them. The two

are so inseparable from each other that one could scarcely be granted and the other withheld without an exercise of arbitrary power inconsistent with the underlying principles of a free government. It might indeed be claimed with great plausibility that such a law would amount to a deprivation of property within the Fourteenth Amendment. The difficulty with the *Dred Scott* case was that the court refused to make a distinction between property in general, and a wholly exceptional class of property. Mr. Benton tersely stated the distinction by saying that the Virginian might carry his slave into the territories, but he could not carry with him the Virginian law which made him a slave.

In his history of the *Dred Scott* case, Mr. Benton states that the doctrine of the Constitution extended to territories as well as to States, first made its appearance in the Senate in the session of 1848–1849, by an attempt to amend a bill giving territorial government to California, New Mexico and Utah, (itself "hitched on" to a general appropriation bill,) by adding the words "that the Constitution of the United States and all and singular the several acts of Congress (describing them,) be and the same hereby are extended and given full force and efficacy in said territories." Says Mr. Benton: "The novelty and strangeness of this proposition called up Mr. Webster, who repulsed as an absurdity and as an impossibility the scheme of extending the Constitution to the territories, declaring that instrument to have been made for States, not territories; that Congress governed the territories independently of the Constitution and incompatibly with it; that no part of it went to a territory but what Congress chose to send; that it could not act of itself anywhere, not even in the States for which it was made, and that it required an act of Congress to put it in operation before it had effect anywhere. Mr. Clay was of the same opinion and added: 'Now, really, I must say the idea that *eo instanti*, upon the consummation of the treaty, the Constitution of the United States spread itself over the acquired territory and carried along with it the institution of slavery, is so irreconcilable with my comprehension, or any reason I possess, that I hardly know how to meet it.' Upon the other hand, Mr. Cal-

houn boldly avowed his intent to carry slavery into them under the wing of the Constitution, and denounced as enemies of the South all who opposed it."

The amendment was rejected by the House, and a contest brought on which threatened the loss of the general appropriation bill in which this amendment was incorporated, and the Senate finally receded from its amendment. "Such," said Mr. Benton, "were the portentous circumstances under which this new doctrine first revealed itself in the American Senate, and then as needing legislative sanction requiring an act of Congress to carry the Constitution into the territories and to give it force and efficacy there." Of the *Dred Scott* case he says.: "I conclude this introductory note with recurring to the great fundamental error of the court, (father of all the political errors,) that of assuming the extension of the Constitution to the territories. I call it assuming, for it seems to be a naked assumption without a reason to support it, or a leg to stand upon, condemned by the Constitution itself, and the whole history of its formation and administration. Who were the parties to it? The States alone. Their delegates framed it in the Federal convention; their citizens adopted it in the state conventions. The Northwest Territory was then in existence and it had been for three years; yet it had no voice either in the framing or adopting of the instrument, no delegate at Philadelphia, no submission of it to their will for adoption. The preamble shows it made by States. Territories are not alluded to in it."

Finally, in summing up the results of the decisions holding the invalidity of the Missouri Compromise and the self-extension of the Constitution to the territories, he declares " that the desions conflict with the uniform action of all the departments of the Federal government from its foundation to the present time, and cannot be received as rules governing Congress and the people without reversing that action, and admitting the political supremacy of the court, and accepting an altered Constitution from its hands and taking a new and portentous point of departure in the working of the government."

To sustain the judgment in the case under consideration it by no means becomes necessary to show that none of the articles

of the Constitution apply to the Island of Porto Rico. There is a clear distinction between such prohibitions as go to the very root of the power of Congress to act at all, irrespective of time or place, and such as are operative only "throughout the United States" or among the several States.

Thus, when the Constitution declares that "no bill of attainder or *ex post facto* law shall be passed," and that "no title of nobility shall be granted by the United States," it goes to the competency of Congress to pass a bill *of that description*. Perhaps, the same remark may apply to the First Amendment, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people to peacefully assemble, and to petition the government for a redress of grievances." We do not wish, however, to be understood as expressing an opinion how far the bill of rights contained in the first eight amendments is of general and how far of local application.

Upon the other hand, when the Constitution declares that all duties shall be uniform "throughout the United States," it becomes necessary to inquire whether there be any territory over which Congress has jurisdiction which is not a part of the "United States," by which term we understand the *States* whose people *united* to form the Constitution, and such as have since been admitted to the Union upon an equality with them. Not only did the people in adopting the Thirteenth Amendment thus recognize a distinction between the United States and "any place subject to their jurisdiction," but Congress itself, in the act of March 27, 1804, c. 56, 2 Stat. 298, providing for the proof of public records, applied the provisions of the act not only to "every court and office within the United States," but to the "courts and offices of the respective territories of the United States, and countries subject to the jurisdiction of the United States," as to the courts and offices of the several States. This classification, adopted by the Eighth Congress, is carried into the Revised Statutes as follows:

"SEC. 905. The acts of the legislature of any State or Terri-

tory, or of any country subject to the jurisdiction of the United States, shall be authenticated," etc.

"Sec. 906. All records and exemplifications of books, which may be kept in any public office of any State or Territory, or any country subject to the jurisdiction of the United States," etc.

. Unless these words are to be rejected as meaningless, we must treat them as a recognition by Congress of the fact that there may be territories subject to the jurisdiction of the United States, which are not *of* the United States.

In determining the meaning of the words of Article I, section 6, " uniform throughout the United States," we are bound to consider not only the provisions forbidding preference being given to the ports of one State over those of another, (to which attention has already been called,) but the other clauses declaring that no tax or duty shall be laid on articles exported from any State, and that no State shall, without the consent of Congress, lay any imposts or duties upon imports or exports, nor any duty on tonnage. The object of all of these was to protect the States which united in forming the Constitution from discriminations by Congress, which would operate unfairly or injuriously upon some States and not equally upon others. The opinion of Mr. Justice White in *Knowlton* v. *Moore*, 178 U. S. 41, contains an elaborate historical review of the proceedings in the convention, which resulted in the adoption of these different clauses and their arrangement, and he there comes to the conclusion (p. 105) that " although the provision as to preference between ports and that regarding uniformity of duties, imposts and excises were one in purpose, one in their adoption," they were originally placed together, and " became separate only in arranging the Constitution for the purpose of style." Thus construed together, the purpose is irresistible that the words " throughout the United States " are indistinguishable from the words " among or between the several States," and that these prohibitions were intended to apply only to commerce between ports of the several States as they then existed or should thereafter be admitted to the Union.

Indeed, the practical interpretation put by Congress upon the Constitution has been long continued and uniform to the effect

that the Constitution is applicable to territories acquired by purchase or conquest only when and so far as Congress shall so direct. Notwithstanding its duty to " guarantee to every State in this Union a republican form of government," Art. IV, sec. 4, by which we understand, according to the definition of Webster, " a government in which the supreme power resides in the whole body of the people, and is exercised by representatives elected by them," Congress did not hesitate, in the original organization of the territories of Louisiana, Florida, the Northwest Territory, and its subdivisions of Ohio, Indiana, Michigan, Illinois and Wisconsin, and still more recently in the case of Alaska, to establish a form of government bearing a much greater analogy to a British crown colony than a republican State of America, and to vest the legislative power either in a governor and council, or a governor and judges, to be appointed by the President. It was not until they had attained a certain population that power was given them to organize a legislature by vote of the people. In all these cases, as well as in Territories subsequently organized west of the Mississippi, Congress thought it necessary either to extend the Constitution and laws of the United States over them, or to declare that the inhabitants should be entitled to enjoy the right of trial by jury, of bail, and of the privilege of the writ of *habeas corpus*, as well as other privileges of the bill of rights.

We are also of opinion that the power to acquire territory by treaty implies not only the power to govern such territory, but to prescribe upon what terms the United States will receive its inhabitants, and what their *status* shall be in what Chief Justice Marshall termed the " American Empire." There seems to be no middle ground between this position and the doctrine that if their inhabitants do not become, immediately upon annexation, citizens of the United States, their children thereafter born, whether savages or civilized, are such, and entitled to all the rights, privileges and immunities of citizens. If such be their *status*, the consequences will be extremely serious. Indeed, it is doubtful if Congress would ever assent to the annexation of territory upon the condition that its inhabitants, however foreign they may be to our habits, traditions and modes

of life, shall become at once citizens of the United States. In all its treaties hitherto the treaty-making power has made special provision for this subject; in the cases of Louisiana and Florida, by stipulating that "the inhabitants shall be incorporated into the Union of the United States and admitted as soon as possible . . . to the enjoyment of all the rights, advantages and immunities of citizens of the United States;" in the case of Mexico, that they should "be incorporated into the Union, and be admitted at the proper time, (to be judged of by the Congress of the United States,) to the enjoyment of all the rights of citizens of the United States;" in the case of Alaska, that the inhabitants who remained three years, "with the exception of uncivilized native tribes, shall be admitted to the enjoyment of all the rights," etc.; and in the case of Porto Rico and the Philippines, "that the civil rights and political *status* of the native inhabitants . . . shall be determined by Congress." In all these cases there is an implied denial of the right of the inhabitants to American citizenship until Congress by further action shall signify its assent thereto.

Grave apprehensions of danger are felt by many eminent men—a fear lest an unrestrained possession of power on the part of Congress may lead to unjust and oppressive legislation, in which the natural rights of territories, or their inhabitants, may be engulfed in a centralized despotism. These fears, however, find no justification in the action of Congress in the past century, nor in the conduct of the British Parliament towards its outlying possessions since the American Revolution. Indeed, in the only instance in which this court has declared an act of Congress unconstitutional as trespassing upon the rights of territories, (the Missouri Compromise,) such action was dictated by motives of humanity and justice, and so far commanded popular approval as to be embodied in the Thirteenth Amendment to the Constitution. There are certain principles of natural justice inherent in the Anglo-Saxon character which need no expression in constitutions or statutes to give them effect or to secure dependencies against legislation manifestly hostile to their real interests. Even in the Foraker act itself, the constitutionality of which is so vigorously assailed, power

was given to the legislative assembly of Porto Rico to repeal the very tariff in question in this case, a power it has not seen fit to exercise. The words of Chief Justice Marshall in *Gibbons* v. *Ogden*, 9 Wheat. 1, with respect to the power of Congress to regulate commerce, are pertinent in this connection: "This power," said he, "like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution. . . . The wisdom and discretion of Congress, their identity with the people, and the influence which their constituents possess at elections, are, in this, as in many other instances, as that, for example, of declaring war, the sole restraints on which they have relied to secure them from its abuse. They are the restraints on which the people must often rely on solely, in all representative governments."

So, too, in *Johnson* v. *McIntosh*, 8 Wheat. 543, 589, it was said by him:

"The title by conquest is acquired and maintained by force. The conqueror prescribes its limits. Humanity, however, acting on public opinion, has established, as a general rule, that the conquered shall not be wantonly oppressed, and that their condition shall remain as eligible as is compatible with the objects of the conquest. Most usually, they are incorporated with the victorious nation, and become subjects or citizens of the government with which they are connected. The new and old members of the society mingle with each other; the distinction between them is gradually lost, and they make one people. Where this incorporation is practicable, humanity demands, and a wise policy requires, that the rights of the conquered to property should remain unimpaired; that the new subjects should be governed as equitably as the old, and that confidence in their security should gradually banish the painful sense of being separated from their ancient connections, and united by force to strangers.

"When the conquest is complete, and the conquered inhabitants can be blended with the conquerors, *or safely governed as a distinct people*, public opinion, which not even the conqueror can disregard, imposes these restraints upon him; and he can-

not neglect them without injury to his fame, and hazard to his power."

The following remarks of Mr. Justice White in the case of *Knowlton* v. *Moore*, 178 U. S. 41, 109, in which the court upheld the progressive features of the legacy tax, are also pertinent:

"The grave consequences which it is asserted must arise in the future if the right to levy a progressive tax be recognized involves in its ultimate aspect the mere assertion that free and representative government is a failure, and that the grossest abuses of power are foreshadowed unless the courts usurp a purely legislative function. If a case should ever arise, where an arbitrary and confiscatory exaction is imposed bearing the guise of a progressive or any other form of tax, it will be time enough to consider whether the judicial power can afford a remedy by applying inherent and fundamental principles for the protection of the individual, even though there be no express authority in the Constitution to do so."

It is obvious that in the annexation of outlying and distant possessions grave questions will arise from differences of race, habits, laws and customs of the people, and from differences of soil, climate and production, which may require action on the part of Congress that would be quite unnecessary in the annexation of contiguous territory inhabited only by people of the same race, or by scattered bodies of native Indians.

We suggest, without intending to decide, that there may be a distinction between certain natural rights, enforced in the Constitution by prohibitions against interference with them, and what may be termed artificial or remedial rights, which are peculiar to our own system of jurisprudence. Of the former class are the rights to one's own religious opinion and to a public expression of them, or, as sometimes said, to worship God according to the dictates of one's own conscience; the right to personal liberty and individual property; to freedom of speech and of the press; to free access to courts of justice, to due process of law and to an equal protection of the laws; to immunities from unreasonable searches and seizures, as well as cruel and unusual punishments; and to such other immunities as are in-

dispensable to a free government. Of the latter class are the rights to citizenship, to suffrage, *Minor* v. *Happersett,* 21 Wall. 162, and to the particular methods of procedure pointed out in the Constitution, which are peculiar to Anglo-Saxon jurisprudence, and some of which have already been held by the States to be unnecessary to the proper protection of individuals.

Whatever may be finally decided by the American people as to the *status* of these islands and their inhabitants—whether they shall be introduced into the sisterhood of States or be permitted to form independent governments—it does not follow that, in the meantime, awaiting that decision, the people are in the matter of personal rights unprotected by the provisions of our Constitution, and subject to the merely arbitrary control of Congress. Even if regarded as aliens, they are entitled under the principles of the Constitution to be protected in life, liberty and property. This has been frequently held by this court in respect to the Chinese, even when aliens, not possessed of the political rights of citizens of the United States. *Yick Wo* v. *Hopkins,* 118 U. S. 356; *Fong Yue Ting* v. *United States,* 149 U. S. 698; *Lem Moon Sing* v. *United States,* 158 U. S. 538, 547; *Wong Wing* v. *United States,* 163 U. S. 228. We do not desire, however, to anticipate the difficulties which would naturally arise in this connection, but merely to disclaim any intention to hold that the inhabitants of these territories are subject to an unrestrained power on the part of Congress to deal with them upon the theory that they have no rights which it is bound to respect.

Large powers must necessarily be entrusted to Congress in dealing with these problems, and we are bound to assume that they will be judiciously exercised. That these powers may be abused is possible. But the same may be said of its powers under the Constitution as well as outside of it. Human wisdom has never devised a form of government so perfect that it may not be perverted to bad purposes. It is never conclusive to argue against the possession of certain powers from possible abuses of them. It is safe to say that if Congress should venture upon legislation manifestly dictated by selfish interests, it would receive quick rebuke at the hands of the people. Indeed, it is scarcely possible that Congress could do a greater injustice

to these islands than would be involved in holding that it could not impose upon the States taxes and excises without extending the same taxes to them. Such requirement would bring them at once within our internal revenue system, including stamps, licenses, excises and all the paraphernalia of that system, and applying it to territories which have had no experience of this kind, and where it would prove an intolerable burden.

This subject was carefully considered by the Senate committee in charge of the Foraker bill, which found, after an examination of the facts, that property in Porto Rico was already burdened with a private debt amounting probably to $30,000,000; that no system of property taxation was or ever had been in force in the island, and that it probably would require two years to inaugurate one and secure returns from it; that the revenues had always been chiefly raised by duties on imports and exports, and that our internal revenue laws, if applied in that island, would prove oppressive and ruinous to many people and interests; that to undertake to collect our heavy internal revenue tax, far heavier than Spain ever imposed upon their products and vocations, would be to invite violations of the law so innumerable as to make prosecutions impossible, and to almost certainly alienate and destroy the friendship and good will of that people for the United States.

In passing upon the questions involved in this case and kindred cases, we ought not to overlook the fact that, while the Constitution was intended to establish a permanent form of government for the States which should elect to take advantage of its conditions, and continue for an indefinite future, the vast possibilities of that future could never have entered the minds of its framers. The States had but recently emerged from a war with one of the most powerful nations of Europe; were disheartened by the failure of the confederacy, and were doubtful as to the feasibility of a stronger union. Their territory was confined to a narrow strip of land on the Atlantic coast from Canada to Florida, with a somewhat indefinite claim to territory beyond the Alleghenies, where their sovereignty was disputed by tribes of hostile Indians supported, as was popularly believed, by the British, who had never formally delivered possession

under the treaty of peace. The vast territory beyond the Mississippi, which formerly had been claimed by France, since 1762 had belonged to Spain, still a powerful nation, and the owner of a great part of the Western Hemisphere. Under these circumstances it is little wonder that the question of annexing these territories was not made a subject of debate. The difficulties of bringing about a union of the States were so great, the objections to it seemed so formidable, that the whole thought of the convention centered upon surmounting these obstacles. The question of territories was dismissed with a single clause, apparently applicable only to the territories then existing, giving Congress the power to govern and dispose of them.

Had the acquisition of other territories been contemplated as a possibility, could it have been foreseen that, within little more than one hundred years, we were destined to acquire not only the whole vast region between the Atlantic and Pacific Oceans, but the Russian possessions in America and distant islands in the Pacific, it is incredible that no provision should have been made for them, and the question whether the Constitution should or should not extend to them have been definitely settled. If it be once conceded that we are at liberty to acquire foreign territory, a presumption arises that our power with respect to such territories is the same power which other nations have been accustomed to exercise with respect to territories acquired by them. If, in limiting the power which Congress was to exercise within the United States, it was also intended to limit it with regard to such territories as the people of the United States should thereafter acquire, such limitations should have been expressed. Instead of that, we find the Constitution speaking only to States, except in the territorial clause, which is absolute in its terms, and suggestive of no limitations upon the power of Congress in dealing with them. The States could only delegate to Congress such powers as they themselves possessed, and as they had no power to acquire new territory they had none to delegate in that connection. The logical inference from this is, that if Congress had power to acquire new territory, which is conceded, that power was not hampered by the constitutional provisions. If, upon the other hand, we assume

that the territorial clause of the Constitution was not intended to be restricted to such territory as the United States then possessed, there is nothing in the Constitution to indicate that the power of Congress in dealing with them was intended to be restricted by any of the other provisions.

There is a provision that "new States may be admitted by the Congress into this Union." These words, of course, carry the Constitution with them, but nothing is said regarding the acquisition of new territories or the extension of the Constitution over them. The liberality of Congress in legislating the Constitution into all our contiguous territories has undoubtedly fostered the impression that it went there by its own force, but there is nothing in the Constitution itself, and little in the interpretation put upon it, to confirm that impression. There is not even an analogy to the provisions of an ordinary mortgage for its attachment to after-acquired property, without which it covers only property existing at the date of the mortgage. In short, there is absolute silence upon the subject. The executive and legislative departments of the government have for more than a century interpreted this silence as precluding the idea that the Constitution attached to these territories as soon as acquired, and unless such interpretation be manifestly contrary to the letter or spirit of the Constitution, it should be followed by the judicial department. Cooley's Consti. Lim. secs. 81 to 85. *Burrow–Giles Lithographic Co.* v. *Sarony,* 111 U. S. 53, 57; *Field* v. *Clark,* 143 U. S. 649, 691.

Patriotic and intelligent men may differ widely as to the desireableness of this or that acquisition, but this is solely a political question. We can only consider this aspect of the case so far as to say that no construction of the Constitution should be adopted which would prevent Congress from considering each case upon its merits, unless the language of the instrument imperatively demand it. A false step at this time might be fatal to the development of what Chief Justice Marshall called the American Empire. Choice in some cases, the natural gravitation of small bodies towards large ones in others, the result of a successful war in still others, may bring about conditions which would render the annexation of distant posses-

sions desirable. If those possessions are inhabited by alien races, differing from us in religion, customs, laws, methods of taxation and modes of thought, the administration of government and justice, according to Anglo-Saxon principles, may for a time be impossible ; and the question at once arises whether large concessions ought not to be made for a time, that, ultimately, our own theories may be carried out, and the blessings of a free government under the Constitution extended to them. We decline to hold that there is anything in the Constitution to forbid such action.

We are therefore of opinion that the Island of Porto Rico is a territory appurtenant and belonging to the United States, but not a part of the United States within the revenue clauses of the Constitution ; that the Foraker act is constitutional, so far as it imposes duties upon imports from such island, and that the plaintiff cannot recover back the duties exacted in this case.

The judgment of the Circuit Court is therefore

*Affirmed.*

MR. JUSTICE WHITE, with whom concurred MR. JUSTICE SHIRAS and MR. JUSTICE MCKENNA, uniting in the judgment of affirmance.

MR. JUSTICE BROWN, in announcing the judgment of affirmance, has in his opinion stated his reasons for his concurrence in such judgment. In the result I likewise concur. As, however, the reasons which cause me to do so are different from, if not in conflict with, those expressed in that opinion, if its meaning is by me not misconceived, it becomes my duty to state the convictions which control me.

The recovery sought is the amount of duty paid on merchandise which came into the United States from Porto Rico after July 1, 1900. The exaction was made in virtue of the act of Congress approved April 12, 1900, entitled " An act temporarily to provide revenue and a civil government for Porto Rico, and for other purposes." 31 Stat. 77, c. 191. The right to recover is predicated on the assumption that Porto Rico, by the ratification of the treaty with Spain, became incorporated into the

United States, and therefore the act of Congress which imposed the duty in question is repugnant to Article I, sec. 8, clause 1, of the Constitution providing that " The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be Uniform throughout the United States." Subsidiarily, it is contended that the duty collected was also repugnant to the export and preference clauses of the Constitution. But as the case concerns no duty on goods going from the United States to Porto Rico, this proposition must depend also on the hypothesis that the provisions of the Constitution referred to apply to Porto Rico because that island has been incorporated into the United States. It is hence manifest that this latter contention is involved in the previous one, and need not be separately considered.

The arguments at bar embrace many propositions which seem to me to be irrelevant, or, if relevant, to be so contrary to reason and so in conflict with previous decisions of this court as to cause them to require but a passing notice. To eliminate all controversies of this character, and thus to come to the pivotal contentions which the case involves, let me state and concede the soundness of some principles, referring, in doing so, in the margin to the authorities by which they are sustained, and making such comment on some of them as may to me appear necessary.

*First.* The government of the United States was born of the Constitution, and all powers which it enjoys or may exercise must be either derived expressly or by implication from that instrument. Ever then, when an act of any department is challenged, because not warranted by the Constitution, the existence of the authority is to be ascertained by determining whether the power has been conferred by the Constitution, either in express terms or by lawful implication, to be drawn from the express authority conferred or deduced as an attribute which legitimately inheres in the nature of the powers given, and which flows from the character of the government established by the Constitution. In other words, whilst confined to its constitu-

tional orbit, the government of the United States is supreme within its lawful sphere.[1]

*Second.* Every function of the government being thus derived from the Constitution, it follows that that instrument is everywhere and at all times potential in so far as its provisions are applicable.[2]

*Third.* Hence it is that wherever a power is given by the Constitution and there is a limitation imposed on the authority, such restriction operates upon and confines every action on the subject within its constitutional limits.[3]

*Fourth.* Consequently it is impossible to conceive that where conditions are brought about to which any particular provision of the Constitution applies, its controlling influence may be frustrated by the action of any or all of the departments of the government. Those departments, when discharging, within the limits of their constitutional power, the duties which rest on them, may of course deal with the subjects committed to them in such a way as to cause the matter dealt with to come under the control of provisions of the Constitution which may not have been previously applicable. But this does not conflict with the doctrine just stated, or presuppose that the Constitution may or may not be applicable at the election of any agency of the government.

*Fifth.* The Constitution has undoubtedly conferred on Congress the right to create such municipal organizations as it may deem best for all the territories of the United States whether they have been incorporated or not, to give to the inhabitants as respects the local governments such degree of representation as may be conducive to the public well-being, to deprive such

---

[1] *Marbury* v. *Madison,* 1 Cranch, 137, 176 *et. seq.* ; *Martin* v. *Hunter,* 1 Wheat. 304, 326; *New Orleans* v. *United States,* 10 Pet. 662, 736; *Geofroy* v. *Riggs,* 133 U. S. 258, 266; *United States* v. *Gettysburg Electric Railway,* 160 U. S. 668, 679, and cases cited.

[2] *The City of Panama,* 101 U. S. 453, 460; *Fong Yue Ting* v. *United States,* 149 U. S. 698, 716, 738.

[3] *Monongahela Navigation Company* v. *United States,* 148 U. S. 312, 336; *Interstate Commerce Commission* v. *Brimson,* 154 U. S. 447, 479; *United States* v. *Joint Traffic Association,* 171 U. S. 505, 571.

territority of representative government if it is considered just to do so, and to change such local governments at discretion.[1]

The plentitude of the power of Congress as just stated is conceded by both sides to this controversy. It has been manifest from the earliest days and so many examples are afforded of it that to refer to them seems superfluous. However, there is an instance which exemplifies the exercise of the power substantially in all its forms, in such an apt way that reference is made to it. The instance referred to is the District of Columbia, which has had from the beginning different forms of government conferred upon it by Congress, some largely representative, others only partially so, until, at the present time, the people of the District live under a local government totally devoid of local representation, in the elective sense, administered solely by officers appointed by the President, Congress, in which the District has no representative in effect, acting as the local legislature.

In some adjudged cases the power to locally govern at discretion has been declared to arise as an incident to the right to acquire territory. In others it has been rested upon the clause of section 3, Article IV, of the Constitution, which vests Congress with the power to dispose of and make all needful rules and regulations respecting the territory or other property of the United States.[2] But this divergence, if not conflict of opinion, does not imply that the authority of Congress to govern the territories is outside of the Constitution, since in either case the right is founded on the Constitution, although referred to different provisions of that instrument.

Whilst, therefore, there is no express or implied limitation on Congress in exercising its power to create local governments for

---

[1] *United States* v. *Kagama*, 118 U. S. 375, 378; *Shively* v. *Bowlby*, 152 U. S. 1, 48.

[2] *Sere* v. *Pitot*, 6 Cranch, 332, 336; *McCulloch* v. *Maryland*, 4 Wheat. 316, 421; *American Ins. Co.* v. *Canter*, 1 Pet. 511, 542; *United States* v. *Gratiot*, 14 Pet. 526, 537; *Dred Scott* v. *Sandford*, 19 How. 393, 448; *Clinton* v. *Englebrecht*, 13 Wall. 434, 447; *Hamilton* v. *Dillin*, 21 Wall. 73, 93; *National Bank* v. *County of Yankton*, 101 U. S. 129, 132; *The City of Panama*, 101 U. S. 453, 457; *Murphy* v. *Ramsey*, 114 U. S. 15, 44; *United States* v. *Kagama*, 118 U. S. 375, 380; *Mormon Church* v. *United States*, 136 U. S. 1, 42; *Boyd* v. *Thayer*, 143 U. S. 135, 169.

any and all of the territories, by which that body is restrained from the widest latitude of discretion, it does not follow that there may not be inherent, although unexpressed, principles which are the basis of all free government which cannot be with impunity transcended. But this does not suggest that every express limitation of the Constitution which is applicable has not force, but only signifies that even in cases where there is no direct command of the Constitution which applies, there may nevertheless be restrictions of so fundamental a nature that they cannot be transgressed, although not expressed in so many words in the Constitution.

*Sixth.* As Congress in governing the territories is subject to the Constitution, it results that all the limitations of the Constitution which are applicable to Congress in exercising this authority necessarily limit its power on this subject. It follows also that every provision of the Constitution which is applicable to the territories is also controlling therein. To justify a departure from this elementary principle by a criticism of the opinion of Mr. Chief Justice Taney in *Scott* v. *Sandford*, 19 How. 393, appears to me to be unwarranted. Whatever may be the view entertained of the correctness of the opinion of the court in that case, in so far as it interpreted a particular provision of the Constitution concerning slavery and decided that as so construed it was in force in the territories, this in no way affects the principle which that decision announced, that the applicable provisions of the Constitution were operative. That doctrine was concurred in by the dissenting judges, as the following excerpts demonstrate. Thus Mr. Justice McLean, in the course of his dissenting opinion, said, (19 How. 542):

" In organizing the government of a territory, Congress is limited to means appropriate to the attainment of the constitutional object. No powers can be exercised which are prohibited by the Constitution, or which are contrary to its spirit."

---

[1] *Mormon Church* v. *United States*, 136 U. S. 1, 44.

Mr. Justice Curtis, also in the dissent expressed by him, said (p. 614):

" If, then, this clause does contain a power to legislate respecting the territory, what are the limits of that power?

" To this I answer that, in common with all the other legislative powers of Congress, it finds limits in the express prohibitions on Congress not to do certain things; that, in the exercise of the legislative power, Congress cannot pass an *ex post facto* law or bill of attainder; and so in respect to each of the other prohibitions contained in the Constitution."

*Seventh.* In the case of the territories, as in every other instance, when a provision of the Constitution is invoked, the question which arises is, not whether the Constitution is operative, for that is self-evident, but whether the provision relied on is applicable.

*Eighth.* As Congress derives its authority to levy local taxes for local purposes within the territories, not from the general grant of power to tax as expressed in the Constitution, it follows that its right to locally tax is not to be measured by the provision empowering Congress " To lay and collect Taxes, Duties, Imposts and Excises," and is not restrained by the requirement of uniformity throughout the United States. But the power just referred to, as well as the qualification of uniformity, restrains Congress from imposing an impost duty on goods coming into the United States from a territory which has been incorporated into and forms a part of the United States. This results because the clause of the Constitution in question does not confer upon Congress power to impose such an impost duty on goods coming from one part of the United States to another part thereof, and such duty besides would be repugnant to the requirement of uniformity throughout the United States.[1]

To question the principle above stated on the assumption that the rulings on this subject of Mr. Chief Justice Marshall in *Loughborough* v. *Blake* were mere *dicta*, seems to me to be entirely inadmissible. And, besides, if such view was justified,

---

[1] *Loughborough* v. *Blake*, 5 Wheat. 317, 322; *Woodruff* v. *Parham*, 8 Wall. 123, 133; *Brown* v. *Houston*, 114 U. S. 622, 628; *Fairbank* v. *United States*, 181 U. S. 283.

the principle would still find support in the decision in *Woodruff* v. *Parham,* and that decision, in this regard, was affirmed by this court in *Brown* v. *Houston* and *Fairbank* v. *United States, supra.*

From these conceded propositions it follows that Congress in legislating for Porto Rico was only empowered to act within the Constitution and subject to its applicable limitations, and that every provision of the Constitution which applied to a country situated as was that island, was potential in Porto Rico.

And the determination of what particular provision of the Constitution is applicable, generally speaking, in all cases, involves an inquiry into the situation of the territory and its relations to the United States. This is well illustrated by some of the decisions of this court which are cited in the margin.[1] Some of these decisions hold on the one hand that, growing out of the presumably ephemeral nature of a territorial government, the provisions of the Constitution relating to the life tenure of judges is inapplicable to courts created by Congress, even in territories which are incorporated into the United States, and some on the other hand decide that the provisions as to common-law juries found in the Constitution are applicable under like conditions; that is to say, although the judge presiding over a jury need not have the constitutional tenure, yet the jury must be in accordance with the Constitution. And the application of the provision of the Constitution relating to juries has been also considered in a different aspect, the case being noted in the margin.[2]

The question involved was the constitutionality of the statutes of the United States conferring power on ministers and consuls

---

[1] *American Insurance Co.* v. *Canter,* 1 Pet. 511; *Benner* v. *Porter,* 9 How. 235; *Webster* v. *Reid,* 11 How. 437, 460; *Clinton* v. *Englebrecht,* 13 Wall. 434; *Reynolds* v. *United States,* 98 U. S. 145; *Cullen* v. *Wilson,* 127 U. S. 540; *McAllister* v. *United States,* 141 U. S. 174; *Springville* v. *Thomas,* 166 U. S. 707; *Bauman* v. *Ross,* 167 U. S. 548; *Thompson* v. *Utah,* 170 U. S. 343; *Capital Traction Co.* v. *Hof,* 174 U. S. 1; *Black* v. *Jackson,* 177 U. S. 349, 363.

[2] *In re Ross,* 140 U. S. 453, 461, 462, 463.

to try American citizens for crimes committed in certain foreign countries.   Rev. Stat. secs. 4083–4086.   The court held the provisions in question not to be repugnant to the Constitution, and that a conviction for a felony without a previous indictment by a grand jury, or the summoning of a petty jury, was valid.

It was decided that the provisions of the Constitution relating to grand and petty juries were inapplicable to consular courts exercising their jurisdiction in certain countries foreign to the United States.   But this did not import that the government of the United States in creating and conferring jurisdiction on consuls and ministers acted outside of the Constitution, since it was expressly held that the power to call such courts into being and to confer upon them the right to try, in the foreign countries in question, American citizens was deducible from the treaty-making power as conferred by the Constitution.   The court said (p. 463):

"The treaty-making power vested in our government extends to all proper subjects of negotiation with foreign governments. It can, equally with any of the former or present governments of Europe, make treaties providing for the exercise of judicial authority in other countries by its officers appointed to reside therein."

In other words, the case concerned not the question of a power outside the Constitution, but simply whether certain provisions of the Constitution were applicable to the authority exercised under the circumstances which the case presented.

Albeit, as a general rule, the *status* of a particular territory has to be taken in view when the applicability of any provision of the Constitution is questioned, it does not follow when the Constitution has absolutely withheld from the government all power on a given subject, that such an inquiry is necessary. Undoubtedly, there are general prohibitions in the Constitution in favor of the liberty and property of the citizen which are not mere regulations as to the form and manner in which a conceded power may be exercised, but which are an absolute denial of all authority under any circumstances or conditions to do particular acts.   In the nature of things, limitations of this char-

acter cannot be under any circumstances transcended, because of the complete absence of power

The distinction which exists between the two characters of restrictions, those which regulate a granted power and those which withdraw all authority on a particular subject, has in effect been always conceded, even by those who most strenuously insisted on the erroneous principle that the Constitution did not apply to Congress in legislating for the territories, and was not operative in such districts of country. No one had more broadly asserted this principle than Mr. Webster. Indeed, the support which that proposition receives from expressions of that illustrious man have been mainly relied upon to sustain it, and yet there can be no doubt that, even whilst insisting upon such principle, it was conceded by Mr. Webster that those positive prohibitions of the Constitution which withhold all power on a particular subject were always applicable. His views of the principal proposition and his concession as to the existence of the qualification are clearly shown by a debate which took place in the Senate on February 24, 1849, on an amendment offered by Mr. Walker extending the Constitution and certain laws of the United States over California and New Mexico. Mr. Webster, in support of his conception that the Constitution did not, generally speaking, control Congress in legislating for the territories or operate in such districts, said as follows (20 Cong. Globe, App. p. 272):

"Mr. President, it is of importance that we should seek to have clear ideas and correct notions of the question which this amendment of the member from Wisconsin has presented to us; and especially that we should seek to get some conception of what is meant by the proposition, in a law, to 'extend the Constitution of the United States to the territories.' Why, sir, the thing is utterly impossible. All the legislation in the world, in this general form, could not accomplish it. There is no cause for the operation of the legislative power in such a matter as that. The Constitution, what is it—we extend the Constitution of the United States by law to a territory? What is the Constitution of the United States? Is not its very first principle that all within its influence and comprehension shall

be represented in the legislature which it establishes, with not only the right of debate and the right to vote in both houses of Congress, but a right to partake in the choice of the President and Vice President? And can we by law extend these rights, or any of them, to a territory of the United States? Everybody will see that it is altogether impracticable."

Thereupon, the following colloquy ensued between Mr. Underwood and Mr. Webster:

" Mr. Underwood: ' The learned Senator from Massachusetts says, and says most appropriately and forcibly, that the principles of the Constitution are obligatory upon us even while legislating for the territories. That is true, I admit, in its fullest force, but if it is obligatory upon us while legislating for the territories, is it possible that it will not be equally obligatory upon the officers who are appointed to administer the laws in these territories?'

" Mr. Webster: 'I never said it was not obligatory upon them. What I said was, that in making. laws for these terri-. tories it was the high duty of Congress to regard those great principles in the Constitution intended for the security of personal liberty and for the security of property.'

" Mr. Underwood: ' . . . Suppose we provide by our legislation that nobody shall be appointed to an office there who professes the Catholic religion. What do we do by an act of this sort?'

" Mr. Webster: 'We violate the Constitution, which says that no religious test shall be required as qualification for office.'"

And this was the state of opinion generally prevailing in the Free Soil and Republican parties, since the resistance of those parties to the extension of slavery into the territories, whilst in a broad sense predicated on the proposition that the Constitution was not generally controlling in the territories, was sustained by express reliance upon the Fifth Amendment to the Constitution forbidding Congress from depriving any person of life, liberty or property without due process of law. Every platform adopted by those parties down to and including 1860, whilst propounding the general doctrine, also in effect declared

the rule just stated. I append in the margin an excerpt from the platform of the Free Soil Party adopted in 1842.[1]

The conceptions embodied in these resolutions were in almost identical language reiterated in the platform of the Liberty Party in 1843, in that of the Free Soil Party in 1852 and in the platform of the Republican Party in 1856. Stanwood, Hist. of Presidency, pp. 218, 253, 254 and 271. In effect, the same thought was repeated in the declaration of principles made by the Republican Party convention in 1860, when Mr. Lincoln was nominated, as will be seen from an excerpt therefrom set out in the margin.[2]

The doctrine that those absolute withdrawals of power which

---

[1] Extract from the Free Soil Party platform of 1842 (Stanwood, Hist. of Presidency, p. 240):

"*Resolved*, That our fathers ordained the Constitution of the United States in order, among other great national objects, to establish justice, promote the general welfare, and secure the blessings of liberty, but expressly denied to the Federal government, which they created, all constitutional power to deprive any person of life, liberty or property without due legal process.

"*Resolved*, That, in the judgment of this convention, Congress has no more power to make a slave than to make a king ; no more power to institute or establish slavery than to institute or establish a monarchy. No such power can be found among those specifically conferred by the Constitution, or derived by any just implication from them.

"*Resolved*, That it is the duty of the Federal government to relieve itself from all responsibility for the existence or continuance of slavery wherever the government possesses constitutional authority to legislate on that subject, and is thus responsible for its existence.

"*Resolved*, That the true and in the judgment of this convention the only safe means of preventing the extension of slavery into territory now free is to prohibit its existence in all such territory by an act of Congress."

[2] Excerpt from declarations made in the platform of the Republican Party in 1860 (Stanwood, Hist. of Presidency, p. 293):

"8. That the normal condition of all the territory of the United States is that of freedom; that as our republican fathers, when they had abolished slavery in all our national territory, ordained that no person should be deprived of life, liberty or property without due process of law, it becomes our duty, by legislation, whenever such legislation is necessary, to maintain this provision of the Constitution against all attempts to violate it; and we deny the authority of Congress, of a territorial legislature or of any individual to give legal existence to slavery in any territory of the United States."

the Constitution has made in favor of human liberty are applicable to every condition or *status* has been clearly pointed out by this court in *Chicago, Rock Island &c. Railway* v. *McGlinn*, (1885) 114 U. S. 542, where, speaking through Mr. Justice Field, the court said (p. 546):

"It is a general rule of public law, recognized and acted upon by the United States, that whenever political jurisdiction and legislative power over any territory are transferred from one nation or sovereign to another, the municipal laws of the country —that is, laws which are intended for the protection of private rights—continue in force until abrogated or changed by the new government or sovereign. By the cession public property passes from one government to the other, but private property remains as before, and with it those municipal laws which are designed to secure its peaceful use and enjoyment. As a matter of course, all laws, ordinances, and regulations in conflict with the political character, institutions, and constitution of the new government are at once displaced. Thus, upon a cession of political jurisdiction and legislative power—and the latter is involved in the former—to the United States, the laws of the country in support of an established religion, or abridging the freedom of the press, or authorizing cruel and unusual punishments, and the like, would at once cease to be of obligatory force without any declaration to that effect; and the laws of the country on other subjects would necessarily be superseded by existing laws of the new government upon the same matters. But with respect to other laws affecting the possession, use and transfer of property, and designed to secure good order and peace in the community, and promote its health and prosperity, which are strictly of a municipal character, the rule is general that a change of government leaves them in force until, by direct action of the new government, they are altered or repealed. *Amer. Ins. Co.* v. *Canter*, 1 Pet. 542; Halleck, Int. Law, chap. 34, § 14."

There is in reason then no room in this case to contend that Congress can destroy the liberties of the people of Porto Rico by exercising in their regard powers against freedom and justice which the Constitution has absolutely denied. There can

also be no controversy as to the right of Congress to locally govern the island of Porto Rico as its wisdom may decide and in so doing to accord only such degree of representative government as may be determined on by that body. There can also be no contention as to the authority of Congress to levy such local taxes in Porto Rico as it may choose, even although the amount of the local burden so levied be manifold more onerous than is the duty with which this case is concerned. But as the duty in question was not a local tax, since it was levied in the United States on goods coming from Porto Rico, it follows that if that island was a part of the United States, the duty was repugnant to the Constitution, since the authority to levy an impost duty conferred by the Constitution on Congress, does not, as I have conceded, include the right to lay such a burden on goods coming from one to another part of the United States. And, besides, if Porto Rico was a part of the United States the exaction was repugnant to the uniformity clause.

The sole and only issue, then, is not whether Congress has taxed Porto Rico without representation—for, whether the tax was local or national, it could have been imposed, although Porto Rico had no representative local government and was not represented in Congress—but is, whether the particular tax in question was levied in such form as to cause it to be repugnant to the Constitution. This is to be resolved by answering the inquiry, Had Porto Rico, at the time of the passage of the act in question, been incorporated into and become an integral part of the United States?

On the one hand, it is affirmed that, although Porto Rico had been ceded by the treaty with Spain to the United States, the cession was accompanied by such conditions as prevented that island from becoming an integral part of the United States, at least, temporarily, and until Congress had so determined. On the other hand, it is insisted that by the fact of cession to the United States alone, irrespective of any conditions found in the treaty, Porto Rico became a part of the United States, and was incorporated into it. It is incompatible with the Constitution, it is argued, for the government of the United States to accept a cession of territory from a foreign country without

complete incorporation following as an immediate result, and therefore it is contended that it is immaterial to inquire what were the conditions of the cession, since if there were any which were intended to prevent incorporation they were repugnant to the Constitution and void. The result of the argument is that the Government of the United States is absolutely without power to acquire and hold territory as property or as appurtenant to the United States. These conflicting contentions are asserted to be sanctioned by many adjudications of this court and by various acts of the executive and legislative branches of the government; both sides, in many instances, referring to the same decisions and to the like acts, but deducing contrary conclusions from them. From this it comes to pass that it will be impossible to weigh the authorities relied upon without ascertaining the subject-matter to which they refer, in order to determine their proper influence. For this reason, in the orderly discussion of the controversy, I propose to consider the subject from the Constitution itself, as a matter of first impression, from that instrument as illustrated by the history of the government, and as construed by the previous decisions of this court. By this process, if accurately carried out, it will follow that the true solution of the question will be ascertained, both deductively and inductively, and the result, besides, will be adequately proven.

It may not be doubted that by the general principles of the law of nations every government which is sovereign within its sphere of action possesses as an inherent attribute the power to acquire territory by discovery, by agreement or treaty, and by conquest. It cannot also be gainsaid that as a general rule wherever a government acquires territory as a result of any of the modes above stated, the relation of the territory to the new government is to be determined by the acquiring power in the absence of stipulations upon the subject. These general principles of the law of nations are thus stated by Halleck in his treatise on International Law, page 126:

"A state may acquire property or domain in various ways; its title may be acquired originally by mere occupancy, and confirmed by the presumption arising from the lapse of time;

or by discovery and lawful possession; or by conquest, confirmed by treaty or tacit consent; or by grant, cession, purchase or exchange; in fine, by any of the recognized modes by which private property is acquired by individuals. It is not our object to enter into any general discussion of these several modes of acquisition, any further than may be necessary to distinguish the character of certain rights of property which are the peculiar objects of international jurisprudence. Wheaton, Elm. Int. Law, pt. 2, ch. 4, secs. 1, 4, 5; Phillimore on Int. Law, vol. 1, secs. 221–217; Grotius, de Jur. Bel. ac. Pac. lib. 2, cap. 4; Vattel, Droit des Gens, liv. 2, chs. 7 and 11; Rutherford, Institutes, b. 1, ch. 3; b. 2, ch. 9; Puffendorf, de Jur. Nat. et Gent. lib. 4, chs. 4, 5, 6; Moser, Versuch, etc., b. 5, cap. 9; Martens, Précis du Droit des Gens, sec 35, *et seq.;* Schmaltz, Droit des Gens, liv. 4, ch. 1; Kluber, Droit des Gens, secs. 125, 126; Heffter, Droit International, sec. 76; Ortolan, Domaine International, sec. 53, *et seq.;* Bowyer, Universal Public Law, ch. 28, Bello, Derecho Internacional, pt. 1, cap. 4; Riquelme, Derecho Pub. Int. lib. 1, tit. 1, cap. 2; Burlamaqui, Droit de la Nat. et des Gens, tome 4, pt. 3, ch. 5."

Speaking of a change of sovereignty, Halleck says (pp. 76, 814):

"Ch. III, Sec. 23. The sovereignty of a state may be lost in various ways. It may be vanquished by a foreign power, and become incorporated into the conquering state *as a province* or as one of its component parts; or it may voluntarily unite itself with another in such a way that its independent existence as a state will entirely cease."

\*      \*      \*      \*      \*      \*      \*      \*

"Ch. XXXIII, Sec. 3. If the hostile nation be subdued and the entire state conquered, a question arises as to the manner in which the conqueror may treat it without transgressing the just bounds established by the rights of conquest. If he simply replaces the former sovereign, and, on the submission of the people, governs them according to the laws of the State, they can have no cause of complaint. Again, if he incorporates them with his former states, giving to them the rights, privileges and immunities of his own subjects, he does for them all that is due

from a humane and equitable conqueror to his vanquished foes.
But if the conquered are a fierce, savage and restless people, he
may, according to the degree of their indocility, govern them
with a tighter rein, so as to curb their 'impetuosity, and to keep
them under subjection.' Moreover, the rights of conquest may,
in certain cases, justify him in imposing a tribute or other bur-
then, either a compensation for the expenses of the war or as a
punishment for the injustice he has suffered from them. . . .
Vattel, Droit des Gens, liv. 3, ch. 13, § 201; Curtis, History,
etc., liv. 7, cap. 8; Grotius, de Jur. Bel. ac. Pac. lib. 3, caps. 8,
15; Puffendorf, de Jur. Nat. et Gent., lib. 8, cap. 6, § 24; Real,
Science du Gouvernement, tome 5, ch. 2, § 5; Heffter, Droit
International, § 124; Abegg, Untersuchungen, etc., p. 86."

In *American Ins. Co.* v. *Canter*, 1 Pet. 511, the general doc-
trine was thus summarized, in the opinion delivered by Mr.
Chief Justice Marshall (p. 542):

" If it (conquered territory) be ceded by the treaty, the acqui-
sition is confirmed, and the ceded territory becomes a part of
the nation to which it is annexed, either on the terms stipulated
in the treaty of cession, or *on such as its new master shall im-
pose.*"

When our forefathers threw off their allegiance to Great Bri-
tain and established a republican government, assuredly they
deemed that the nation which they called into being was en-
dowed with those general powers to acquire territory which all
independent governments in virtue of their sovereignty enjoyed.
This is demonstrated by the concluding paragraph of the Dec-
laration of Independence, which reads as follows:

" As free and independent States, they [the United States of
America] have full power to levy war, conclude peace, contract
alliances, establish commerce, and to do all other acts and things
which independent States may of right do."

That under the confederation it was considered that the gov-
ernment of the United States had authority to acquire territory
like any other sovereignty, is clearly established by the elev-
enth of the articles of confederation.

The decisions of this court leave no room for question that,
under the Constitution, the government of the United States,

in virtue of its sovereignty, supreme within the sphere of its delegated power, has the full right to acquire territory enjoyed by every other sovereign nation.

In *American Insurance Co.* v. *Canter,* 1 Pet. 511, the court, by Mr. Chief Justice Marshall, said (p. 542) : " The Constitution confers absolutely on the government of the Union, the powers of making war, and of making treaties ; consequently, that government possesses the power of acquiring territory, either by conquest or by treaty."

In *United States* v. *Huckabee,* (1872) 16 Wall. 414, the court, speaking through Mr. Justice Clifford, said (p. 434) : " Power to acquire territory either by conquest or treaty is vested by the Constitution in the United States. Conquered territory, however, is usually held as a mere military occupation until the fate of the nation from which it is conquered is determined, but if the nation is entirely subdued, or in case it be destroyed and ceases to exist, the right of occupation becomes permanent, and the title vests absolutely in the conqueror. *American Ins. Co.* v. *Canter,* 1 Pet. 511 ; *Hogsheads of Sugar* v. *Boyle,* 9 Cranch, 195 ; *Shanks* v. *Dupont,* 3 Pet. 246 ; *United States* v. *Rice,* 4 Wheat. 254 ; *The Amy Warwick,* 2 Sprague, 143 ; *Johnson* v. *McIntosh,* 8 Wheat. 588. Complete conquest, by whatever mode it may be perfected, carries with it all the rights of the former government, or, in other words, the conqueror, by the completion of his conquest, becomes the absolute owner of the property conquered from the enemy, nation or state. His rights are no longer limited to mere occupation of what he has taken into his actual possession, but they extend to all the property and rights of the conquered state, including even debts as well as personal and real property. Halleck, International Law, 839 ; *Elphinstone* v. *Bedreechund,* 1 Knapp's Privy Council Cases, 329 ; Vattel, 365 ; 3 Phillimore's International Law, 505."

In *Mormon Church* v. *United States,* (1889) 136 U. S. 1, Mr. Justice Bradley, announcing the opinion of the court, declared (p. 42) : " The power to acquire territory, other than the territory northwest of the Ohio River, (which belonged to the United States at the adoption of the Constitution,) is derived from the treaty-making power and the power to declare and carry

on war.   The incidents of these powers are those of national sovereignty, and belong to all independent governments.   The power to make acquisitions of territory by conquest, by treaty and by cession is an incident of national sovereignty.   The Territory of Louisiana, when acquired from France, and the territories west of the Rocky Mountains, when acquired from Mexico, became the absolute property and domain of the United States, subject to such conditions as the government, in its diplomatic negotiations, had seen fit to accept relating to the rights of the people then inhabiting those territories."

Indeed, it is superfluous to cite authorities establishing the right of the government of the United States to acquire territory, in view of the possession of the Northwest Territory when the Constitution was framed and the cessions to the general government by various States subsequent to the adoption of the Constitution, and in view also of the vast extension of the territory of the United States brought about since the existence of the Constitution by substantially every form of acquisition known to the law of nations.   Thus, in part at least, " the title of the United States to Oregon was founded upon original discovery and actual settlement of citizens of the United States, authorized or approved by the government of the United States."   *Shively* v. *Bowlby*, 152 U. S. 50.   The Province of Louisiana was ceded by France in 1803; the Floridas were transferred by Spain in 1819; Texas was admitted into the Union by compact with Congress in 1845; California and New Mexico were acquired by the treaty with Mexico of 1848, and other western territory from Mexico by the treaty of 1853; numerous islands have been brought within the dominion of the United States under the authority of the act of August 18, 1856, c. 164, usually designated as the Guano Islands act, reenacted in Revised Statutes, sections 5570–5578; Alaska was ceded by Russia in 1867; Medway Island, the western end of the Hawaiian group, 1200 miles from Honolulu, was acquired in 1867, and $50,000 was expended in efforts to make it a naval station; on the renewal of a treaty with Hawaii, November 9, 1887, Pearl Harbor was leased for a permanent naval station; by joint resolution of Congress the Hawaiian Islands came un-

der the sovereignty of the United States in 1898; and on April 30, 1900, an act for the government of Hawaii was approved, by which the Hawaiian Islands were given the *status* of an incorporated territory; on May 21, 1890, there was proclaimed by the President an agreement, concluded and signed with Germany and Great Britain, for the joint administration of the Samoan Islands, 26 Stat. 1497; and, on February 16, 1900, 31 Stat. 67, there was proclaimed a convention between the United States, Germany and Great Britain, by which Germany and Great Britain renounced in favor of the United States all their rights and claims over and in respect to the Island of Tutuilla and all other islands of the Samoan group east of longitude 171° west of Greenwich. And finally the treaty with Spain which terminated the recent war was ratified.

It is worthy of remark that, beginning in the administration of President Jefferson, the acquisitions of foreign territory above referred to were largely made whilst that political party was in power, which announced, as its fundamental tenet, the duty of strictly construing the Constitution, and it is true to say that all shades of political opinion have admitted the power to acquire and lent their aid to its accomplishment. And the power has been asserted in instances where it has not been exercised. Thus, during the administration of President Pierce, in 1854, a draft of a treaty for the annexation of Hawaii was agreed upon, but, owing to the death of the King of the Hawaiian Islands, was not executed. The second article of the proposed treaty provided as follows (Ex. Doc. Senate, 55th Congress, 2d sess., Report No. 681, Calendar No. 747, p. 91):

### " Article II.

" The Kingdom of the Hawaiian Islands shall be incorporated into the American Union as a State, enjoying the same degree of sovereignty as other States, and admitted as such as soon as it can be done in consistency with the principles and requirements of the Federal Constitution, to all the rights, privileges and immunities of a State as aforesaid, on a perfect equality with the other States of the Union."

It is insisted, however, that, conceding the right of the gov-

ernment of the United States to acquire territory, as all such territory when acquired becomes absolutely incorporated into the United States, every provision of the Constitution which would apply under that situation is controlling in such acquired territory. This, however, is but to admit the power to acquire and immediately to deny its beneficial existence.

The general principle of the law of nations, already stated, is that acquired territory, in the absence of agreement to the contrary, will bear such relation to the acquiring government as may be by it determined. To concede to the government of the United States the right to acquire and to strip it of all power to protect the birthright of its own citizens and to provide for the well-being of the acquired territory by such enactments as may in view of its condition be essential, is, in effect, to say that the United States is helpless in the family of nations, and does not possess that authority which has at all times been treated as an incident of the right to acquire. Let me illustrate the accuracy of this statement. Take a case of discovery. Citizens of the United States discover an unknown island, peopled with an uncivilized race, yet rich in soil, and valuable to the United States for commercial and strategic reasons. Clearly, by the law of nations, the right to ratify such acquisition and thus to acquire the territory would pertain to the government of the United States. *Johnson* v. *McIntosh*, 8 Wheat. 543, 595; *Martin* v. *Waddell*, 16 Pet. 367, 409; *Jones* v. *United States*, 137 U. S. 202, 212; *Shively* v. *Bowlby*, 152 U. S. 1, 50. Can it be denied that such right could not be practically exercised if the result would be to endow the inhabitants with citizenship of the United States and to subject them not only to local but also to an equal proportion of national taxes, even although the consequence would be to entail ruin on the discovered territory and to inflict grave detriment on the United States to arise both from the dislocation of its fiscal system and the immediate bestowal of citizenship on those absolutely unfit to receive it?

The practice of the government has been otherwise. As early as 1856 Congress enacted the Guano Islands act, heretofore referred to, which, by section 1, provided that, when any

citizen of the United States shall "discover a deposit of guano on any island, rock or key, not within the lawful jurisdiction of any other government, and not occupied by the citizens of any other · government, and shall take peaceable possession thereof, and occupy the same, said island, rock or key may, at the discretion of the President of the United States, be considered *as appertaining* to the United States." 11 Stat. 119, c. 164; Rev. Stat. § 5570. Under the act referred to, it was stated in argument, that the government now holds and protects American citizens in the occupation of some seventy islands. The statute came under consideration in *Jones* v. *United States*, 137 U. S. 202, where the question was whether or not the act was valid and it was decided that the act was a lawful exercise of power, and that islands thus acquired were "appurtenant" to the United States. The court, in the course of the opinion, speaking through Mr. Justice Gray, said (p. 212):

"By the law of nations, recognized by all civilized states, dominion of new territory may be acquired by discovery and occupation, as well as by cession or conquest; and when citizens or subjects of one nation, in its name, and by its authority or with its assent, take and hold actual, continuous and useful possession, (although only for the purpose of carrying on a particular business, such as catching and curing fish or working mines,) of territory unoccupied by any other government or its citizens, the nation to which they belong may exercise such jurisdiction and for such period as it sees fit over territory so acquired. This principle affords ample warrant for the legislation of Congress concerning guano islands. Vattel, lib. 1, chap. 18; Wheaton on International Law (8th ed.), §§ 161, 165, 176, note 104; Halleck on International Law, chap. 6, §§ 7, 15; 1 Phillimore on International Law (3d ed.), §§ 227, 229, 230, 242; 1 Calvo, Droit International (4th ed.), §§ 266, 277, 300; *Whiton* v. *Albany County Ins. Co.*, 109 Mass. 24, 31."

And these considerations concerning discovery are equally applicable to ownership resulting from conquest. A just war is declared and in its prosecution the territory of the enemy is invaded and occupied. Would not the war, even if waged successfully, be fraught with danger if the effect of occupation was

to necessarily incorporate an alien and hostile people into the United States? Take another illustration. Suppose at the termination of a war the hostile government had been overthrown and the entire territory or a portion thereof was occupied by the United States, and there was no government to treat with or none willing to cede by treaty, and thus it became necessary for the United States to hold the conquered country for an indefinite period, or at least until such time as Congress deemed that it should be either released or retained because it was apt for incorporation into the United States. If holding was to have the effect which is now claimed for it, would not the exercise of judgment respecting the retention be so fraught with danger to the American people that it could not be safely exercised?

Yet, again. Suppose the United States, in consequence of outrages perpetrated upon its citizens, was obliged to move its armies or send its fleets to obtain redress, and it came to pass that an expensive war resulted and culminated in the occupation of a portion of the territory of the enemy, and that the retention of such territory—an event illustrated by examples in history—could alone enable the United States to recover the pecuniary loss it had suffered. And suppose further that to do so would require occupation for an indefinite period, dependent upon whether or not payment was made of the required indemnity. It being true that incorporation must necessarily follow the retention of the territory, it would result that the United States must abandon all hope of recouping itself for the loss suffered by the unjust war, and, hence, the whole burden would be entailed upon the people of the United States. This would be a necessary consequence, because if the United States did not hold the territory as security for the needed indemnity it could not collect such indemnity, and on the other hand if incorporation must follow from holding the territory the uniformity provision of the Constitution would prevent the assessment of the cost of the war solely upon the newly acquired country. In this, as in the case of discovery, the traditions and practices of the government demonstrate the unsoundness of the contention. Congress, on May 13, 1846, declared that

war existed with Mexico. In the summer of that year New Mexico and California were subdued by the American arms and the military occupation which follbwed continued until after the treaty of peace was ratified, in May, 1848. Tampico, a Mexican port, was occupied by our forces on November 15, 1846, and possession was not surrendered until after the ratification. In the spring of 1847 President Polk, through the Secretary of the Treasury, prepared a tariff of duties on imports and tonnage which was put in force in the conquered country. 1 Senate Documents, First Session, 30th Congress, pp. 562, 569. By this tariff, *duties were laid as well on merchandise exported from the United States* as from other countries, except as to supplies for our army, and on May 10, 1847, an exemption from tonnage duties was accorded to " all vessels chartered by the United States to convey supplies of any and all descriptions to our army and navy, and actually laden with supplies." Ib. 583. An interesting debate respecting the constitutionality of this action of the President is contained in 18 Cong. Globe, First Session, 30th Congress, at pp. 478, 479, 484–489, 495, 498, etc.

In *Fleming* v. *Page*, 9 How. 603, it was held that the revenue officials properly treated Tampico as a port of a foreign country during the occupation by the military forces of the United States, and that duties on imports into the United States from Tampico were lawfully levied under the general tariff act of 1846. Thus, although Tampico was in the possession of the United States, and the court expressly held that in an international sense the port was a part of the territory of the United States, yet it was decided that, in the sense of the revenue laws, Tampico was a foreign country. The special tariff act promulgated by President Polk was in force in New Mexico and California until after notice was received of the ratification of the treaty of peace. In *Cross* v. *Harrison*, 16 How. 164, certain collections of impost duties on goods brought from foreign countries into California prior to the time when official notification had been received in California that the treaty of cession had been ratified, as well as impost duties levied after the receipt of such notice, were called in question. The duties collected prior to the receipt of notice were laid at the rate fixed by the tariff promulgated by the Presi-

dent; those laid after the notification conformed to the general tariff laws of the United States. The court decided that all the duties collected were valid. The court undoubtedly in the course of its opinion said that immediately upon the ratification of the treaty California became a part of the United States and subject to its revenue laws. However, the opinion pointedly referred to a letter of the Secretary of the Treasury directing the enforcement of the tariff laws of the United States, upon the express ground that Congress had enacted laws which recognized the treaty of cession. Besides, the decision was expressly placed upon the conditions of the treaty, and it was stated, in so many words, that a different rule would have been applied had the stipulations in the treaty been of a different character.

But, it is argued, all the instances previously referred to may be conceded, for they but illustrate the rule *inter arma silent leges*. Hence, they do not apply to acts done after the cessation of hostilities when a treaty of peace has been concluded. This not only begs the question, but also embodies a fallacy. A case has been supposed in which it was impossible to make a treaty because of the unwillingness or disappearance of the hostile government, and, therefore, the occupation necessarily continued, although actual war had ceased. The fallacy lies in admitting the right to exercise the power, if only it is exerted by the military arm of the government, but denying it wherever the civil power comes in to regulate and make the conditions more in accord with the spirit of our free institutions. Why it can be thought, although under the Constitution the military arm of the government is in effect the creature of Congress, that such arm may exercise a power without violating the Constitution, and yet Congress—the creator—may not regulate, I fail to comprehend.

This further argument, however, is advanced. Granting that Congress may regulate without incorporating, where the military arm has taken possession of foreign territory, and where there has been or can be no treaty, this does not concern the decision of this case, since there is here involved no regulation but an actual cession to the United States of territory by treaty. The general rule of the law of nations, by which the acquiring

government fixes the *status* of acquired territory, it is urged, does not apply to the government of the United States, because it is incompatible with the Constitution that that government should hold territory under a cession and administer it as a dependency without its becoming incorporated. This claim, I have previously said, rests on the erroneous assumption that the United States under the Constitution is stripped of those powers which are absolutely inherent in and essential to national existence. The certainty of this is illustrated by the examples already made use of in the supposed cases of discovery and conquest.

If the authority by treaty is limited as suggested, then it will be impossible to terminate a successful war by acquiring territory through a treaty, without immediately incorporating such territory into the United States. Let me, however, eliminate the case of war and consider the treaty-making power as subserving the purposes of the peaceful evolution of national life. Suppose the necessity of acquiring a naval station or a coaling station on an island inhabited with people utterly unfit for American citizenship and totally incapable of bearing their proportionate burden of the national expense. Could such island, under the rule which is now insisted upon, be taken? Suppose again the acquisition of territory for an interoceanic canal, where an inhabited strip of land on either side is essential to the United States for the preservation of the work. Can it be denied that, if the requirements of the Constitution as to taxation are to immediately control, it might be impossible by treaty to accomplish the desired result?

Whilst no particular provision of the Constitution is referred to to sustain the argument that it is impossible to acquire territory by treaty without immediate and absolute incorporation, it is said that the spirit of the Constitution excludes the conception of property or dependencies possessed by the United States, and which are not so completely incorporated as to be in all respects a part of the United States; that the theory upon which the Constitution proceeds is that of confederated and independent States, and that no territory therefore can be acquired which does not contemplate statehood, and excludes the acquisition of

any territory which is not in a position to be treated as an integral part of the United States. But this reasoning is based on political and not judicial considerations. Conceding that the conception upon which the Constitution proceeds is that no territory as a general rule should be acquired unless the territory may reasonably be expected to be worthy of statehood, the determination of when such blessing is to be bestowed is wholly a political question, and the aid of the judiciary cannot be invoked to usurp political discretion in order to save the Constitution from imaginary or even real dangers. The Constitution may not be saved by destroying its fundamental limitations.

Let me come, however, to a consideration of the express powers which are conferred by the Constitution to show how unwarranted is the principle of immediate incorporation, which is here so strenuously insisted on. In doing so it is conceded at once that the true rule of construction is not to consider one provision of the Constitution alone, but to contemplate all, and therefore to limit one conceded attribute by those qualifications which naturally result from the other powers granted by that instrument, so that the whole may be interpreted by the spirit which vivifies, and not by the letter which killeth. Undoubtedly, the power to carry on war and to make treaties implies also the exercise of those incidents which ordinarily inhere in them. Indeed, in view of the rule of construction which I have just conceded—that all powers conferred by the Constitution must be interpreted with reference to the nature of the government and be construed in harmony with related provisions of the Constitution—it seems to me impossible to conceive that the treaty-making power by a mere cession can incorporate an alien people into the United States without the express or implied approval of Congress. And from this it must follow that there can be no foundation for the assertion that where the treaty-making power has inserted conditions which preclude incorporation until Congress has acted in respect thereto, such conditions are void and incorporation results in spite thereof. If the treaty-making power can absolutely, without the consent of Congress, incorporate territory, and if that power may

not insert conditions against incorporation, it must follow that the treaty-making power is endowed by the Constitution with the most unlimited right, susceptible of destroying every other provision of the Constitution; that is, it may wreck our institutions. If the proposition be true, then millions of inhabitants of alien territory, if acquired by treaty, can, without the desire or consent of the people of the United States speaking through Congress, be immediately and irrevocably incorporated into the United States, and the whole structure of the government be overthrown. While thus aggrandizing the treaty-making power on the one hand, the construction at the same time minimizes it on the other, in that it strips that authority of any right to acquire territory upon any condition which would guard the people of the United States from the evil of immediate incorporation. The treaty-making power then, under this contention, instead of having the symmetrical functions which belong to it from its very nature, becomes distorted —vested with the right to destroy upon the one hand and deprived of all power to protect the government on the other.

And, looked at from another point of view, the effect of the principle asserted is equally antagonistic, not only to the express provisions but to the spirit of the Constitution in other respects. Thus, if it be true that the treaty-making power has the authority which is asserted, what becomes of that branch of Congress which is peculiarly the representative of the people of the United States, and what is left of the functions of that body under the Constitution? For, although the House of Representatives might be unwilling to agree to the incorporation of alien races, it would be impotent to prevent its accomplishment, and the express provisions conferring upon Congress the power to regulate commerce, the right to raise revenue—bills for which, by the Constitution, must originate in the House of Representatives—and the authority to prescribe uniform naturalization laws would be in effect set at naught by the treaty-making power. And the consequent result—incorporation—would be beyond all future control of or remedy by the American people, since, at once and without hope of redress or power of change, incorporation by the treaty would have been brought about.

The inconsistency of the position is at once manifest. The basis of the argument is that the treaty must be considered to have been incorporated, because acquisition presupposes the exercise of judgment as to fitness for immediate incorporation. But the deduction drawn is, although the judgment exercised is against immediate incorporation and this result is plainly expressed, the conditions are void because no judgment against incorporation can be called into play.

All the confusion and dangers above indicated, however, it is argued, are more imaginary than real, since, although it be conceded that the treaty-making power has the right by cession to incorporate without the consent of Congress, that body may correct the evil by availing itself of the provision of the Constitution giving to Congress the right to dispose of the territory and other property of the United States. This assumes that there has been absolute incorporation by the treaty-making power on the one hand, and yet asserts that Congress may deal with the territory as if it had not been incorporated into the United States. In other words, the argument adopts conflicting theories of the Constitution and applies them both at the same time. I am not unmindful that there has been some contrariety of decision on the subject of the meaning of the clause empowering Congress to dispose of the territories and other property of the United States, some adjudged cases treating that article as referring to property as such and others deriving from it the general grant of power to govern territories. In view, however, of the relations of the territories to the government of the United States at the time of the adoption of the Constitution, and the solemn pledge then existing that they should forever " remain a part of the confederacy of the United States of America," I cannot resist the belief that the theory that the disposing clause relates as well to a relinquishment or cession of sovereignty as to a mere transfer of rights of property, is altogether erroneous.

Observe again the inconsistency of this argument. It considers, on the one hand, that so vital is the question of incorporation that no alien territory may be acquired by a cession without absolutely endowing the territory with incorporation and

the inhabitants with resulting citizenship, because, under our system of government, the assumption that a territory and its inhabitants may be held by any other title than one incorporating is impossible to be thought of. And yet to avoid the evil consequences which must follow from accepting this proposition, the argument is that all citizenship of the United States is precarious and fleeting, subject to be sold at any moment like any other property. That is to say, to protect a newly acquired people in their presumed rights, it is essential to degrade the whole body of American citizenship.

The reasoning which has sometimes been indulged in by those who asserted that the Constitution was not at all operative in the territories is that, as they were acquired by purchase, the right to buy included the right to sell. This has been met by the proposition that if the country purchased and its inhabitants became incorporated into the United States, it came under the shelter of the Constitution, and no power existed to sell American citizens. In conformity to the principles which I have admitted it is impossible for me to say at one and the same time that territory is an integral part of the United States protected by the Constitution, and yet the safeguards, privileges, rights and immunities which arise from this situation are so ephemeral in their character that by a mere act of sale they may be destroyed. And, applying this reasoning to the provisions of the treaty under consideration, to me it seems indubitable that if the treaty with Spain incorporated all the territory ceded into the United States, it resulted that the millions of people to whom that treaty related were, without the consent of the American people as expressed by Congress, and without any hope of relief, indissolubly made a part of our common country.

Undoubtedly, the thought that under the Constitution power existed to dispose of people and territory and thus to annihilate the rights of American citizens was contrary to the conceptions of the Constitution entertained by Washington and Jefferson. In the written suggestions of Mr. Jefferson, when Secretary of State, reported to President Washington in March, 1792, on the subject of proposed negotiations between the United States and Spain, which were intended to be communicated by way of in-

struction to the commissioners of the United States appointed to manage such negotiations, it was observed, in discussing the possibility as to compensation being demanded by Spain "for the ascertainment of our right" to navigate the lower part of the Mississippi, as follows:

"We have nothing else" (than a relinquishment of certain claims on Spain) "to give in exchange. For as to territory, we have neither the right nor the disposition to alienate an inch of what belongs to any member of our Union. Such a proposition therefore is totally inadmissible, and not to be treated for a moment." Ford's Writings of Jefferson, vol. v, p. 476.

The rough draft of these observations was submitted to Mr. Hamilton, then Secretary of the Treasury, for suggestions, previously to sending it to the President, some time before March 5, and Hamilton made the following (among other) notes upon it:

"Page 25. Is it true that the United States have no right to *alienate an inch* of the territory in question, except in the case of necessity intimated in another place? Or will it be useful to avow the denial of such a right? It is apprehended that the doctrine which restricts the alienation of territory to cases of *extreme necessity* is applicable rather to *peopled* territory than to waste and uninhabited districts. Positions restraining the right of the United States to accommodate to exigencies which may arise ought ever to be advanced with great caution." Ford's Writings of Jefferson, vol. v, p. 443.

Respecting this note, Mr. Jefferson commented as follows:

"The power to alienate the *unpeopled* territories of any State is not among the enumerated powers, given by the Constitution to the general government, and if we may go out of that instrument and *accommodate to exigencies which may arise* by alienating the *unpeopled* territory of a State, we may accommodate ourselves a little more by alienating that which is *peopled*, and still a little more by selling the *people* themselves. A shade or two more in the degree of exigency is all that will be requisite, and of that degree we shall ourselves be the judges. However, may it not be hoped that these questions are forever laid to rest by the Twelfth Amendment once made a part of the Constitution, declaring expressly that ' the powers not delegated to the

United States by the Constitution are reserved to the States respectively?' And if the general government has no power to alienate the territory of a State, it is too irresistible an argument to deny ourselves the use of it on the present occasion." Ib.

The opinions of Mr. Jefferson, however, met the approval of President Washington. On March 18, 1792, in inclosing to the commissioners to Spain their commission, he said, among other things:

. "You will herewith receive your commission; as also observations on these several subjects reported to the President and approved by him, which will therefore serve as instructions for you. These expressing minutely the sense of our government, and what they wish to have done, it is unnecessary for me to do more here than desire you to pursue these objects unremittingly," etc. Ford's Writings of Jefferson, vol. v, p. 456.

When the subject-matter to which the negotiation related is considered it becomes evident that the word "State" as above used related merely to territory which was either claimed by some of the States, as Mississippi Territory was by Georgia, or to the Northwest Territory embraced within the ordinance of 1787, or the territory south of the Ohio (Tennessee), which had also been endowed with all the rights and privileges conferred by that ordinance, and all which territory had originally been ceded by States to the United States under express stipulations that such ceded territory should be ultimately formed into States of the Union. And this meaning of the word "State" is absolutely in accord with what I shall hereafter have occasion to demonstrate was the conception entertained by Mr. Jefferson of what constituted the United States.

. True, from the exigency of a calamitous war or the necessity of a settlement of boundaries, it may be that citizens of the United States may be expatriated by the action of the treaty-making power, impliedly or expressly ratified by Congress.

But the arising of these particular conditions cannot justify the general proposition that territory which is an integral part of the United States may, as a mere act of sale, be disposed of. If however the right to dispose of an incorporated American territory and citizens by the mere exertion of the power to sell

be conceded, *arguendo*, it would not relieve the dilemma. It is ever true that where a malign principle is adopted, as long as the error is adhered to it must continue to produce its baleful results. Certainly, if there be no power to acquire subject to a condition, it must follow that there is no authority to dispose of subject to conditions, since it cannot be that the mere change of form of the transaction could bestow a power which the Constitution has not conferred. It would follow then that any conditions annexed to a disposition which looked to the protection of the people of the United States or to enable them to safeguard the disposal of territory would be void; and thus it would be that either the United States must hold on absolutely or must dispose of unconditionally.

A practical illustration will at once make the consequences clear. Suppose Congress should determine that the millions of inhabitants of the Philippine Islands should not continue appurtenant to the United States, but that they should be allowed to establish an autonomous government, outside of the Constitution of the United States, coupled, however, with such conditions providing for control as far only as essential to the guarantee of life and property and to protect against foreign encroachment. If the proposition of incorporation be well founded, at once the question would arise whether the ability to impose these conditions existed, since no power was conferred by the Constitution to annex conditions which would limit the disposition. And if it be that the question of whether territory is immediately fit for incorporation when it is acquired is a judicial and not a legislative one, it would follow that the validity of the conditions would also come within the scope of judicial authority, and thus the entire political policy of the government be alone controlled by the judiciary.

The theory as to the treaty-making power upon which the argument which has just been commented upon rests, it is now proposed to be shown, is refuted by the history of the government from the beginning. There has not been a single cession made from the time of the Confederation up to the present day, excluding the recent treaty with Spain, which has not contained stipulations to the effect that the United States through Con-

gress would either not disincorporate or would incorporate the ceded territory into the United States. There were such conditions in the deed of cession by Virginia when it conveyed the Northwest Territory to the United States. Like conditions were attached by North Carolina to the cession whereby the territory south of the Ohio, now Tennessee, was transferred. Similar provisions were contained in the cession by Georgia of the Mississippi territory, now the States of Alabama and Mississippi. Such agreements were also expressed in the treaty of 1803, ceding Louisiana; that of 1819, ceding the Floridas, and in the treaties of 1848 and 1853, by which a large extent of territory was ceded to this country, as also in the Alaska treaty of 1867. To adopt the limitations on the treaty-making power now insisted upon would presuppose that every one of these conditions thus sedulously provided for was superfluous, since the guaranties which they afforded would have obtained, although they were not expressly provided for.

When the various treaties by which foreign territory has been acquired are considered in the light of the circumstances which surrounded them, it becomes to my mind clearly established that the treaty-making power was always deemed to be devoid of authority to incorporate territory into the United States without the assent, express or implied, of Congress, and that no question to the contrary has ever been even mooted. To appreciate this it is essential to bear in mind what the words " United States" signified at the time of the adoption of the Constitution. When by the treaty of peace with Great Britain the independence of the United States was acknowledged, it is unquestioned that all the territory within the boundaries defined in that treaty, whatever may have been the disputes as to title, substantially belonged to particular States. The entire territory was part of the United States, and all the native white inhabitants were citizens of the United States and endowed with the rights and privileges arising from that relation. When, as has already been said, the Northwest Territory was ceded by Virginia, it was expressly stipulated that the rights of the inhabitants in this regard should be respected. The ordinance of 1787, providing for the government of the Northwest Territory, fulfilled

this promise on behalf of the Confederation.   Without under-
taking to reproduce the text of the ordinance, it suffices to say
that it contained a bill of rights, a promise of ultimate statehood,
and it provided (italics mine) that "The said territory and the
States which may be formed therein *shall ever remain a part of
this confederacy of the United States of America*, subject to the ar-
ticles of confederation, and to such alterations therein as shall
be constitutionally made, and to all the acts and ordinances of
the United States in Congress assembled, conformably thereto."
It submitted the inhabitants to a liability for a tax to pay their
proportional part of the public debt and the expenses of the gov-
ernment to be assessed by the rule of apportionment which gov-
erned the States of the confederation.   It forbade slavery
within the Territory, and contained a stipulation that the pro-
visions of the ordinance should ever remain unalterable unless
by common consent.

Thus it was that, at the adoption of the Constitution, the Uni-
ted States, as a geographical unit and as a governmental concep-
tion both in the international and domestic sense, consisted not
only of States, but also of territories, all the native white inhab-
tiants being endowed with citizenship, protected by pledges of a
common union, and, except as to political advantages, all enjoy-
ing equal rights and freedom, and safeguarded by substantially
similar guaranties, all being under the obligation to contribute
their proportionate share for the liquidation of the debt and
future expenses of the general government.

The opinion has been expressed that the ordinance of 1787
became inoperative and a nullity on the adoption of the Con-
stitution (Taney, C. J., in *Scott* v. *Sandford*, 19 How. 393, 438,)
while, on the other hand, it has been said that the ordinance of
1787 was "the most solemn of all engagements," and became
a part of the Constitution of the United States by reason of
the sixth article, which provided that "all debts contracted and
engagements entered into, before the adoption of this Constitu-
tion, shall be as valid against the United States under this
Constitution as under the confederation."   Per Baldwin, J.,
concurring opinion in *Lessee of Pollard's Heirs* v. *Kibbe*, 14
Pet. 353, 417, and per Catron, J., in dissenting opinion in *Stra-*

*der* v. *Graham,*10 How. 82, 98. Whatever view may be taken of this difference of legal opinion, my mind refuses to assent to the conclusion that under the Constitution the provision of the Northwest Territory ordinance making such territory forever a part of the confederation was not binding on the government of the United States when the Constitution was formed. When it is borne in mind that large tracts of this territory were reserved for distribution among the continental soldiers, it is impossible for me to believe that it was ever considered that the result of the cession was to take the Northwest Territory out of the Union, the necessary effect of which would have been to expatriate the very men who by their suffering and valor had secured the liberty of their united country. Can it be conceived that North Carolina, after the adoption of the Constitution, would cede to the general government the territory south of the Ohio River, intending thereby to expatriate those dauntless mountaineers of North Carolina who had shed lustre upon the Revolutionary arms by the victory of King's Mountain? And the rights bestowed by Congress after the adoption of the Constitution, as I shall proceed to demonstrate, were utterly incompatible with such a theory.

Beyond question, in one of the early laws enacted at the first session of the First Congress, the binding force of the ordinance was recognized, and certain of its provisions concerning the appointment of officers in the territory were amended to conform the ordinance to the new Constitution. c. 8, August 7, 1789, 1 Stat. 50.

In view of this it cannot, it seems to me, be doubted that the United States continued to be composed of States and territories, all forming an integral part thereof and incorporated therein, as was the case prior to the adoption of the Constitution. Subsequently, the territory now embraced in the State of Tennessee was ceded to the United States by the State of North Carolina. In order to insure the rights of the native inhabitants, it was expressly stipulated that the inhabitants of the ceded territory should enjoy all the rights, privileges, benefits and advantages set forth in the ordinance " of the late Congress for the government of the western territory of the United

States." A condition was, however, inserted in the cession that no regulation should be made by Congress tending to emancipate slaves. By act of April 2, 1790, 1 Stat. 106, c. 6, this cession was accepted. . And, at the same session, on May 26, 1790, an act was passed for the government of this territory, under the designation of "the territory of the United States south of the Ohio River." 1 Stat. 123, c. 14. This act, except as to the prohibition which was found in the Northwest Territory ordinance as to slavery, in express terms declared that the inhabitants of the territory should enjoy all the rights conferred by that ordinance.

A government for the Mississippi Territory was organized on April 7, 1798. 1 Stat. 549, c. 28. The land embraced was claimed by the State of Georgia, and her rights were saved by the act. The sixth section thereof provided as follows:

" SEC. 6. *And be it further enacted,* That from and after the establishment of the said government, the people of the aforesaid territory, shall be entitled to and enjoy, all and singular the rights, privileges and advantages granted to the people of the territory of the United States northwest of the river Ohio, in and by the aforesaid ordinance of the thirteenth day of July, in the year one thousand seven hundred and eighty-seven, in as full and ample a manner as the same are possessed and enjoyed by the people of the said last-mentioned territory."

Thus clearly defined by boundaries, by common citizenship, by like guarantees, stood the United States when the plan of acquiring by purchase from France the Province of Louisiana was conceived by President Jefferson. Naturally, the suggestion which arose, was the power on the part of the government of the United States, under the Constitution, to incorporate into the United States—a Union then composed, as I have stated, of States and Territories—a foreign province inhabited by an alien people, and thus make them partakers in the American commonwealth. Mr. Jefferson, not doubting the power of the United States to acquire, consulted Attorney General Lincoln as to the right by treaty to stipulate for incorporation. By that officer Mr. Jefferson was, in effect, advised that the power to incorporate, that is, to share the privileges and im-

munities of the people of the United States with a foreign population, required the consent of the people of the United States, and it was suggested, therefore, that if a treaty of cession were made containing such agreements it should be put in the form of a change of boundaries instead of a cession, so as thereby to bring the territory within the United States. The letter of Mr. Lincoln was sent by President Jefferson to Mr. Gallatin, the Secretary of the Treasury. Mr. Gallatin did not agree as to the propriety of the expedient suggested by Mr. Lincoln. In a letter to President Jefferson, in effect so stating, he said:

"But, does any constitutional objection really exist? To me it would appear (1) that the United States as a nation have an inherent right to acquire territory; (2) that whenever that acquisition is by treaty, the same constituted authorities in which the treaty-making power is vested have a constitutional right to sanction the acquisition; (3) that whenever the territory has been acquired Congress have the power either of admitting into the Union as a new State or of annexing to a State, with the consent of that State, or of making regulations for the government of such territory." Gallatin's Writings, vol. 1, p. 11, etc.

To this letter President Jefferson replied in January, 1803, clearly showing that he thought there was no question whatever of the right of the United States to acquire, but that he did not believe incorporation could be stipulated for and carried into effect without the consent of the people of the United States. He said (italics mine):

"You are right, in my opinion, as to Mr. L.'s proposition: *There is no constitutional difficulty as to the acquisition of territory, and whether when acquired it may be taken into the Union by the Constitution as it now stands* will become a question of expediency. I think it will be safer not to permit the enlargement of the Union but by amendment of the Constitution." Gallatin's Writings, vol. 1, p. 115.

And the views of Mr. Madison, then Secretary of State, exactly conformed to those of President Jefferson, for, on March 2, 1803, in a letter to the commissioners who were negotiating the treaty, he said:

"To incorporate the inhabitants of the hereby ceded territory

with the citizens of the United States, being a provision which cannot now be made, it is to be expected from the character and policy of the United States that such incorporation will take place without unnecessary delay." State Papers, II, 540.

Let us pause for a moment to accentuate the irreconcilable conflict which exists between the interpretation given to the Constitution at the time of the Louisiana treaty by Jefferson and Madison, and the import of that instrument as now insisted upon. You are to negotiate, said Madison to the commissioners, to obtain a cession of the territory, but you must not under any circumstances agree " *to incorporate the inhabitants of the hereby ceded territory with the citizens of the United States, being a provision which cannot now be made.*" Under the theory now urged, Mr. Madison should have said : You are to negotiate for the cession of the territory of Louisiana to the United States, and if deemed by you expedient in accomplishing this purpose, you may provide for the immediate incorporation of the inhabitants of the acquired territory into the United States. This you can freely do because the Constitution of the United States has conferred upon the treaty-making power the absolute right to bring all the alien people residing in acquired territory into the United States and thus divide with them the rights which peculiarly belong to the citizens of the United States. Indeed, it is immaterial whether you make such agreements, since by the effect of the Constitution without reference to any agreements which you may make for that purpose, all the alien territory and its inhabitants will instantly become incorporated into the United States if the territory is acquired.

Without going into details, it suffices to say that a compliance with the instructions given them would have prevented the negotiators on behalf of the United States from inserting in the treaty any provision looking even to the ultimate incorporation of the acquired territory into the United States. In view of the emergency and exigencies of the negotiations, however, the commissioners were constrained to make such a stipulation, and the treaty provided as follows :

" Art. III. The inhabitants of the ceded territory shall be incorporated into the Union of the United States, and admitted

as soon as possible, according to the principles of the Federal Constitution, to the enjoyment of all the rights, advantages and immunities of citizens of the United States ; and in the mean time they shall be maintained and protected in the free enjoyment of their liberty, property and the religion which they profess." 8 Stat. 202.

Weighing the provisions just quoted, it is evident they refute the theory of incorporation arising at once from the mere force of a treaty, even although such result be directly contrary to any provisions which a treaty may contain. Mark the language. It expresses a promise : " The inhabitants of the ceded territory *shall be incorporated into the Union of the United States.* . . ." Observe how guardedly the fulfillment of this pledge is postponed until its accomplishment is made possible by the will of the American people, since it is to be executed only " *as soon as possible according to the principles of the Federal Constitution.*" If the view now urged be true, this wise circumspection was unnecessary, and, indeed, as I have previously said, the entire proviso was superfluous, since everything which it assured for the future was immediately and unalterably to arise.

It is said, however, that the treaty for the purchase of Louisiana took for granted that the territory ceded would be immediately incorporated into the United States, and hence the guarantees contained in the treaty related, not to such incorporation, but was a pledge that the ceded territory was to be made a part of the Union as a State. The minutest analysis, however, of the clauses of the treaty fails to disclose any reference to a promise of statehood, and hence it can only be that the pledges made referred to incorporation into the United States. This will further appear when the opinions of Jefferson and Madison and their acts on the subject are reviewed. The argument proceeds upon the theory that the words of the treaty " shall be incorporated into the Union of the United States," could only have referred to a promise of statehood, since the then existing and incorporated Territories were not a part of the Union of the United States, as that Union consisted only of the States. But this has been shown to be unfounded,

since the "Union of the United States" was composed of States and Territories, both having been embraced within the boundaries fixed by the treaty of peace between Great Britain and the United States which terminated the Revolutionary war, the latter, the Territories, embracing districts of country which were ceded by the States to the United States under the express pledge that they should forever remain a part thereof. That this conception of the Union composing the United States was the understanding of Jefferson and Madison, and indeed of all those who participated in the events which preceded and led up to the Louisiana treaty, results from what I have already said, and will be additionally demonstrated by statements to be hereafter made. Again, the inconsistency of the argument is evident. Thus, whilst the premise upon which it proceeds is that foreign territory, when acquired, becomes at once a part of the United States, despite conditions in the treaty expressly excluding such consequence, it yet endeavors to escape the refutation of such theory which arises from the history of the government by the contention that the territories which were a part of the United States were not component constituents of the Union which composed the United States. I do not understand how foreign territory which has been acquired by treaty can be asserted to have been absolutely incorporated into the United States as a part thereof despite conditions to the contrary inserted in the treaty, and yet the assertion be made that the territories which, as I have said, were in the United States originally as a part of the States and which were ceded by them upon express condition that they should forever so remain a part of the United States, were not a part of the Union composing the United States. The argument, indeed, reduces itself to this, that for the purpose of incorporating foreign territory into the United States domestic territory must be disincorporated. In other words, that the Union must be, at least in theory, dismembered for the purpose of maintaining the doctrine of the immediate incorporation of alien territory.

That Mr. Jefferson deemed the provision of the treaty relating to incorporation to be repugnant to the Constitution is unquestioned. Whilst he conceded, as has been seen, the right

to acquire, he doubted the power to incorporate the territory into the United States without the consent of the people by a constitutional amendment. In July, 1803, he proposed two drafts of a proposed amendment, which he thought ought to be submitted to the people of the United States to enable them to ratify the terms of the treaty. The first of these, which is dated July, 1803, is printed in the margin.[1]

The second and revised amendment was as follows :

" Louisiana, as ceded by France to the United States, is made a part of the United States. Its white inhabitants shall be citizens, and stand, as to their rights and obligations, on the same footing with other citizens of the United States, in analogous situations. Save only that, as to the portion thereof lying north of the latitude of the mouth of Arcana River, no new State shall be established nor any grants of land made therein other than to Indians in exchange for equivalent portions of lands occupied by them until an amendment of the Constitution shall be made for those purposes.

" Florida also, whensoever it may be rightfully obtained, shall become a part of the United States. Its white inhabitants shall thereupon become citizens, and shall stand, as to their rights and obligations, on the same footing with other citizens of the United States in analogous situations." Ford's Writings of Jefferson, vol. 8, p. 241.

It is strenuously insisted that Mr. Jefferson's conviction on the subject of the repugnancy of the treaty to the Constitution was

---

[1] First draft of Mr. Jefferson's proposed amendment to the Constitution. "The Province of Louisiana is incorporated with the United States and made part thereof. The rights of occupancy in the soil and of self-government are confirmed to Indian inhabitants as they now exist." It then proceeded with other provisions relative to Indian rights and possession and exchange of lands, and forbidding Congress to dispose of the lands otherwise than is therein provided without further amendment to the Constitution. This draft closes thus: "Except as to that portion thereof which lies south of the latitude of 31°, which, whenever they deem expedient, they may enact into a territorial government, either separate or as making part with one on the eastern side of the river, vesting the inhabitants thereof with all rights possessed by other territorial citizens of the United States." Writings of Jefferson, edited by Ford, vol. 8, p. 241.

based alone upon the fact that he thought the treaty exceeded the limits of the Constitution, because he deemed that it provided for the admission, according to the Constitution, of the acquired territory as a new State or States into the Union, and hence, for the purpose of conferring this power, he drafted the amendment. The contention is refuted by two considerations; the first, because the two forms of amendment which Mr. Jefferson prepared did not purport to confer any power upon Congress to admit new States; and, second, they absolutely forbade Congress from admitting a new State out of a described part of the territory without a further amendment to the Constitution. It cannot be conceived that Mr. Jefferson would have drafted an amendment to cure a defect which he thought existed and yet say nothing in the amendment on the subject of such defect. And, moreover, it cannot be conceived that he drafted an amendment to confer a power he supposed to be wanting under the Constitution, and thus ratify the treaty, and yet in the very amendment withhold in express terms, as to a part of the ceded territory, the authority which it was the purpose of the amendment to confer.

I excerpt in the margin[1] two letters from Mr. Jefferson, one

---

[1] Letter to William Dunbar of July 7, 1803:

"Before you receive this you will have heard through the channel of the public papers of the cession of Louisiana by France to the United States. The terms as stated in the National Intelligencer are accurate. That the treaty may be ratified in time, I have found it necessary to convene Congress on the 17th of October, and it is very important for the happiness of the country that they should possess all information which can be obtained respecting it, that they make the best arrangements practicable for its good government. It is most necessary because they will be obliged to ask from the people an amendment of the Constitution authorizing their receiving the province into the Union and providing for its government, and limitations of power which shall be given by that amendment will be unalterable but by the same authority." Jefferson's Writings, vol. 8, p. 254.

Letter to Wilson Cary Nicholas of September 7, 1803:

"I am aware of the force of the observations you make on the power given by the Constitution to Congress to admit new States into the Union without restraining the subject to the territory then constituting the United States. But when I consider that the limits of the United States are precisely fixed by the treaty of 1783, that the Constitution expressly declares itself to be made for the United States, I cannot help believing

written under date of July 7, 1803, to William Dunbar, and the other dated September 7, 1803, to Wilson Cary Nicholas, which show clearly the difficulties which were in the mind of Mr. Jefferson, and which remove all doubt concerning the meaning of the amendment which he wrote and the adoption of which he deemed necessary to cure any supposed want of power concerning the treaty would be provided for.

These letters show that Mr. Jefferson bore in mind the fact that the Constitution in express terms delegated to Congress the power to admit new States, and, therefore, no further authority on this subject was required. But he thought this power in Congress was confined to the area embraced within the limits of the United States, as existing at the adoption of the Constitution. To fulfill the stipulations of the treaty so as to cause the ceded territory to become a part of the United States, Mr. Jefferson deemed an amendment to the Constitution to be essential. For this reason the amendment which he formulated declared that the territory ceded was to be " *a part of the United States,* and its white inhabitants shall be citizens, and stand, as to their rights and obligations, on the same footing with other citizens of the United States, *in analogous situations.*" What these words meant is not open to doubt when it is observed that they were but the paraphrase of the following words, which were contained in the first proposed amendment which Mr. Jefferson wrote : " Vesting the inhabitants thereof with all rights possessed *by other territorial citizens of the United States,*" which clearly show that it was the want of power to incorporate the ceded country into the United States as a territory which was in Mr. Jefferson's mind, and to accomplish which re-

---

that the intention was to permit Congress to admit into the Union new States which should be formed out of the territory for which and under whose authority alone they were then acting. I do not believe it was meant that they might receive England, Ireland, Holland, etc., into it, which would be the case under your construction. When an instrument admits two constructions, the one safe, the other dangerous, the one precise, the other indefinite, I prefer that which is safe and precise. I had rather ask an enlargement of power from the nation where it is found necessary than to assume it by a construction which would make our powers boundless." Writings of Jefferson, vol. 8, p. 247.

sult he thought an amendment to the Constitution was required. This provision of the amendment applied to all of the territory ceded, and, therefore, brought it all into the United States, and hence placed it in a position where the power of Congress to admit new States would have attached to it. As Mr. Jefferson deemed that every requirement of the treaty would be fulfilled by incorporation, and that it would be unwise to form a new State out of the upper part of the new territory, after thus providing for the complete execution of the treaty by incorporation of all the territory into the United States, he inserted a provision *forbidding Congress from admitting a new State out of a part of the territory.*

With the debates which took place on the subject of the treaty I need not particularly concern myself. Some shared Mr. Jefferson's doubts as to the right of the treaty-making power to incorporate the territory into the United States without an amendment of the Constitution; others deemed that the provision of the treaty was but a promise that Congress would ultimately incorporate as a territory, and until by the action of Congress this latter result was brought about full power of legislation to govern as deemed best was vested in Congress. This latter view prevailed. Mr. Jefferson's proposed amendment to the Constitution, therefore, was never adopted by Congress, and hence was never submitted to the people.

An act was approved on October 31, 1803, 2 Stat. 245, "to enable the President of the United States to take possession of the territories ceded by France to the United States by the treaty concluded at Paris on the 30th of April last, and for the temporary government thereof." The provisions of this act were absolutely incompatible with the conception that the territory had been incorporated into the United States by virtue of the cession. On November 10, 1803, 2 Stat. 245, an act was passed providing for the issue of stock to raise the funds to pay for the territory. On February 24, 1804, 2 Stat. 251, an act was approved which expressly extended certain revenue and other laws over the ceded country. On March 26, 1804, 2 Stat. 283, an act was passed dividing the "Province of Louisiana" into Orleans Territory on the south and the District of Louisiana to

the north. This act extended over the Territory of Orleans a large number of the general laws of the United States and provided a form of government. For the purposes of government the District of Louisiana was attached to the Territory of Indiana, which had been carved out of the Northwest Territory. Although the area described as Orleans Territory was thus under the authority of a territorial government and many laws of the United States had been extended by act of Congress to it, it was manifest that Mr. Jefferson thought that the requirement of the treaty that it should be incorporated into the United States had not been complied with.

In a letter written to Mr. Madison on July 14, 1804, Mr. Jefferson, speaking of the treaty of cession, said (Ford's Writings of Jefferson, vol. 8, p. 313):

" The enclosed reclamations of Girod & Chote against the claims of Bapstroop to a monopoly of the Indian commerce supposed to be under the protection of the third article of the Louisiana convention, as well as some other claims to abusive grants, will probably force us to meet that question. The article has been worded with remarkable caution on the part of our negotiators. It is that the inhabitants shall be admitted as soon as possible, according to the principles of our Constitution, to the enjoyment of all the rights of citizens, and, in the mean time, *en attendant*, shall be maintained in their liberty, property and religion. That is, that they shall continue under the protection of the treaty, until the principles of our Constitution can be extended to them, when the protection of the treaty is to cease, and that of our own principles to take its place. But as this could not be done at once, it has been provided to be as soon as our rules will admit. Accordingly, Congress has begun by extending about twenty particular laws by their titles, to Louisiana. Among these is the act concerning intercourse with the Indians, which establishes a system of commerce with them admitting no monopoly. That class of rights therefore are now taken from under the treaty and placed under the principles of our laws. I imagine it will be necessary to express an opinion to Governor Claiborne on this subject, after you shall have made up one."

In another letter to Mr. Madison, under date of August 15, 1804, Mr. Jefferson said (Ib. p. 315):

"I am so much impressed with the expediency of putting a termination to the right of France to patronize the rights of Louisiana, which will cease with their complete adoption as citizens of the United States, that I hope to see that take place on the meeting of Congress."

At the following session of Congress, on March 2, 1805, 2 Stat. 322, c. 23, an act was approved, which, among other purposes, doubtless was intended to fulfill the hope expressed by Mr. Jefferson in the letter just quoted. That act, in the first section, provided that the inhabitants of the Territory of Orleans "*shall be entitled to and enjoy all the rights, privileges and advantages secured by the said ordinance,*" (that is, the ordinance of 1787,) "*and now enjoyed by the people of the Mississippi Territory.*" As will be remembered, the ordinance of 1787 had been extended to that territory. 1 Stat. 550, c. 28. Thus, strictly in accord with the thought embodied in the amendments contemplated by Mr. Jefferson, citizenship was conferred, and the Territory of Orleans was incorporated into the United States to fulfill the requirements of the treaty, by placing it exactly in the position which it would have occupied had it been within the boundaries of the United States as a territory at the time the Constitution was framed. It is pertinent to recall that the treaty contained stipulations giving certain preferences and commercial privileges for a stated period to the vessels of French and Spanish subjects, and that even after the action of Congress above stated this condition of the treaty continued to be enforced, thus demonstrating that even after the incorporation of the territory the express provisions conferring a temporary right which the treaty had stipulated for and which Congress had recognized were not destroyed, the effect being that incorporation as to such matter was for the time being in abeyance.

The upper part of the Province of Louisiana, designated by the act of March 26, 1804, 2 Stat. 283, c. 38, as the District of Louisiana, and by the act of March 3, 1805, 2 Stat. 331, c. 27, as the Territory of Louisiana, was created the Territory of Mis-

souri on June 4, 1812. 2 Stat. 743, c 95. By this latter act, though the ordinance of 1787 was not in express terms extended over the territory—probably owing to the slavery agitation— the inhabitants of the territory were accorded substantially all the rights of the inhabitants of the Northwest Territory. Citizenship was in effect recognized in the ninth section, whilst the fourteenth section contained an elaborate declaration of the rights secured to the people of the territory.

Pausing to analyze the practical construction which resulted from the acquisition of the vast domain covered by the Louisiana purchase, it indubitably results, first, that it was conceded by every shade of opinion that the government of the United States had the undoubted right to acquire, hold and govern the territory as a possession, and that incorporation into the United States could under no circumstances arise solely from a treaty of cession, even although it contained provisions for the accomplishment of such result; second, it was strenuously denied by many eminent men that in acquiring territory, citizenship could be conferred upon the inhabitants within the acquired territory; in other words, that the territory could be incorporated into the United States without an amendment to the Constitution; and, third, that the opinion which prevailed was that, although the treaty might stipulate for incorporation and citizenship under the Constitution, such agreements by the treaty-making power were but promises depending for their fulfillment on the future action of Congress. In accordance with this view the territory acquired by the Louisiana purchase was governed as a mere dependency, until, conformably to the suggestion of Mr. Jefferson, it was by the action of Congress incorporated as a Territory into the United States and the same rights were conferred in the same mode by which other Territories had previously been incorporated, that is, by bestowing the privileges of citizenship and the rights and immunities which pertained to the Northwest Territory.

Florida was ceded by treaty signed on February 2, 1819. 8 Stat. 252. Whilst drafted in accordance with the precedent afforded by the treaty ceding Louisiana, the Florida treaty was slightly modified in its phraseology, probably to meet the view

that under the Constitution Congress had the right to determine the time when incorporation was to arise. Acting under the precedent afforded by the Louisiana case Congress adopted a plan of government which was wholly inconsistent with the theory that the territory had been incorporated. General Jackson was appointed governor under this act, and exercised a degree of authority entirely in conflict with the conception that the territory was a part of the United States, in the sense of incorporation, and that those provisions of the Constitution which would have been applicable under that hypothesis were then in force. It will serve no useful purpose to go through the gradations of legislation adopted as to Florida. Suffice it to say that in 1822, (3 Stat. 654, c. 13,) an act was passed, as in the case of Missouri, and presumably for the same reason, which, whilst not referring to the Northwest Territory ordinance, *in effect endowed the inhabitants of that territory with the rights granted by such ordinance.*

This treaty also, it is to be remarked, contained discriminatory commercial provisions incompatible with the conception of immediate incorporation arising from the treaty, and they were enforced by the executive officers of the government.

The intensity of the political differences which existed at the outbreak of hostilities with Mexico, and at the termination of the war with that country, and the subject around which such conflicts of opinion centered probably explains why the treaty of peace with Mexico departed from the form adopted in the previous treaties concerning Florida and Louisiana. That treaty, instead of expressing a cession in the form previously adopted, whether intentionally or not I am unable, of course, to say, resorted to the expedient suggested by Attorney General Lincoln to President Jefferson, and accomplished the cession *by changing the boundaries of the two countries;* in other words, *by bringing the acquired territory within the described boundaries of the United States.* The treaty, besides, contained a stipulation for rights of citizenship; in other words, a provision equivalent in terms to those used in the previous treaties to which I have referred. The controversy which was then flagrant on the subject of slavery prevented the passage of a

bill giving California a territorial form of government, and California after considerable delay was therefore directly admitted into the Union as a State. After the ratification of the treaty various laws were enacted by Congress, which in effect treated the territory as acquired by the United States, and the executive officers of the government, conceiving that these acts were an implied or express ratification of the provisions of the treaty by Congress, acted upon the assumption that the provisions of the treaty were thus made operative, and hence incorporation had thus become efficacious.

Ascertaining the general rule from the provisions of this latter treaty and the practical execution which it received, it will be seen that the precedents established in the cases of Louisiana and Florida were departed from to a certain extent; that is, the rule was considered to be that where the treaty, in express terms, brought the territory within the boundaries of the United States and provided for incorporation, and the treaty was expressly or impliedly recognized by Congress, the provisions of the treaty ought to be given immediate effect. But this did not conflict with the general principles of the law of nations which I have at the outset stated, but enforced it, since the action taken assumed, not that incorporation was brought about by the treaty-making power wholly without the consent of Congress, but only that as the treaty provided for incorporation in express terms, and Congress had acted without repudiating it, its provisions should be at once enforced.

Without referring in detail to the acquisition from Russia of Alaska, it suffices to say that that treaty also contained provisions for incorporation and was acted upon exactly in accord with the practical construction applied in the case of the acquisitions from Mexico as just stated. However, the treaty ceding Alaska contained an express provision excluding from citizenship the uncivilized native tribes, and it has been nowhere contended that this condition of exclusion was inoperative because of the want of power under the Constitution in the treaty-making authority to so provide, which must be the case if the limitation on the treaty-making power, which is here asserted, be well founded. The treaty concerning Alaska, therefore, adds

cogency to the conception established by every act of the government from the foundation—that the condition of a treaty, when expressly or impliedly ratified by Congress, becomes the measure by which the rights arising from the treaty are to be adjusted.

The demonstration which it seems to me is afforded by the review which has preceded is besides sustained by various other acts of the government which to me are wholly inexplicable except upon the theory that it was admitted that the government of the United States had the power to acquire and hold territory without immediately incorporating it. Take, for instance, the simultaneous acquisition and admission of Texas, which was admitted into the Union as a State by joint resolution of Congress instead of by treaty. To what grant of power under the Constitution can this action be referred, unless it be admitted that Congress is vested with the right to determine when incorporation arises? It cannot be traced to the authority conferred on Congress to admit new States, for to adopt that theory would be to presuppose that this power gave the prerogative of conferring statehood on wholly foreign territory. But this I have incidentally shown is a mistaken conception. Hence, it must be that the action of Congress at one and the same time fulfilled the function of incorporation; and this being so, the privilege of statehood was added. But I shall not prolong this opinion by occupying time in referring to the many other acts of the government which further refute the correctness of the propositions which are here insisted on and which I have previously shown to be without merit. In concluding my appreciation of the history of the government attention is called to the Thirteenth Amendment to the Constitution, which to my mind seems to be conclusive. The first section of the amendment, the italics being mine, reads as follows: " Sec. 1. Neither slavery nor involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall exist within the United States, *or any place subject to their jurisdiction.*" Obviously this provision recognized that there may be places subject to the jurisdiction of the United States but which are not

incorporated into it, and hence are not within the United States in the completest sense of those words.

Let me proceed to show that the decisions of this court, without a single exception, are absolutely in accord with the true rule as evolved from a correct construction of the Constitution as a matter of first impression and as shown by the history of the government which has been previously epitomized. As it is appropriate here, I repeat the quotation which has heretofore been made from the opinion, delivered by Mr. Chief Justice Marshall, in *American Insurance Co.* v. *Canter*, 1 Pet. 511, where, considering the Florida treaty, the court said (p. 542):

"The usage of the world is, if a nation be not entirely subdued, to consider the holding of conquered territory as a mere military occupation, until its fate shall be determined at the treaty of peace. If it be ceded by the treaty, the acquisition is confirmed, and the ceded territory becomes a part of the nation to which it is annexed, either on the terms stipulated in the treaty of cession, or on such as its new master shall impose."

In *Fleming* v. *Page* the court, speaking through Mr. Chief Justice Taney, discussing the acts of the military forces of the United States while holding possession of Mexican territory, said (9 How. 603, 614):

"The United States, it is true, may extend its boundaries by conquest or treaty, and may demand the cession of territory as the condition of peace, in order to indemnify its citizens for the injuries they have suffered, or to reimburse the government for the expense of the war. But this can be done only by the treaty-making power or the legislative authority."

In *Cross* v. *Harrison*, 16 How. 164, the question for decision, as I have previously observed, was as to the legality of certain duties, collected both before and after the ratification of the treaty of peace, on foreign merchandise imported into California. Part of the duties collected were assessed upon importations made by local officials before notice had been received of the ratification of the treaty of peace, and when duties were laid under a tariff which had been promulgated by the President. Other duties were imposed subsequent to the receipt of notification of the ratification, and these latter duties were laid

according to the tariff as provided in the laws of the United States. All the exactions were upheld. The court decided that prior to and up to the receipt of notice of the ratification of the treaty, the local government lawfully imposed the tariff then in force in California, although it differed from that provided by Congress, and that subsequent to the receipt of notice of the ratification of the treaty, the duty prescribed by the act of Congress which the President had ordered the local officials to enforce could be lawfully collected. The opinion undoubtedly expressed the thought that by the ratification of the treaty in question, which, as I have shown, not only included the ceded territory within the boundaries of the United States, but also expressly provided for incorporation, the territory had become a part of the United States, and the body of the opinion quoted the letter of the Secretary of the Treasury which referred to the enactment of laws of Congress by which the treaty had been impliedly ratified. The decision of the court as to duties imposed subsequent to the receipt of notice of the ratification of the treaty of peace undoubtedly took the fact I have just stated into view and, in addition, unmistakably proceeded upon the nature of the rights which the treaty conferred. No comment can obscure or do away with the patent fact, namely, that it was unequivocally decided that if different provisions had been found in the treaty, a contrary result would have followed. Thus, speaking through Mr. Justice Wayne, the court said (16 How. 197):

"By the ratification of the treaty, California became a part of the United States. And, *as there is nothing differently stipulated in the treaty with respect to commerce*, it became instantly bound and privileged by the laws which Congress had passed to raise a revenue from duties on imports and tonnage."

It is then, as I think, indubitably settled by the principles of the law of nations, by the nature of the government created under the Constitution, by the express and implied powers conferred upon that government by the Constitution, by the mode in which those powers have been executed, from the beginning, and by an unbroken line of decisions of this court, first announced by Marshall and followed and lucidly expounded

by Taney, that the treaty-making power cannot incorporate territory into the United States without the express or implied assent of Congress, that it may insert in a treaty conditions against immediate incorporation, and that on the other hand when it has expressed in the treaty the conditions favorable to incorporation, they will, if the treaty be not repudiated by Congress, have the force of the law of the land, and therefore by the fulfillment of such conditions cause incorporation to result. It must follow, therefore, that where a treaty contains no conditions for incorporation, and, above all, where it not only has no such conditions but expressly provides to the contrary, incorporation does not arise until in the wisdom of Congress it is deemed that the acquired territory has reached that state where it is proper that it should enter into and form a part of the American family.

Does, then, the treaty in question contain a provision for incorporation, or does it, on the contrary, stipulate that incorporation shall not take place from the mere effect of the treaty and until Congress has so determined? is then the only question remaining for consideration.

The provisions of the treaty with respect to the *status* of Porto Rico and its inhabitants are as follows:

## "Article II.

"Spain cedes to the United States the Island of Porto Rico and other islands now under Spanish sovereignty in the West Indies, and the Island of Guam in the Marianas or Ladrones."

## "Article IX.

"Spanish subjects, natives of the Peninsula, residing in the territory over which Spain by the present treaty relinquishes or cedes her sovereignty, may remain in such territory or may remove therefrom, retaining in either event all their rights of property, including the right to sell or dispose of such property or of its proceeds; and they shall also have the right to carry on their industry, commerce and professions, being subject in respect thereof to such laws as are applicable to other foreigners. In case they remain in the territory they may pre-

serve their allegiance to the crown of Spain by making, before
a court of record, within a year from the date of the exchange
of ratifications of this treaty, a declaration of their decision to
preserve such allegiance; in default of which declaration they
shall be held to have renounced it and to have adopted the
nationality of the territory in which they may reside.

"The civil rights and political *status* of the native inhabi-
tants of the territories hereby ceded to the United States shall
be determined by the Congress.

## "Article X.

"The inhabitants of the territories over which Spain relin-
quishes or cedes her sovereignty shall be secured in the free
exercise of their religion."

It is to me obvious that the above quoted provisions of the
treaty do not stipulate for incorporation, but on the contrary
expressly provide that the "civil rights and political *status* of
the native inhabitants of the territories hereby ceded," shall
be determined by Congress. When the rights to which this
careful provision refers are put in juxtaposition with those
which have been deemed essential from the foundation of the
government to bring about incorporation, all of which have
been previously referred to, I cannot doubt that the express
purpose of the treaty was not only to leave the *status* of the
territory to be determined by Congress but to prevent the
treaty from operating to the contrary. Of course, it is evi-
dent that the express or implied acquiescence by Congress in
a treaty so framed cannot import that a result was brought
about which the treaty itself—giving effect to its provisions
—could not produce. And, in addition, the provisions of the
act by which the duty here in question was imposed, taken
as a whole, seem to me plainly to manifest the intention of
Congress that for the present at least Porto Rico is not to be
incorporated into the United States.

The fact that the act directs the officers to swear to support
the Constitution does not militate against this view, for, as I
have conceded, whether the island be incorporated or not, the
applicable provisions of the Constitution are there in force. A

further analysis of the provisions of the act seems to me not to be required in view of the fact that as the act was reported from the committee it contained a provision conferring citizenship upon the inhabitants of Porto Rico, and this was stricken out in the Senate. The argument, therefore, can only be that rights were conferred, which, after consideration, it was determined should not be granted. Moreover I fail to see how it is possible, on the one hand, to declare that Congress in passing the act had exceeded its powers by treating Porto Rico as not incorporated into the United States, and, at the same time, it be said that the provisions of the act itself amount to an incorporation of Porto Rico into the United States, although the treaty had not previously done so. It in reason cannot be that the act is void because it seeks to keep the island disincorporated, and, at the same time, that material provisions are not to be enforced because the act does incorporate. Two irreconcilable views of that act cannot be taken at the same time, the consequence being to cause it to be unconstitutional.

In what has preceded I have in effect considered every substantial proposition and have either conceded or reviewed every authority referred to as establishing that immediate incorporation resulted from the treaty of cession which is under consideration. Indeed, the whole argument in favor of the view that immediate incorporation followed upon the ratification of the treaty in its last analysis necessarily comes to this: Since it has been decided that incorporation flows from a treaty which provides for that result, when its provisions have been expressly or impliedly approved by Congress, it must follow that the same effect flows from a treaty which expressly stipulates to the contrary, even although the condition to that end has been approved by Congress. That is to say, the argument is this: Because a provision for incorporation when ratified incorporates, therefore a provision against incorporation must also produce the very consequence which it expressly provides against.

The result of what has been said is that whilst in an international sense Porto Rico was not a foreign country, since it was subject to the sovereignty of and was owned by the United States, it was foreign to the United States in a domestic sense,

because the island had not been incorporated into the United States, but was merely appurtenant thereto as a possession. As a necessary consequence, the impost in question assessed on merchandise coming from Porto Rico into the United States after the cession was within the power of Congress, and that body was not, moreover, as to such imposts, controlled by the clause requiring that imposts should be uniform throughout the United States; in other words, the provision of the Constitution just referred to was not applicable to Congress in legislating for Porto Rico.

Incidentally I have heretofore pointed out that the arguments of expediency, pressed with so much earnestness and ability concern the legislative and not the judicial department of the government. But it may be observed that even if the disastrous consequences which are foreshadowed as arising from conceding that the government of the United States may hold property without incorporation were to tempt me to depart from what seems to me to be the plain line of judicial duty, reason admonishes me that so doing would not serve to prevent the grave evils which it is insisted must come, but, on the contrary, would only render them more dangerous. This must be the result, since, as already said, it seems to me it is not open to serious dispute, that the military arm of the government of the United States may hold and occupy conquered territory without incorporation for such length of time as may seem appropriate to Congress in the exercise of its discretion. The denial of the right of the civil power to do so would not therefore prevent the holding of territory by the United States if it was deemed best by the political department of the government, but would simply necessitate that it should be exercised by the military instead of by the civil power.

And to me it further seems apparent that another and more disastrous result than that just stated would follow as a consequence of an attempt to cause judicial judgment to invade the domain of legislative discretion. Quite recently one of the stipulations contained in the treaty with Spain which is now under consideration came under review by this court. By the provision in question Spain relinquished "all claim of sover-

eignty over and title to Cuba." It was further provided in the treaty as follows:

" And as the island is upon the evacuation by Spain to be occupied by the United States, the United States will so long as such occupation shall last assume and discharge the obligations that may under international law result from the fact of its occupation and for the protection of life and property."

It cannot, it is submitted, be questioned that, under this provision of the treaty, as long as the occupation of the United States lasts, the benign sovereignty of the United States extends over and dominates the Island of Cuba. Likewise, it is not, it seems to me, questionable that the period when that sovereignty is to cease is to be determined by the legislative department of the government of the United States in the exercise of the great duties imposed upon it and with the sense of the responsibility which it owes to the people of the United States and the high respect which it of course feels for all the moral obligations by which the government of the United States may, either expressly or impliedly, be bound. Considering the provisions of this treaty and reviewing the pledges of this government extraneous to that instrument, by which the sovereignty of Cuba is to be held by the United States for the benefit of the people of Cuba and for their account, to be relinquished to them when the conditions justify its accomplishment, this court unanimously held in *Neely* v. *Henkel*, 180 U. S. 109, that Cuba was not incorporated into the United States and was a foreign country. It follows from this decision that it is lawful for the United States to take possession of and hold in the exercise of its sovereign power a particular territory, without incorporating it into the United States, if there be obligations of honor and good faith which, although not expressed in the treaty, nevertheless sacredly bind the United States to terminate the dominion and control, when, in its political discretion, the situation is ripe to enable it to do so. Conceding, then, for the purpose of the argument, it to be true that it would be a violation of duty under the Constitution for the legislative department, in the exercise of its discretion, to accept a cession of and permanently hold territory which is not

intended to be incorporated, the presumption necessarily must be that that department, which within its lawful sphere is but the expression of the political conscience of the people of the United States, will be faithful to its duty under the Constitution, and, therefore, when the unfitness of particular territory for incorporation is demonstrated the occupation will terminate. I cannot conceive how it can be held that pledges made to an alien people can be treated as more sacred than is that great pledge given by every member of every department of the government of the United States to support and defend the Constitution.

But if it can be supposed—which, of course, I do not think to be conceivable—that the judiciary would be authorized to draw to itself by an act of usurpation purely political functions, upon the theory that if such wrong is not committed a greater harm will arise, because the other departments of the government will forget their duty to the Constitution and wantonly transcend its limitations, I am further admonished that any judicial action in this case which would be predicated upon such an unwarranted conception would be absolutely unavailing. It cannot be denied that under the rule clearly settled in *Neely* v. *Henkel, supra,* the sovereignty of the United States may be extended over foreign territory to remain paramount until in the discretion of the political department of the government of the United States it be relinquished. This method, then, of dealing with foreign territory, would, in any event, be available. Thus, the enthralling of the treaty-making power, which would result from holding that no territory could be acquired by treaty of cession without immediate incorporation, would only result in compelling a resort to the subterfuge of relinquishment of sovereignty, and thus indirection would take the place of directness of action—a course which would be incompatible with the dignity and honor of the government.

I am authorized to say that Mr. Justice Shiras and Mr. Justice McKenna concur in this opinion.

Mr. Justice Gray, concurring.

Concurring in the judgment of affirmance in this case, and in substance agreeing with the opinion of Mr. Justice White, I will sum up the reasons for my concurrence in a few propositions, which may also indicate my position in other cases now standing for judgment.

The cases now before the court do not touch the authority of the United States over the Territories, in the strict and technical sense, being those which lie within the United States, as bounded by the Atlantic and Pacific Oceans, the Dominion of Canada and the Republic of Mexico, and the Territories of Alaska and Hawaii; but they relate to territory, in the broader sense, acquired by the United States by war with a foreign State.

As Chief Justice Marshall said: "The Constitution confers absolutely on the government of the Union the powers of making war, and of making treaties; consequently, that government possesses the power of acquiring territory, either by conquest or by treaty. The usage of the world is, if a nation be not entirely subdued, to consider the holding of conquered territory as a mere military occupation, until its fate shall be determined at the treaty of peace. If it be ceded by the treaty, the acquisition is confirmed, and the ceded territory becomes a part of the nation to which it is annexed; either on the terms stipulated in the treaty of cession, or on such as its new master shall impose." *American Insurance Co.* v. *Canter*, (1828) 1 Pet. 511, 542.

The civil government of the United States cannot extend immediately, and of its own force, over territory acquired by war. Such territory must necessarily, in the first instance, be governed by the military power under the control of the President as commander in chief. Civil government cannot take effect at once, as soon as possession is acquired under military authority, or even as soon as that possession is confirmed by treaty. It can only be put in operation by the action of the appropriate political department of the government, at such time and in such degree as that department may determine. There must, of necessity, be a transition period.

In a conquered territory, civil government must take effect, either by the action of the treaty-making power, or by that of

the Congress of the United States. The office of a treaty of cession ordinarily is to put an end to all authority of the foreign government over the territory; and to subject the territory to the disposition of the Government of the United States.

The government and disposition of territory so acquired belong to the Government of the United States, consisting of the President, the Senate, elected by the States, and the House of Representatives, chosen by and immediately representing the people of the United States. Treaties by which territory is acquired from a foreign State usually recognize this.

It is clearly recognized in the recent treaty with Spain, especially in the ninth article, by which "The civil rights and political *status* of the native inhabitants of the territories hereby ceded to the United States shall be determined by the Congress."

By the fourth and thirteenth articles of the treaty, the United States agree that, for ten years, Spanish ships and merchandise shall be admitted to the ports of the Philippine Islands on the same terms as ships and merchandise of the United States, and Spanish scientific, literary and artistic works, not subversive of public order, shall continue to be admitted free of duty into all the ceded territories. Neither of the provisions could be carried out if the Constitution required the customs regulations of the United States to apply in those territories.

In the absence of Congressional legislation, the regulation of the revenue of the conquered territory, even after the treaty of cession, remains with the executive and military authority.

So long as Congress has not incorporated the territory into the United States, neither military occupation nor cession by treaty makes the conquered territory domestic territory, in the sense of the revenue laws. But those laws concerning "foreign countries" remain applicable to the conquered territory until changed by Congress. Such was the unanimous opinion of this court, as declared by Chief Justice Taney, in *Fleming* v. *Page*, 9 How. 603, 617.

If Congress is not ready to construct a complete government for the conquered territory, it may establish a temporary government, which is not subject to all the restrictions of the Constitution.

Such was the effect of the act of Congress of April 12, 1900, c. 191, entitled " An act temporarily to provide revenues and a civil government for Porto Rico, and for other purposes." By the third section of that act, it was expressly declared that the duties thereby established on merchandise and articles going into Porto Rico from the United States, or coming into the United States from Porto Rico, should cease in any event on March 1, 1902, and sooner if .the legislative assembly of Porto Rico should enact and put into operation a system of local taxation to meet the necessities of the government established by that act.

The system of duties, temporarily established by that act during the transition period, was within the authority of Congress under the Constitution of the United States.

MR. CHIEF JUSTICE FULLER, (with whom concurred MR. JUSTICE HARLAN, MR. JUSTICE BREWER and MR. JUSTICE PECKHAM,) dissenting.

This is an action brought to recover moneys exacted by the collector of customs at the port of New York as import duties on two shipments of fruit from ports in the island of Porto Rico to the port of New York in November, 1900.

The treaty ceding Porto Rico to the United States was ratified by the Senate, February 6, 1899 ; Congress passed an act to carry out its obligations March 3, 1899 ; and the ratifications were exchanged, and the treaty proclaimed April 11, 1899. Then followed the act approved April 12, 1900. 31 Stat. 77, c. 191.

Mr. Justice Harlan, Mr. Justice Brewer, Mr. Justice Peckham and myself are unable to concur in the opinions and judgment of the court in this case. The majority widely differ in the reasoning by which the conclusion is reached, although there seems to be concurrence in the view that Porto Rico belongs to the United States, but nevertheless, and notwithstanding the act of Congress, is not a part of the United States, subject to the provisions of the Constitution in respect of the levy of taxes, duties, imposts and excises.

The inquiry is whether the act of April 12, 1900, so far as it requires the payment of import duties on merchandise brought from a port of Porto Rico as a condition of entry into other ports of the United States, is consistent with the Federal Constitution.

The act creates a civil government for Porto Rico, with a Governor, Secretary, Attorney General, and other officers, appointed by the President, by and with the advice and consent of the Senate, who, together with five other persons, likewise so appointed and confirmed, are constituted an executive council; local legislative powers are vested in a legislative assembly, consisting of the executive council and a house of delegates to be elected; courts are provided for, and, among other things, Porto Rico is constituted a judicial district, with a district judge, attorney and marshal to be appointed by the President for the term of four years. The district court is to be called the District Court of the United States for Porto Rico, and to possess, in addition to the ordinary jurisdiction of District Courts of the United States, jurisdiction of all cases cognizant in the Circuit Courts of the United States. The act also provides that " Writs of error and appeals from the final decisions of the Supreme Court of Porto Rico and the District Court of the United States shall be allowed and may be taken to the Supreme Court of the United States in the same manner and under the same regulations and in the same cases as from the Supreme Courts of the Territories of the United States; and such writs of error and appeal shall be allowed in all cases where the Constitution of the United States, or a treaty thereof, or an act of Congress is brought in question and the right claimed thereunder is denied."

It was also provided that the inhabitants continuing to reside in Porto Rico, who were Spanish subjects on April 11, 1899, and their children born subsequent thereto, (except such as should elect to preserve their allegiance to the Crown of Spain,) together with citizens of the United States, residing in Porto Rico, should " constitute a body politic under the name of The People of Porto Rico, with governmental powers as hereinafter conferred and with power to sue and be sued as such."

FULLER, C. J., HARLAN, BREWER and PECKHAM, JJ., dissenting.

All officials authorized by the act are required to "before entering upon the duties of their respective offices take an oath to support the Constitution of the United States and the laws of Porto Rico."

The second, third, fourth, fifth and thirty-eighth sections of the act are printed in the margin.[1]

---

[1] SEC. 2. That on and after the passage of this act the same tariffs, customs, and duties shall be levied, collected, and paid upon all articles imported into Porto Rico from ports other than those of the United States which are required by law to be collected upon articles imported into the United States from foreign countries: *Provided*, That on all coffee in the bean or ground imported into Porto Rico there shall be levied and collected a duty of five cents per pound, any law or part of law to the contrary notwithstanding: *And provided further*, That all Spanish scientific, literary, and artistic works, not subversive of public order in Porto Rico, shall be admitted free of duty into Porto Rico for a period of ten years, reckoning from the eleventh day of April, eighteen hundred and ninety-nine, as provided in said treaty of peace between the United States and Spain: *And provided further*, That all books and pamphlets printed in the English language shall be admitted into Porto Rico free of duty when imported from the United States.

SEC. 3. That on and after the passage of this act all merchandise coming into the United States from Porto Rico and coming into Porto Rico from the United States shall be entered at the several ports of entry upon payment of fifteen per centum of the duties which are required to be levied, collected, and paid upon like articles of merchandise imported from foreign countries; and in addition thereto upon articles of merchandise of Porto Rican manufacture coming into the United States and withdrawn for consumption or sale upon payment of a tax equal to the internal revenue tax imposed in the United States upon the like articles of merchandise of domestic manufacture; such tax to be paid by internal revenue stamp or stamps to be purchased and provided by the Commissioner of Internal Revenue and to be procured from the collector of internal revenue at or most convenient to the port of entry of said merchandise in the United States, and to be affixed under such regulations as the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, shall prescribe; and on all articles of merchandise of United States manufacture coming into Porto Rico in addition to the duty above provided upon payment of a tax equal in rate and amount to the internal revenue tax imposed in Porto Rico upon the like articles of Porto Rican manufacture: *Provided*, That on and after the date when this act shall take effect, all merchandise and articles, except coffee, not dutiable under the tariff laws of the United States, and all merchandise and articles entered in Porto Rico free of duty under orders heretofore made by the Secretary of War, shall be admitted

It will be seen that duties are imposed upon " merchandise coming into Porto Rico from the United States ; " " merchandise

into the several ports thereof, when imported from the United States, free of duty, all laws or parts of laws to the contrary notwithstanding; and whenever the legislative assembly of Porto Rico shall have enacted and put into operation a system of local taxation to meet the necessities of the government of Porto Rico, by this act established, and shall by resolution duly passed so notify the President, he shall make proclamation thereof, and thereupon all tariff duties on merchandise and articles going into Porto Rico from the United States or coming into the United States from Porto Rico shall cease, and from and after such date all such merchandise and articles shall be entered at the several ports of entry free of duty; and in no event shall any duties be collected after the first day of March, nineteen hundred and two, on merchandise and articles going into Porto Rico from the United States or coming into the United States from Porto Rico.

SEC. 4. That the duties and taxes collected in Porto Rico in pursuance of this act, less the cost of collecting the same, and the gross amount of all collections of duties and taxes in the United States upon articles of merchandise coming from Porto Rico, shall not be covered into the general fund of the Treasury, but shall be held as a separate fund, and shall be placed at the disposal of the President to be used for the government and benefit of Porto Rico until the government of Porto Rico herein provided for shall have been organized, when all moneys theretofore collected under the provisions hereof, then unexpended, shall be transferred to the local treasury of Porto Rico, and the Secretary of the Treasury shall designate the several ports and sub-ports of entry into Porto Rico and shall make such rules and regulations and appoint such agents as may be necessary to collect the duties and taxes authorized to be levied, collected, and paid in Porto Rico by the provisions of this act, and he shall fix the compensation and provide for the payment thereof of all such officers, agents, and assistants as he may find it necessary to employ to carry out the provisions hereof; *Provided, however,* That as soon as a civil government for Porto Rico shall have been organized in accordance with the provisions of this act and notice thereof shall have been given to the President he shall make proclamation thereof, and thereafter all collections of duties and taxes in Porto Rico under the provisions of this act shall be paid into the treasury of Porto Rico, to be expended as required by law for the government and benefit thereof instead of being paid into the Treasury of the United States.

SEC. 5. That on and after the day when this act shall go into effect all goods, wares, and merchandise previously imported from Porto Rico, for which no entry has been made, and all goods, wares, and merchandise previously entered without payment of duty and under bond for warehousing, transportation, or any other purpose, for which no permit of delivery to the importer or his agent has been issued, shall be subjected to the duties imposed by this act, and to no other duty, upon the entry or the withdrawal

coming into the United States from Porto Rico;" taxes upon "articles of merchandise of Porto Rican manufacture coming into the United States and withdrawn from consumption or sale" "equal to the internal-revenue tax imposed in the United States upon like articles of domestic manufacture;" and "on all articles of merchandise of United States manufacture coming into Porto Rico," "a tax equal in rate and amount to the internal-revenue tax imposed in Porto Rico upon the like articles of Porto Rican manufacture."

And it is also provided that all duties collected in Porto Rico on imports from foreign countries and on "merchandise coming into Porto Rico from the United States," and "the gross amount of all collections of duties and taxes in the United States upon articles of merchandise coming from Porto Rico," shall be held as a separate fund and placed "at the disposal of the President to be used for the government and benefit of Porto Rico" until the local government is organized, when "all collections of taxes and duties under this act shall be paid into the treasury of Porto Rico instead of being paid into the Treasury of the United States."

The first clause of section 8 of Article I of the Constitution

---

thereof: *Provided*, That when duties are based upon the weight of merchandise deposited in any public or private bonded warehouse said duties shall be levied and collected upon the weight of such merchandise at the time of its entry.

\*　\*　\*　\*　\*　\*　\*　\*

SEC. 38. That no export duties shall be levied or collected on exports from Porto Rico; but taxes and assessments on property, and license fees for franchises, privileges, and concessions may be imposed for the purposes of the insular and municipal governments, respectively as may be provided and defined by act of the legislative assembly; and where necessary to anticipate taxes and revenues, bonds and other obligations may be issued by Porto Rico or any municipal government therein as may be provided by law to provide for expenditures authorized by law, and to protect the public credit, and to reimburse the United States for any moneys which have been or may be expended out of the emergency fund of the War Department for the relief of the industrial conditions of Porto Rico caused by the hurricane of August eighth, eighteen hundred and ninety-nine. *Provided, however,* That no public indebtedness of Porto Rico or of any municipality thereof shall be authorized or allowed in excess of seven per centum of the aggregate tax valuation of its property.

provides: " The Congress shall have power to levy and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defence and general welfare of the United States; but all duties, imposts and excises shall be uniform throughout the United States."

Clauses four, five and six of section nine are:

" No capitation, or other direct, tax shall be laid, unless in proportion to the census or enumeration hereinbefore directed to be taken.

" No tax or duty shall be laid on articles exported from any State.

" No preference shall be given by any regulation of commerce or revenue to the ports of one State over those of another; nor shall vessels bound to, or from, one State, be obliged to enter, clear, or pay duties in another."

This act on its face does not comply with the rule of uniformity and that fact is admitted.

The uniformity required by the Constitution is a geographical uniformity, and is only attained when the tax operates with the same force and effect in every place where the subject of it is found. *Knowlton* v. *Moore*, 178 U. S. 41; *Head Money Cases*, 112 U. S. 580, 594. But it is said that Congress in attempting to levy these duties was not exercising power derived from the first clause of section 8, or restricted by it, because in dealing with the territories Congress exercises unlimited powers of government, and, moreover, that these duties are merely local taxes.

This court, in 1820, when Marshall was Chief Justice, and Washington, William Johnson, Livingston, Todd, Duvall and Story were his associates, took a different view of the power of Congress in the matter of laying and collecting taxes, duties, imposts and excises in the territories, and its ruling in *Loughborough* v. *Blake*, 5 Wheat. 317, has never been overruled.

It is said in one of the opinions of the majority that the Chief Justice " made certain observations which have occasioned some embarrassment in other cases." Manifestly this is so in this case, for it is necessary to overrule that decision in order to reach the result herein announced.

The question in *Loughborough* v. *Blake* was whether Congress had the right to impose a direct tax on the District of Columbia apart from the grant of exclusive legislation, which carried the power to levy local taxes. The court held that Congress had such power under the clause in question. The reasoning of Chief Justice Marshall was directed to show that the grant of the power " to lay and collect taxes, duties, imposts and excises," because it was general and without limitation as to place, consequently extended " to all places over which the government extends," and he declared that, if this could be doubted, the doubt was removed by the subsequent words, which modified the grant, " but all duties, imposts and excises shall be uniform throughout the United States." He then said : " It will not be contended that the modification of the power extends to places to which the power itself does not extend. The power then to lay and collect duties, imposts and excises may be exercised, and must be exercised throughout the United States. Does this term designate the whole, or any portion of the American empire? Certainly this question can admit of but one answer. It is the name given to our great republic, which is composed of States and territories. The District of Columbia, or the territory west of the Missouri, is not less within the United States, than Maryland or Pennsylvania; and it is not less necessary, on the principles of our Constitution, that uniformity in the imposition of imposts, duties and excises should be observed in the one, than in the other. Since, then, the power to lay and collect taxes, which includes direct taxes, is obviously coextensive with the power to lay and collect duties, imposts and excises, and since the latter extends throughout the United States, it follows that the power to impose direct taxes also extends throughout the United States."

It is wholly inadmissible to reject the process of reasoning by which the Chief Justice reached and tested the soundness of his conclusion as merely *obiter.*

Nor is there any intimation that the ruling turned on the theory that the Constitution irrevocably adhered to the soil of Maryland and Virginia, and, therefore, accompanied the parts which were ceded to form the District, or that " the tie " be-

tween those States and the Constitution " could not be dissolved, without at least the consent of the Federal and state governments to a formal separation," and that this was not given by the cession and its acceptance in accordance with the constitutional provision itself, and hence that Congress was restricted in the exercise of its powers in the District, while not so in the territories.

So far from that, the Chief Justice held the territories as well as the District to be part of the United States for the purposes of national taxation, and repeated in effect what he had already said in *McCulloch* v. *Maryland,* 4 Wheaton, 316, 408 : " Throughout this vast republic, from the St. Croix to the Gulf of Mexico, from the Atlantic to the Pacific, revenue is to be collected and expended, armies are to be marched and supported."

Conceding that the power to tax for the purposes of territorial government is implied from the power to govern territory, whether the latter power is attributed to the power to acquire or the power to make needful rules and regulations, these particular duties are nevertheless not local in their nature, but are imposed as in the exercise of national powers. The levy is clearly a regulation of commerce, and a regulation affecting the States and their people as well as this territory and its people. The power of Congress to act directly on the rights and interests of the people of the States can only exist if, and as, granted by the Constitution. And by the Constitution Congress is vested with power " to regulate commerce with foreign nations, and among the several States, and with the Indian tribes." The territories are indeed not mentioned by name, and yet commerce between the territories and foreign nations is covered by the clause, which would seem to have been intended to embrace the entire internal as well as foreign commerce of the country.

It is evident that Congress cannot regulate commerce between a territory and the States and other territories in the exercise of the bare power to govern the particular territory, and as this act was framed to operate and does operate on the people of the States, the power to so legislate is apparently

rested on the assumption that the right to regulate commerce between the States and territories comes within the commerce clause by necessary implication. *Stoutenburgh* v. *Hennick*, 129 U. S. 141.

Accordingly the act of Congress of August 8, 1890, entitled "An act to limit the effect of the regulations of commerce between the several States and with foreign countries in certain cases," applied in terms to the territories as well as to the States.

In any point of view, the imposition of duties on commerce operates to regulate commerce, and is not a matter of local legislation; and it follows that the levy of these duties was in the exercise of the national power to do so, and subject to the requirement of geographical uniformity.

The fact that the proceeds are devoted by the act to the use of the territory does not make national taxes, local. Nobody disputes the power of Congress to lay and collect duties, geographically uniform, and apply the proceeds by a proper appropriation act to the relief of a particular territory, but the destination of the proceeds would not change the source of the power to lay and collect. And that suggestion certainly is not strengthened when based on the diversion of duties collected from all parts of the United States to a territorial treasury before reaching the Treasury of the United States. Clause 7 of section 9 of Article I provides that "no money shall be drawn from the Treasury, but in consequence of appropriations made by law," and the proposition that this may be rendered inapplicable if the money is not permitted to be paid in so as to be susceptible of being drawn out, is somewhat startling.

It is also urged that Chief Justice Marshall was entirely in fault because while the grant was general and without limitation as to place, the words, "throughout the United States," imposed a limitation as to place so far as the rule of uniformity was concerned, namely, a limitation to the States as such.

Undoubtedly the view of the Chief Justice was utterly inconsistent with that contention, and, in addition to what has been quoted, he further remarked: "If it be said that the principle of uniformity, established in the Constitution, secures the District from oppression in the imposition of indirect taxes, it is

not less true that the principle of apportionment, also established in the Constitution, secures the District from any oppressive exercise of the power to lay and collect direct taxes." It must be borne in mind that the grant was of the absolute power of taxation for national purposes, wholly unlimited as to place, and subjected to only one exception and two qualifications. The exception was that exports could not be taxed at all. The qualifications were that direct taxes must be imposed by the rule of apportionment, and indirect taxes by the rule of uniformity. *License Tax Cases*, 5 Wall. 462. But as the power necessarily could be exercised throughout every part of the national domain, State, Territory, District, the exception and the qualifications attended its exercise. That is to say, the protection extended to the people of the States extended also to the people of the District and the Territories.

In *Knowlton* v. *Moore*, 178 U. S. 41, it is shown that the words "throughout the United States" are but a qualification introduced for the purpose of rendering the uniformity prescribed, geographical, and not intrinsic, as would have resulted if they had not been used.

As the grant of the power to lay taxes and duties was unqualified as to place, and the words were added for the sole purpose of preventing the uniformity required from being intrinsic, the intention thereby to circumscribe the area within which the power could operate not only cannot be imputed, but the contrary presumption must prevail.

Taking the words in their natural meaning—in the sense in which they are frequently and commonly used—no reason is perceived for disagreeing with the Chief Justice in the view that they were used in this clause to designate the geographical unity known as "The United States," "our great republic, which is composed of States and territories."

Other parts of the Constitution furnish illustrations of the correctness of this view. Thus the Constitution vests Congress with the power "to establish an uniform rule of naturalization, and uniform laws on the subject of bankruptcies throughout the United States."

FULLER, C. J., HARLAN, BREWER and PECKHAM, JJ., dissenting.

This applies to the territories as well as the States, and has always been recognized in legislation as binding.

Aliens in the territories are made citizens of the United States, and bankrupts residing in the territories are discharged from debts owing citizens of the States pursuant to uniform rules and laws enacted by Congress in the exercise of this power.

The Fourteenth Amendment provides that "all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the States wherein they reside;" and this court naturally held, in the *Slaughter House Cases*, 16 Wall. 36, that the United States included the District and the territories. Mr. Justice Miller observed: "It had been said by eminent judges that no man was a citizen of the United States, except as he was a citizen of one of the States composing the Union. Those, therefore, who had been born and resided always in the District of Columbia or in the territories, though within the United States, were not citizens. Whether this proposition was sound or not had never been judicially decided." And he said the question was put at rest by the Amendment, and the distinction between citizenship of the United States and citizenship of a State was clearly recognized and established. "Not only may a man be a citizen of the United States without being a citizen of a State, but an important element is necessary to convert the former into the latter. He must reside within the State to make him a citizen of it, but it is only necessary that he should be born or naturalized in the United States to be a citizen of the Union."

No person is eligible to the office of President unless he has "attained to the age of thirty-five years, and been fourteen years a resident within the United States." Clause 5, sec. 1, Art. II.

Would a native-born citizen of Massachusetts be ineligible if he had taken up his residence and resided in one of the territories for so many years that he had not resided altogether fourteen years in the States? When voted for he must be a citizen of one of the States (clause 3, sec. 1, Art. II; Art. XII), but as to length of time must residence in the territories be counted against him?

The Fifteenth Amendment declares that "the right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." Where does that prohibition on the United States especially apply if not in the territories?

The Thirteenth Amendment says that neither slavery nor involuntary servitude "shall exist within the United States or any place subject to their jurisdiction." Clearly this prohibition would have operated in the territories if the concluding words had not been added. The history of the times shows that the addition was made in view of the then condition of the country—the amendment passed the house January 31, 1865,—and it is moreover otherwise applicable than to the territories. Besides, generally speaking, when words are used simply out of abundant caution, the fact carries little weight.

Other illustrations might be adduced but it is unnecessary to prolong this opinion by giving them.

I repeat that no satisfactory ground has been suggested for restricting the words "throughout the United States," as qualifying the power to impose duties, to the States, and that conclusion is the more to be avoided when we reflect that it rests, in the last analysis, on the assertion of the possession by Congress of unlimited power over the territories.

The government of the United States is the government ordained by the Constitution, and possesses the powers conferred by the Constitution. "This original and supreme will organizes the government, and assigns to different departments their respective powers. It may either stop here, or establish certain limits not to be transcended by those departments. The government of the United States is of the latter description. The powers of the legislature are defined and limited; and that those limits may not be mistaken or forgotten, the Constitution is written. To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained?" *Marbury* v. *Madison*, 1 Cranch, 137, 176. The opinion of the court, by Chief Justice Marshall, in that case, was delivered at

the February term, 1803, and at the October term, 1885, the court, in *Yick Wo* v. *Hopkins,* 118 U. S. 356, speaking through Mr. Justice Matthews, said: " When we consider the nature and theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they 'do not mean to leave room for the play and action of purely personal and arbitrary power. Sovereignty itself is, of course, not subject to law, for it is the author and source of law; but in our system, while sovereign powers are delegated to the agencies of government, sovereignty itself remains with the people, by whom and for whom all government exists and acts. And the law is the definition and limitation of power."

From *Marbury* v. *Madison* to the present day, no utterance of this court has intimated a doubt that in its operation on the people, by whom and for whom it was established, the national government is a government of enumerated powers, the exercise of which is restricted to the use of means appropriate and plainly adapted to constitutional ends, and which are " not prohibited, but consist with the letter and spirit of the Constitution."

The powers delegated by the people to their agents are not enlarged by the expansion of the domain within which they are exercised. When the restriction on the exercise of a particular power by a particular agent is ascertained, that is an end of the question.

To hold otherwise is to overthrow the basis of our constitutional law, and moreover, in effect, to reassert the proposition that the States and not the people created the government.

It is again to antagonize Chief Justice Marshall, when he said: "The government of the Union, then, (whatever may be the influence of this fact on the case,) is, emphatically, and truly, a government of the people. In form and in substance it emanates from them. Its powers are granted by them, and are to be exercised directly on them, and for their benefit. This government is acknowledged by all to be one of enumerated powers." 4 Wheat. 404.

The prohibitory clauses of the Constitution are many, and

they have been repeatedly given effect by this court in respect of the Territories and the District of Columbia.

The underlying principle is indicated by Chief Justice Taney, in *The Passenger Cases*, 7 How. 283, 492, where he maintained the right of the American citizen to free transit in these words: "Living as we do under a common government, charged with the great concerns of the whole Union, every citizen of the United States, from the most remote States or territories, is entitled to free access, not only to the principal departments established at Washington, but also to its judicial tribunals and public offices in every State and territory of the Union. . . . For all the great purposes for which the Federal government was formed, we are one people, with one common country. We are all citizens of the United States; and, as members of the same community, must have the right to pass and repass through every part of it without interruption, as freely as in our own States."

In *Cross* v. *Harrison*, 16 How. 164, 197, it was held that by the ratification of the treaty with Mexico "California became a part of the United States," and that: "The right claimed to land foreign goods within the United States at any place out of a collection district, if allowed, would be a violation of that provision in the Constitution which enjoins that all duties, imposts and excises shall be uniform throughout the United States."

In *Dred Scott* v. *Sandford*, 19 How. 393, the court was unanimous in holding that the power to legislate respecting a territory was limited by the restrictions of the Constitution, or, as Mr. Justice Curtis put it, by "the express prohibitions on Congress not to do certain things."

Mr. Justice McLean said: "No powers can be exercised which are prohibited by the Constitution, or which are contrary to its spirit."

Mr. Justice Campbell: "I look in vain, among the discussions of the time, for the assertion of a supreme sovereignty for Congress over the territory then belonging to the United States, or that they might thereafter acquire. I seek in vain for an annunciation that a consolidated power had been inaugurated,

whose subject comprehended an empire, and which had no restriction but the discretion of Congress."

Chief Justice Taney: "The powers over persons and property of which we speak are not only not granted to Congress, but are in express terms denied, and they are forbidden to exercise them. And this prohibition is not confined to the States, but the words are general, and extend to the whole territory over which the Constitution gives it power to legislate, including those portions of it remaining under territorial government, as well as that covered by States. It is a total absence of power everywhere within the dominion of the United States, and places the citizens of a territory, so far as these rights are concerned, on the same footing with citizens of the States, and guards them as firmly and plainly against any inroads which the general government might attempt, under the plea of implied or incidental powers."

Many of the later cases were brought from territories over which Congress had professed to "extend the Constitution," or from the District after similar provision, but the decisions did not rest upon the view that the restrictions on Congress were self-imposed, and might be withdrawn at the pleasure of that body.

*Capital Traction Company* v. *Hof,* 174 U. S. 1, is a fair illustration, for it was there ruled, citing *Webster* v. *Reid,* 11 How. 437; *Callan* v. *Wilson,* 127 U. S. 550; *Thompson* v. *Utah,* 170 U. S. 343, that "it is beyond doubt, at the present day, that the provisions of the Constitution of the United States securing the right of trial by jury, whether in civil or in criminal cases, are applicable to the District of Columbia."

No reference whatever was made to section 34 of the act of February 21, 1871, 16 Stat. 419, c. 62, which, in providing for the election of a delegate for the District, closed with the words: "The person having the greatest number of legal votes shall be declared by the governor to be duly elected, and a certificate thereof shall be given accordingly; and the Constitution and all laws of the United States, which are not locally inapplicable, shall have the same force and effect within the said District of Columbia as elsewhere within the United States."

Nor did the court in *Bauman* v. *Ross*, 167 U. S. 548, attribute the application of the Fifth Amendment to the act of Congress, although it was cited to another point.

The truth is that, as Judge Edmunds wrote, "the instances in which Congress has declared in statutes organizing territories, that the Constitution and laws should be in force there, are no evidence that they were not already there, for Congress and all legislative bodies have often made enactments that in effect merely declared existing law. In such cases they declare a preëxisting truth to ease the doubts of casuists." Cong. Rec. 56th Cong. 1st Sess. p. 3507.

In *Callan* v. *Wilson*, 127 U. S. 540, 550, which was a criminal prosecution in the District of Columbia, Mr. Justice Harlan, speaking for the court, said: "There is nothing in the history of the Constitution or of the original amendments to justify the assertion that the people of this District may be lawfully deprived of the benefit of any of the constitutional guarantees of life, liberty, and property—especially of the privilege of trial by jury in criminal cases." And further: "We cannot think that the people of this District have, in that regard, less rights than those accorded to the people of the territories of the United States."

In *Thompson* v. *Utah*, 170 U. S. 343, it was held that a statute of the State of Utah, providing for the trial of criminal cases other than capital, by a jury of eight, was invalid as applied on a trial for a crime committed before Utah was admitted; that it was not "competent for the State of Utah, upon its admission into the Union, to do in respect of Thompson's crime what the United States could not have done while Utah was a Territory;" and that an act of Congress providing for a trial by a jury of eight persons in the Territory of Utah would have been in conflict with the Constitution.

Article 6 of the Constitution ordains: "This Constitution, and the laws of the United States which shall be made in persuance thereof and all treaties made, or which shall be made under the authority of the United States, shall be the supreme law of the land."

And, as Mr. Justice Curtis observed in *United States* v. *Morris*,

1 Curtis, 23, 50, "nothing can be clearer than the intention to have the Constitution, laws, and treaties of the United States in equal force throughout every part of the territory of the United States, alike in all places, at all times."

But it is said that an opposite result will be reached if the opinion of Chief Justice Marshall in *American Insurance Company* v. *Canter*, 1 Pet. 511, be read "in connection with Art. III, secs. 1 and 2 of the Constitution, vesting ' the judicial power of the United States' in ' one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish. The judges, both of the Supreme and inferior courts, shall hold their offices during good behaviour,' " etc. And it is argued : " As the only judicial power vested in Congress is to create courts whose judges shall hold their offices during good behaviour, it necessarily follows that, if Congress authorizes the creation of courts and the appointment of judges for a limited time, it must act independently of the Constitution, and upon territory which is not part of the United States within the meaning of the Constitution."

And further, that if the territories "be a part of the United States, it is difficult to see how Congress could create courts in such territories, except under the judicial clause of the Constitution."

By the ninth clause of section 8 of Article I, Congress is vested with power " to constitute tribunals inferior to the Supreme Court," while by section 1 of Article III the power is granted to it to establish inferior courts in which the judicial power of the government treated of in that article is vested.

That power was to be exerted over the controversies therein named, and did not relate to the general administration of justice in the territories, which was committed to courts established as part of the territorial government.

What the Chief Justice said was (p. 546): " These courts, then, are not constitutional courts, in which the judicial power conferred by the Constitution on the general government can be deposited. They are incapable of receiving it. They are legislative courts, created in virtue of the general right of sovereignty which exists in the government, or in virtue of that

clause which enables Congress to make all needful rules and regulations respecting the territory belonging to the United States. The jurisdiction with which they are invested is not a part of that judicial power which is defined in the third article of the Constitution, but is conferred by Congress, in the execution of those general powers which that body possesses over the territories of the United States."

The Chief Justice was dealing with the subject in view of the nature of the judicial department of the government and the distinction between Federal and state jurisdiction, and the conclusion was, to use the language of Mr. Justice Harlan in *McAllister* v. *United States*, 141 U. S. 174, " that courts in the territories, created under the plenary municipal authority that Congress possesses over the territories of the United States, are not courts of the United States created under the authority conferred by that article."

But it did not therefore follow that the territories were not parts of the United States, and that the power of Congress, in general, over them, was unlimited; nor was there in any of the discussions on this subject the least intimation to that effect.

And this may justly be said of expressions in some other cases, supposed to give color to this doctrine of absolute dominion in dealing with civil rights.

In *Murphy* v. *Ramsey*, 114 U. S. 15, Mr. Justice Matthews said : " The personal and civil rights of the inhabitants of the territories are secured to them, as to other citizens, by the principles of constitutional liberty which restrain all the agencies of government, state and national. Their political rights are franchises, which they hold as privileges in the legislative discretion of the Congress of the United States."

In the *Mormon Church Case*, 136 U. S. 1, 44, Mr. Justice Bradley observed : " Doubtless Congress, in legislating for the territories, would be subject to those fundamental limitations in favor of personal rights which are formulated in the Constitution and its amendments ; but these limitations would exist rather by inference and the general spirit of the Constitution from which Congress derives all its powers than by any express and direct application of its provisions."

That able judge was referring to the fact that the Constitution does not expressly declare that its prohibitions operate on the power to govern the territories, but because of the implication that an express provision to that effect might be essential, three members of the court were constrained to dissent, regarding it, as was said, " of vital consequence that absolute power should never be conceded as belonging under our system of government to any one of its departments."

What was ruled in *Murphy* v. *Ramsey* is that in places over which Congress has exclusive local jurisdiction its power over the political *status* is plenary.

Much discussion was had at the bar in respect to the citizenship of the inhabitants of Porto Rico, but we are not required to consider that subject at large in these cases. It will be time enough to seek a ford when, if ever, we are brought to the stream.

Yet although we are confined to the question of the validity of certain duties imposed after the organization of Porto Rico as a territory of the United States a few observations and some references to adjudged cases may well enough be added in view of the line of argument pursued in the concurring opinion.

In *American Insurance Company* v. *Canter*, 1 Pet. 511, 541—in which, by the way, the court did not accept the views of Mr. Justice Johnson in the Circuit Court or of Mr. Webster in argument—Chief Justice Marshall said : " The course which the argument has taken, will require, that, in deciding this question, the court should take into view the relation in which Florida stands to the United States. The Constitution confers absolutely on the government of the Union, the powers of making war, and of making treaties ; consequently, that government possesses the power of acquiring territory, either by conquest or by treaty. The usage of the world is, if a nation be not entirely subdued, to consider the holding of conquered territory as a mere military occupation, until its fate shall be determined at the treaty of peace. If it be ceded by the treaty, the acquisition is confirmed, and the ceded territory becomes a part of the nation to which it is annexed ; either on the terms stipulated in the treaty of cession, or on such as its new master shall impose.

On such transfer of territory, it has never been held, that the relations of the inhabitants with each other undergo any change. Their relations with their former sovereign are dissolved, and new relations are created between them, and the government which has acquired their territory.  The same act which transfers their country, transfers the allegiance of those who remain in it; and the law, which may be denominated political, is necessarily changed, although that which regulates the intercourse, and general conduct of individuals, remains in force, until altered by the newly created power of the State.  On the 2d of February, 1819, Spain ceded Florida to the United States.  The sixth article of the treaty of cession contains the following provision: 'The inhabitants of the territories, which his Catholic Majesty cedes to the United States by this treaty, shall be incorporated in the Union of the United States, as soon as may be consistent with the principles of the Federal Constitution; and admitted to the enjoyment of the privileges, rights, and immunities of the citizens of the United States.'  This treaty is the law of the land, and admits the inhabitants of Florida to the enjoyment of the privileges, rights, and immunities, of the citizens of the United States.  It is unnecessary to inquire, whether this is not their condition, independent of stipulation. They do not, however, participate in political power; they do not share in the government, till Florida shall become a State. In the mean time, Florida continues to be a territory of the United States; governed by virtue of that clause in the Constitution, which empowers Congress 'to make all needful rules and regulations, respecting the territory, or other property belonging to the United States.'  Perhaps the power of governing a territory belonging to the United States, which has not, by becoming a State, acquired the means of self-government, may result necessarily from the facts, that it is not within the jurisdiction of any particular State, and is within the power and jurisdiction of the United States.  The right to govern may be the inevitable consequence of the right to acquire territory. Whichever may be the source, whence the power is derived, the possession of it is unquestioned."

General Halleck, (Int. Law, 1st ed. chap. 33, § 14,) after quoting from Chief Justice Marshall, observed:

"This is now a well settled rule of the law of nations, and is universally admitted. Its provisions are clear and simple, and easily understood; but it is not so easy to distinguish between what are *political* and what are *municipal* laws, and to determine *when* and *how far* the constitution and laws of the conqueror change or replace those of the conquered. And in case the government of the new state is a constitutional government, of limited and divided powers, questions necessarily arise respecting the authority, which, in the absence of legislative action, can be exercised in the conquered territory after the cessation of war, and the conclusion of a treaty of peace. The determination of these questions depends upon the institutions and laws of the new sovereign, which, though conformable to the general rule of the law of nations, affect the construction and application of that rule to particular cases."

In *United States* v. *Percheman*, 7 Pet. 51, 87, the Chief Justice said:

"The people change their allegiance; their relation to their ancient sovereign is dissolved; but their relations to each other, and their rights of property, remain undisturbed. If this be the modern rule even in cases of conquest, who can doubt its application to the case of an amicable cession of territory? . . . . The cession of a territory by its name from one sovereign to another, conveying the compound idea of surrendering at the same time the lands and the people who inhabit them, would be necessarily understood to pass the sovereignty only, and not to interfere with private property."

Again the court in *Pollard's Lessee* v. *Hagan*, 3 How. 212, 225 said:

"Every nation acquiring territory, by treaty or otherwise, must hold it subject to the constitution and laws of its own government, and not according to those of the government ceding it."

And in *Chicago, Rock Island & Pacific Railway Co.* v. *Mc-Glinn*, 114 U. S. 546: "It is a general rule of public law, recognized and acted upon by the United States, that whenever

political jurisdiction and legislative power over any territory are transferred from one nation or sovereign to another, the municipal laws of the country, that is, laws which are intended for the protection of private rights, continue in force until abrogated or changed by the new government or sovereign. By the cession public property passes from one government to the other, but private property remains as before, and with it those municipal laws which are designed to secure its peaceful use and enjoyment. As a matter of course, all laws, ordinances, and regulations in conflict with the political character, institutions, and constitution of the new government are at once displaced. Thus, upon a cession of political jurisdiction and legislative power—and the latter is involved in the former—to the United States, the laws of the country in support of an established religion, or abridging the freedom of the press, or authorizing cruel and unusual punishments, and the like, would at once cease to be of obligatory force without any declaration to that effect; and the laws of the country on other subjects would necessarily be superseded by existing laws of the new government upon the same matters. But with respect to other laws affecting the possession, use and transfer of property, and designed to secure good order and peace in the community, and promote its health and prosperity, which are strictly of a municipal character, the rule is general that a change of government leaves them in force until, by direct action of the new government, they are altered or repealed."

When a cession of territory to the United States is completed by the ratification of a treaty, it was stated in *Cross* v. *Harrison*, 16 How. 164, 198, that the land ceded becomes a part of the United States, and that as soon as it becomes so the territory is subject to the acts which were in force to regulate foreign commerce with the United States, after those had ceased which had been instituted for its regulation as a belligerent right; and the latter ceased after the ratification of the treaty. This statement was made by the Justice delivering the opinion as the result of the discussion and argument which he had already set forth. It was his summing up of what he supposed was decided on that subject in the case in which he was writing

FULLER, C. J., HARLAN, BREWER and PECKHAM, JJ., dissenting.

The new master was, in the instance of Porto Rico, the United States, a constitutional government with limited powers, and the terms which the Constitution itself imposed, or which might be imposed in accordance with the Constitution, were the terms on which the new master took possession.

The power of the United States to acquire territory by conquest, by treaty, or by discovery and occupation, is not disputed, nor is the proposition that in all international relations, interests, and responsibilities the United States is a separate, independent, and sovereign nation; but it does not derive its powers from international law, which, though a part of our municipal law, is not a part of the organic law of the land. The source of national power in this country is the Constitution of the United States; and the government, as to our internal affairs, possesses no inherent sovereign power not derived from that instrument, and inconsistent with its letter and spirit.

Doubtless the subjects of the former sovereign are brought by the transfer under the protection of the acquiring power, and are so far forth impressed with its nationality, but it does not follow that they necessarily acquire the full *status* of citizens. The ninth article of the treaty ceding Porto Rico to the United States provided that Spanish subjects, natives of the Peninsula, residing in the ceded territory, might remain or remove, and in case they remained might preserve their allegiance to the crown of Spain by making a declaration of their decision to do so, "in default of which declaration they shall be held to have renounced it and to have adopted the nationality of the territory in which they reside."

The same article also contained this paragraph: "The civil rights and political *status* of the native inhabitants of the territories hereby ceded to the United States shall be determined by Congress." This was nothing more than a declaration of the accepted principles of international law applicable to the *status* of the Spanish subjects and of the native inhabitants. It did not assume that Congress could deprive the inhabitants of ceded territory of rights to which they might be entitled. The grant by Spain could not enlarge the powers of Congress, nor did it

purport to secure from the United States a guaranty of civil or political privileges.

Indeed a treaty which undertook to take away what the Constitution secured or to enlarge the Federal jurisdiction would be simply void.

"It need hardly be said that a treaty cannot change the Constitution or be held valid if it be in violation of that instrument. This results from the nature and fundamental principles of our government." *The Cherokee Tobacco,* 11 Wall. 616, 620.

So Mr. Justice Field in *Geofroy* v. *Riggs,* 133 U. S. 258, 267: "The treaty power, as expressed in the Constitution, is in terms unlimited except by those restraints which are found in that instrument against the action of the government or of its departments, and those arising from the nature of the government itself and of that of the States. It would not be contended that it extends so far as to authorize what the Constitution forbids, or a change in the character of the government or in that of one of the States, or a cession of any portion of the territory of the latter, without its consent."

And it certainly cannot be admitted that the power of Congress to lay and collect taxes and duties can be curtailed by an arrangement made with a foreign nation by the President and two thirds of a quorum of the Senate. See 2 Tucker on the Constitution, §§ 354, 355, 356.

In the language of Judge Cooley: "The Constitution itself never yields to treaty or enactment; it neither changes with time nor does it in theory bend to the force of circumstances. It may be amended according to its own permission; but while it stands it is 'a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times and under all circumstances.' Its principles cannot, therefore, be set aside in order to meet the supposed necessities of great crises. 'No doctrine involving more pernicious consequences was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government.'"

I am not intimating in the least degree that any reason exists for regarding this article to be unconstitutional, but even if it

were, the fact of the cession is a fact accomplished, and this court is concerned only with the question of the power of the government in laying duties in respect of commerce with the territory so ceded.

In the concurring opinion of Mr. Justice White, we find certain important propositions conceded, some of which are denied, or not admitted in the other. These are to the effect that " when an act of any department is challenged, because not warranted by the Constitution, the existence of the authority is to be ascertained by determining whether the power has been conferred by the Constitution, either in express terms or by lawful implication;" that as every function of the government is derived from the Constitution, "that instrument is everywhere and at all times potential in so far as its provisions are applicable;" that "wherever a power is given by the Constitution and there is a limitation imposed on the authority, such restriction operates upon and confines every action on the subject within its constitutional limits;" that where conditions are brought about to which any particular provision of the Constitution applies, its controlling influence cannot be frustrated by the action of any or all of the departments of the government; that the Constitution has conferred on Congress the right to create such municipal organizations as it may deem best for all the territories of the United States, but every applicable express limitation of the Constitution is in force, and even where there is no express command which applies, there may nevertheless be restrictions of so fundamental a nature that they cannot be transgressed though not expressed in so many words; that every provision of the Constitution which is applicable to the territories is controlling therein, and all the limitations of the Constitution applicable to Congress in governing the territories necessarily limit its power; that in the case of the territories, when a provision of the Constitution is invoked, the question is whether the provision relied on is applicable; and that the power to lay and collect taxes, duties, imposts and excises, as well as the qualification of uniformity, restrains Congress from imposing an impost duty on goods coming into the United States from a territory

which has been in corporated into and forms a part of the United States.

And it is said that the determination of whether a particular provision is applicable involves an inquiry into the situation of the territory and its relations to the United States, although it does not follow, when the Constitution has withheld all power over a given subject, that such an inquiry is necessary.

The inquiry is stated to be: "Had Porto Rico, at the time of the passage of the act in question, been incorporated into and become an integral part of the United States?" And the answer being given that it had not, it is held that the rule of uniformity was not applicable.

I submit that that is not the question in this case. The question is whether, when Congress has created a civil government for Porto Rico, has constituted its inhabitants a body politic, has given it a governor and other officers, a legislative assembly, and courts, with the right of appeal to this court, Congress can in the same act and in the exercise of the power conferred by the first clause of section eight, impose duties on the commerce between Porto Rico and the States and other territories in contravention of the rule of uniformity qualifying the power. If this can be done, it is because the power of Congress over commerce between the States and any of the territories is not restricted by the Constitution. This was the position taken by the Attorney General, with a candor and ability that did him great credit.

But that position is rejected, and the contention seems to be that if an organized and settled province of another sovereignty is acquired by the United States, Congress has the power to keep it, like a disembodied shade, in an intermediate state of ambiguous existence for an indefinite period; and, more than that, that after it has been called from that limbo, commerce with it is absolutely subject to the will of Congress, irrespective of constitutional provisions.

The accuracy of this view is supposed to be sustained by the act of 1856 in relation to the protection of citizens of the United States removing guano from unoccupied islands; but I am unable to see why the discharge by the United States of its un-

doubted duty to protect its citizens on *terra nullius,* whether temporarily engaged in catching and curing fish, or working mines, or taking away manure, furnishes support to the proposition that the power of Congress over the territories of the United States is unrestricted.

Great stress is thrown upon the word "incorporation," as if possessed of some occult meaning, but I take it that the act under consideration made Porto Rico, whatever its situation before, an organized territory of the United States. Being such, and the act undertaking to impose duties by virtue of clause one of section 8, how is it that the rule which qualifies the power does not apply to its exercise in respect of commerce with that territory? The power can only be exercised as prescribed, and even if the rule of uniformity could be treated as a mere regulation of the granted power, a suggestion to which I do not assent, the validity of these duties comes up directly and it is idle to discuss the distinction between a total want of power and a defective exercise of it.

The concurring opinion recognizes the fact that Congress, in dealing with the people of new territories or possessions, is bound to respect the fundamental guarantees of life, liberty, and property, but assumes that Congress is not bound, in those territories or possessions, to follow the rules of taxation prescribed by the Constitution. And yet the power to tax involves the power to destroy, and the levy of duties touches all our people in all places under the jurisdiction of the government.

The logical result is that Congress may prohibit commerce altogether between the States and territories, and may prescribe one rule of taxation in one territory, and a different rule in another.

That theory assumes that the Constitution created a government empowered to acquire countries throughout the world, to be governed by different rules than those obtaining in the original States and territories, and substitutes for the present system of republican government, a system of domination over distant provinces in the exercise of unrestricted power.

In our judgment, so much of the Porto Rican act as author-

ized the imposition of these duties is invalid, and plaintiffs were entitled to recover.

Some argument was made as to general consequences apprehended to flow from this result, but the language of the Constitution is too plain and unambiguous to permit its meaning to be thus influenced. There is nothing "in the literal construction so obviously absurd, or mischievous, or repugnant to the general spirit of the instrument, as to justify those who expound the Constitution" in giving it a construction not warranted by its words.

Briefs have been presented at this bar, purporting to be on behalf of certain industries, and eloquently setting forth the desirability that our government should possess the power to impose a tariff on the products of newly acquired territories so as to diminish or remove competition. That, however, furnishes no basis for judicial judgment, and if the producers of staples, in the existing States of this Union, believe the Constitution should be amended so as to reach that result, the instrument itself provides how such amendment can be accomplished. The people of all the States are entitled to a voice in the settlement of that subject.

Again, it is objected on behalf of the government that the possession of absolute power is essential to the acquisition of vast and distant territories, and that we should regard the situation as it is to-day rather than as it was a century ago. "We must look at the situation as comprehending a possibility—I do not say a probability, but a possibility—that the question might be as to the powers of this government in the acquisition of Egypt and the Soudan, or a section of Central Africa, or a spot in the Antarctic Circle, or a section of the Chinese Empire."

But it must be remembered that, as Marshall and Story declared, the Constitution was framed for ages to come, and that the sagacious men who framed it were well aware that a mighty future waited on their work. The rising sun to which Franklin referred at the close of the convention, they well knew, was that star of empire, whose course Berkeley had sung sixty years before.

They may not indeed have deliberately considered a trium-

MR. JUSTICE HARLAN, dissenting.

phal progress of the nation, as such, around the earth, but, as Marshall wrote: "It is not enough to say, that this particular case was not in the mind of the convention, when the article was framed, nor of the American people, when it was adopted. It is necessary to go farther, and to say that, had this particular case been suggested, the language would have been so varied, as to exclude it, or it would have been made a special exception."

This cannot be said, and, on the contrary, in order to the successful extension of our institutions, the reasonable presumption is that the limitations on the exertion of arbitrary power would have been made more rigorous.

After all, these arguments are merely political, and "political reasons have not the requisite certainty to afford rules of judicial interpretation."

Congress has power to make all laws which shall be necessary and proper for carrying into execution all the powers vested by the Constitution in the government of the United States, or in any department or officer thereof. If the end be legitimate and within the scope of the Constitution, then, to accomplish it, Congress may use "all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consistent with the letter and spirit of the Constitution."

The grave duty of determining whether an act of Congress does or does not comply with these requirements is only to be discharged by applying the well settled rules which govern the interpretation of fundamental law, unaffected by the theoretical opinions of individuals.

Tested by those rules our conviction is that the imposition of these duties cannot be sustained.

MR. JUSTICE HARLAN, dissenting.

I concur in the dissenting opinion of the Chief Justice. The grounds upon which he and Mr. Justice Brewer and Mr. Justice Peckham regard the Foraker act as unconstitutional in the particulars involved in this action meet my entire approval.

Those grounds need not be restated, nor is it necessary to re-examine the authorities cited by the Chief Justice. I agree in holding that Porto Rico—at least after the ratification of the treaty with Spain—became a part of the United States within the meaning of the section of the Constitution enumerating the powers of Congress and providing that " *all* duties, imposts and excises shall be uniform *throughout the United States.*"

In view, however, of the importance of the questions in this case, and of the consequences that will follow any conclusion reached by the court, I deem it appropriate—without redis-cussing the principal questions presented—to add some observa-tions suggested by certain passages in opinions just delivered in support of the judgment.

In one of those opinions it is said that "the Constitution was created by the people of the *United States,* as a union of *States,* to be governed solely by representatives of the *States;*" also, that "we find the Constitution speaking *only to States,* except in the territorial clause, which is absolute in its terms, and sug-gestive of no limitations upon the power of Congress in dealing with them." I am not sure that I correctly interpret these words. But if it is meant, as I assume it is meant, that, with the exception named, the Constitution was ordained by the States, and is addressed to and operates only on the States, I cannot accept that view.

In *Martin* v. *Hunter,* 1 Wheat. 304, 324, 326, 331, this court, speaking by Mr. Justice Story, said that "the Constitution of the United States was ordained and established, not by the States in their sovereign capacities, but emphatically, as the preamble of the Constitution declares, by the People of the United States."

In *McCulloch* v. *Maryland,* 4 Wheat. 316, 403–406, Chief Justice Marshall, speaking for this court, said: "The Govern-ment proceeds directly from the people; is 'ordained and es-tablished' in the name of the people; and is declared to be ordained, 'in order to form a more perfect union, establish jus-tice, ensure domestic tranquillity, and secure the blessings of liberty to themselves and their posterity.' The assent of the States, in their sovereign capacity, is implied in calling a Con-

MR. JUSTICE HARLAN, dissenting.

vention, and thus submitting that instrument to the people. But the people were at perfect liberty to accept or reject it; and their act was final. It required not the affirmance, and could not be negatived, by the state governments. The Constitution, when thus adopted, was of complete obligation, and bound the state sovereignties. . . . The Government of the Union, then, (whatever may be the influence of this fact on the case,) is, emphatically, and truly, a government of the people. In form and substance it emanates from them. Its powers are granted by them, and are to be exercised directly on them and for their benefit. This Government is acknowledged by all to be one of enumerated powers. . . . It is the Government of all; its powers are delegated by all; it represents all, and acts for all."

Although the States are constituent parts of the United States, the Government rests upon the authority of the people of the United States, and not on that of the States. Chief Justice Marshall, delivering the unanimous judgment of this court in *Cohens* v. *Virginia*, 6 Wheat. 264, 413, said: "That the United States form for many, and for most important purposes, a single nation, has not yet been denied. In war, we are one people. In making peace, we are one people. In all commercial regulations, we are one and the same people. In many other respects, the American people are one; and the government which is alone capable of controlling and managing their interests in all these respects is the Government of the Union. It is their Government, and in that character they have no other. America has chosen to be, in many respects and to many purposes, a nation; and for all these purposes her Government is complete; to all these objects it is competent. The people have declared that in the exercise of all powers given for those objects, it is supreme. It can, then, in effecting these objects, legitimately control all individuals or governments within the American territory."

In reference to the doctrine that the Constitution was established by and for the States as distinct political organizations, Mr. Webster said: "The Constitution itself in its very front refutes that. It declares that it is ordained and established by

the People of the United States.   So far from saying that it is established by the governments of the several States, it does not even say that it is established by the people of the several States.   But it pronounces that it was established by the people of the United States in the aggregate.   Doubtless, the people of the several States, taken collectively, constitute the people of the United States.   But it is in this their collective capacity, it is as all the people of the United States, that they established the Constitution."

In view of the adjudications of this court, I cannot assent to the proposition, whether it be announced in express words or by implication, that the National Government is a government of or by the States in union, and that the prohibitions and limitations of the Constitution are addressed only to the States.   That is but another form of saying that like the government created by the Articles of Confederation, the present government is a mere league of States, held together by compact between themselves ; whereas, as this court has often declared, it is a government created by the People of the United States, with enumerated powers, and supreme over States and individuals, with respect to certain objects, throughout the entire territory over which its jurisdiction extends.   If the National Government is, in any sense, a compact, it is a compact between the People of the United States among themselves as constituting in the aggregate the political community by whom the National Government was established.   The Constitution speaks not simply to the States in their organized capacities, but to all peoples, whether of States or territories, who are subject to the authority of the United States.   *Martin* v. *Hunter*, 1 Wheat. 304, 327.

In the opinion to which I am referring it is also said that the " practical interpretation put by Congress upon the Constitution has been long continued and uniform to the effect that the Constitution is applicable to territories acquired by purchase or conquest only when and so far as Congress shall so direct ; " that while all power of government may be abused, the same may be said of the power of the Government " under the Constitution as well as outside of it ; " that " if it once be conceded that we are at liberty to acquire foreign territory, a presumption arises that

our power with respect to such territories is the same power which other nations have been accustomed to exercise with respect to territories acquired by them ; " that " the liberality of Congress in legislating the Constitution into all our contiguous territories has undoubtedly fostered the impression that it went there by its own force, but there is nothing in the Constitution itself, and little in the interpretation put upon it, to confirm that impression ; " that as the States could only delegate to Congress such powers as they themselves possessed, and as they had no power to acquire new territory, and therefore none to delegate in that connection, the logical inference is that " if Congress had power to acquire new territory, which is conceded, that power was not hampered by the constitutional provisions ; " that if " we assume that the territorial clause of the Constitution was not intended to be restricted to such territory as the United States then possessed, there is nothing in the Constitution to indicate that the power of Congress in dealing with them was intended to be restricted by any of the other provisions ; " and that " the executive and legislative departments of the Government have for more than a century interpreted this silence as precluding the idea that the Constitution attached to these territories as soon as acquired."

These are words of weighty import. They involve consequences of the most momentous character. I take leave to say that if the principles thus announced should ever receive the sanction of a majority of this court, a radical and mischievous change in our system of government will be the result. We will, in that event, pass from the era of constitutional liberty guarded and protected by a written constitution into an era of legislative absolutism.

Although from the foundation of the Government this court has held steadily to the view that the Government of the United States was one of enumerated powers, and that no one of its branches, nor all of its branches combined, could constitutionally exercise powers not granted, or which were not necessarily implied from those expressly granted, *Martin* v. *Hunter*, 1 Wheat. 304, 326, 331, we are now informed that Congress possesses powers *outside of the Constitution*, and may deal with new ter-

ritory, acquired by treaty or conquest, in the same manner *as other nations have been accustomed to act with respect to territories acquired by them.* In my opinion, Congress has no existence and can exercise no authority outside of the Constitution. Still less is it true that Congress can deal with new territories just as other nations have done or may do with their new territories. This nation is under the control of a written constitution, the supreme law of the land and the only source of the powers which our Government, or any branch or officer of it, may exert at any time or at any place. Monarchical and despotic governments, unrestrained by written constitutions, may do with newly acquired territories what this Government may not do consistently with our fundamental law. To say otherwise is to concede that Congress may, by action taken outside of the Constitution, engraft upon our republican institutions a colonial system such as exists under monarchical governments. Surely such a result was never contemplated by the fathers of the Constitution. If that instrument had contained a word suggesting the possibility of a result of that character it would never have been adopted by the People of the United States. The idea that this country may acquire territories anywhere upon the earth, by conquest or treaty, and hold them as mere colonies or provinces—the people inhabiting them to enjoy only such rights as Congress chooses to accord to them—is wholly inconsistent with the spirit and genius as well as with the words of the Constitution.

The idea prevails with some—indeed, it found expression in arguments at the bar—that we have in this country substantially or practically two national governments; one, to be maintained under the Constitution, with all its restrictions; the other to be maintained by Congress outside and independently of that instrument, by exercising such powers as other nations of the earth are accustomed to exercise. It is one thing to give such a latitudinarian construction to the Constitution as will bring the exercise of power by Congress, upon a particular occasion or upon a particular subject, within its provisions. It is quite a different thing to say that Congress may, if it so elects, proceed outside of the Constitution. The glory of our American system

of government is that it was created by a written constitution which protects the people against the exercise of arbitrary, unlimited power, and the limits of which instrument may not be passed by the government it created, or by any branch of it, or even by the people who ordained it, except by amendment or change of its provisions. "To what purpose," Chief Justice Marshall said in *Marbury* v. *Madison*, 1 Cranch, 137, 176, "are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained? The distinction between a government with limited and unlimited powers is abolished if those limits do not confine the persons on whom they are imposed, and if acts prohibited and acts allowed are of equal obligation."

The wise men who framed the Constitution, and the patriotic people who adopted it, were unwilling to depend for their safety upon what, in the opinion referred to, is described as " certain principles of natural justice inherent in Anglo-Saxon character which need no expression in constitutions or statutes to give them effect or to secure dependencies against legislation manifestly hostile to their real interests." They proceeded upon the theory—the wisdom of which experience has vindicated—that the only safe guaranty against governmental oppression was to withhold or restrict the power to oppress. They well remembered that Anglo-Saxons across the ocean had attempted, in defiance of law and justice, to trample upon the rights of Anglo-Saxons on this continent and had sought, by military force, to establish a government that could at will destroy the privileges that inhere in liberty. They believed that the establishment here of a government that could administer public affairs according to its will unrestrained by any fundamental law and without regard to the inherent rights of freemen, would be ruinous to the liberties of the people by exposing them to the oppressions of arbitrary power. Hence, the Constitution enumerates the powers which Congress and the other Departments may exercise—leaving unimpaired, to the States or the People, the powers not delegated to the National Government nor prohibited to the States. That instrument so expressly declares in

the Tenth Article of Amendment. It will be an evil day for American liberty if the theory of a government outside of the supreme law of the land finds lodgment in our constitutional jurisprudence. No higher duty rests upon this court than to exert its full authority to prevent all violation of the principles of the Constitution.

Again, it is said that Congress has assumed, in its past history, that the Constitution goes into territories acquired by purchase or conquest *only when and as it shall so direct*, and we are informed of the liberality of Congress in *legislating* the Constitution into all our contiguous territories. This is a view of the Constitution that may well cause surprise, if not alarm. Congress, as I have observed, has no existence except by virtue of the Constitution. It is the creature of the Constitution. It has no powers which that instrument has not granted, expressly or by necessary implication. I confess that I cannot grasp the thought that Congress which lives and moves and has its being in the Constitution and is consequently the mere creature of that instrument, can, at its pleasure, legislate or exclude its creator from territories which were acquired only by authority of the Constitution.

By the express words of the Constitution, every Senator and Representative is bound, by oath or affirmation, to regard it as the supreme law of the land. When the Constitutional Convention was in session there was much discussion as to the phraseology of the clause defining the supremacy of the Constitution, laws and treaties of the United States. At one stage of the proceedings the Convention adopted the following clause: "This Constitution, and the laws of the United States made in pursuance thereof, and all the treaties made under the authority of the United States, shall be the supreme law of the several *States* and of *their* citizens and inhabitants, and the judges of the several States shall be bound thereby in their decisions, anything in the constitutions or laws of the several States to the contrary notwithstanding." This clause was amended, on motion of Mr. Madison, by inserting after the words "all treaties made" the words "or which shall be made." If the clause, so amended, had been inserted in the Constitution as finally adopted, per-

haps there would have been some justification for saying that the Constitution, laws and treaties of the United States constituted the supreme law only in the States, and that outside of the States the will of Congress was supreme. But the framers of the Constitution saw the danger of such a provision, and put into that instrument in place of the above clause the following: " This Constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be *the supreme law of the land ;* and the judges in every State shall be bound thereby, anything in the constitution or laws of any State to the contrary notwithstanding." Meigs's Growth of the Constitution, 284, 287. That the Convention struck out the words " the supreme law of the several States" and inserted " the supreme law of the land," is a fact of no little significance. The " land " referred to manifestly embraced all the peoples and all the territory, whether within or without the States, over which the United States could exercise jurisdiction or authority.

Further, it is admitted that *some* of the provisions of the Constitution do apply to Porto Rico and may be invoked as limiting or restricting the authority of Congress, or for the protection of the people of that island. And it is said that there is a clear distinction between such prohibitions " as go to the very root of the power of Congress to act at all, irrespective of time or place, and such as are operative only ' throughout the United States ' or among the several States." In the enforcement of this suggestion it is said in one of the opinions just delivered : " Thus, when the Constitution declares that ' no bill of attainder or *ex post facto* law shall be passed,' and that ' no title of nobility shall be granted by the United States,' it goes to the competency of Congress to pass a bill *of that description.*" I cannot accept this reasoning as consistent with the Constitution or with sound rules of interpretation. The express prohibition upon the passage by Congress of bills of attainder, or of *ex post facto* laws, or the granting of titles of nobility, goes no more directly to the root of the power of Congress than does the express prohibition against the imposition by Congress of any

duty, impost or excise that is not uniform throughout the United States. The opposite theory, I take leave to say, is quite as extraordinary as that which assumes that Congress may exercise powers outside of the Constitution, and may, in its discretion, legislate that instrument into or out of a domestic territory of the United States.

In the opinion to which I have referred it is suggested that conditions may arise when the annexation of distant possessions may be desirable. " If," says that opinion, " those possessions are inhabited by alien races, differing from us in religion, customs, laws, methods of taxation and modes of thought, the administration of government and justice, according to Anglo-Saxon principles, may for a time be impossible; and the question at once arises whether large *concessions* ought not to be made for a time, that ultimately our own theories may be carried out, and the blessings of a free government under the Constitution extended to them. We decline to hold that there is anything in the Constitution to forbid such action." In my judgment, the Constitution does not sustain any such theory of our governmental system. Whether a particular race will or will not assimilate with our people, and whether they can or cannot with safety to our institutions be brought within the operation of the Constitution, is a matter to be thought of when it is proposed to acquire their territory by treaty. A mistake in the acquistion of territory, although such acquisition seemed at the time to be necessary, cannot be made the ground for violating the Constitution or refusing to give full effect to its provisions. The Constitution is not to be obeyed or disobeyed as the circumstances of a particular crisis in our history may suggest the one or the other course to be pursued. The People have decreed that it shall be the supreme law of the land at all times. When the acquisition of territory becomes complete, by cession, the Constitution necessarily becomes the supreme law of such new territory, and no power exists in any Department of the Government to make " concessions " that are inconsistent with its provisions. The authority to make such concessions implies the existence in Congress of power to declare that constitutional provisions may be ignored under special or

embarrassing circumstances. No such dispensing power exists in any branch of our Government. The Constitution is supreme over every foot of territory, wherever situated, under the jurisdiction of the United States, and its full operation cannot be stayed by any branch of the Government in order to meet what some may suppose to be extraordinary emergencies. If the Constitution is in force in any territory, it is in force there for every purpose embraced by the objects for which the Government was ordained. Its authority cannot be displaced by concessions, even if it be true, as asserted in argument in some of these cases, that if the tariff act took effect in the Philippines of its own force, the inhabitants of Mandanao, who live on imported rice, would starve, because the import duty is many fold more than the ordinary cost of the grain to them. The meaning of the Constitution cannot depend upon accidental circumstances arising out of the products of other countries or of this country. We cannot violate the Constitution in order to serve particular interests in our own or in foreign lands. Even this court, with its tremendous power, must heed the mandate of the Constitution. No one in official station, to whatever department of the Government he belongs, can disobey its commands without violating the obligation of the oath he has taken. By whomsoever and wherever power is exercised in the name and under the authority of the United States, or of any branch of its Government, the validity or invalidity of that which is done must be determined by the Constitution.

In *DeLima* v. *Bidwell*, just decided, we have held that upon the ratification of the treaty with Spain, Porto Rico ceased to be a foreign country and became a domestic territory of the United States. We have said in that case that from 1803 to the present time there was not a shred of authority, except a *dictum* in one case, "for holding that a district ceded to and in possession of the United States remains for any purpose a foreign territory;" that territory so acquired cannot be "domestic for one purpose and foreign for another;" and that any judgment to the contrary would be "pure judicial legislation," for which there was no warrant in the Constitution or in the powers conferred upon this court. Although, as we have just decided,

Porto Rico ceased, after the ratification of the treaty with Spain, to be a foreign country within the meaning of the tariff act, and became a domestic country—"a territory of the United States"—it is said that if Congress so wills it may be controlled and governed outside of the Constitution and by the exertion of the powers which other nations have been accustomed to exercise with respect to territories acquired by them; in other words, we may solve the question of the power of Congress under the Constitution, by referring to the powers that may be exercised by other nations. I cannot assent to this view. I reject altogether the theory that Congress, in its discretion, can exclude the Constitution from a domestic territory of the United States, acquired, and which could only have been acquired, in virtue of the Constitution. I cannot agree that it is a domestic territory of the United States for the purpose of preventing the application of the tariff act imposing duties upon imports from foreign countries, but not a part of the United States for the purpose of enforcing the constitutional requirement that *all* duties, imposts and excises imposed by Congress " shall be uniform throughout the United States." How Porto Rico can be a domestic territory of the United States, as distinctly held in *DeLima* v. *Bidwell*, and yet, as is now held, not embraced by the words " throughout the United States," is more than I can understand.

We heard much in argument about the " expanding future of our country." It was said that the United States is to become what is called a " world power;" and that if this Government intends to keep abreast of the times and be equal to the great destiny that awaits the American people, it *must* be allowed to exert all the power that other nations are accustomed to exercise. My answer is, that the fathers never intended that the authority and influence of this nation should be exerted otherwise than in accordance with the Constitution. If our Government needs more power than is conferred upon it by the Constitution, that instrument provides the mode in which it may be amended and additional power thereby obtained. The People of the United States who ordained the Constitution never supposed that a change could be made in our system of govern-

ment by mere judicial interpretation. They never contemplated any such juggling with the words of the Constitution as would authorize the courts to hold that the words "throughout the United States," in the taxing clause of the Constitution, do not embrace a domestic "territory of the United States" having a civil government established by the authority of the United States. This is a distinction which I am unable to make, and which I do not think ought to be made when we are endeavoring to ascertain the meaning of a great instrument of government.

There are other matters to which I desire to refer. In one of the opinions just delivered the case of *Neely* v. *Henkel*, 180 U. S. 119, is cited in support of the proposition that the provision of the Foraker act here involved was consistent with the Constitution. If the contrary had not been asserted I should have said that the judgment in that case did not have the slightest bearing on the question before us. The only inquiry there was whether Cuba was a foreign country or territory within the meaning not of the tariff act but of the act of June 6, 1900, 31 Stat. 656, c. 793. We held that it was a foreign country. We could not have held otherwise, because the United States, when recognizing the existence of war between this country and Spain, disclaimed "any disposition or intention to exercise sovereignty, jurisdiction or control over said island except for the pacification thereof," and asserted "its determination, when that is accomplished, to leave the government and control of the island to its people." We said: "While by the act of April 25, 1898, declaring war between this country and Spain, the president was directed and empowered to use our entire land and naval forces, as well as the militia of the several States to such an extent as was necessary, to carry such act into effect, that authorization was not for the purpose of making Cuba an integral part of the United States, but only for the purpose of compelling the relinquishment by Spain of its authority and government in that island and the withdrawal of its forces from Cuba and Cuban waters. The legislative and executive branches of the Government, by the joint resolution of April 20, 1898, expressly disclaimed any purpose to exercise sovereignty, juris-

diction or control over Cuba 'except for the pacification thereof,' and asserted the determination of the United States, that object being accomplished, to leave the government and control of Cuba to its own people. All that has been done in relation to Cuba has had that end in view, and, so far as this court is informed by the public history of the relations of this country with that island, nothing has been done inconsistent with the declared object of the war with Spain. Cuba is none the less foreign territory, within the meaning of the act of Congress, because it is under a Military Governor appointed by and representing the President in the work of assisting the inhabitants of that island to establish a government of their own, under which, as a free and independent people, they may control their own affairs without interference by other nations. The occupancy of the island by troops of the United States was the necessary result of the war. That result could not have been avoided by the United States consistently with the principles of international law or with its obligations to the people of Cuba. It is true that as between Spain and the United States —indeed, as between the United States and all foreign nations —Cuba, upon the cessation of hostilities with Spain and after the Treaty of Paris was to be treated as if it were conquered territory. But as between the United States and Cuba, that island is territory held in trust for the inhabitants of Cuba to whom it rightfully belongs, and to whose exclusive control it will be surrendered when a stable government shall have been established by their voluntary action." In answer to the suggestion that, under the modes of trial there adopted, Neely, if taken to Cuba, would be denied the rights, privileges and immunities accorded by our Constitution to persons charged with crime against the United States, we said that the constitutional provisions referred to "have no relation to crimes committed without the jurisdiction of the United States against the laws of a foreign country." What use can be made of that case in order to prove that the Constitution is not in force in a territory of the United States acquired by treaty, except as Congress may provide, is more than I can perceive.

There is still another view taken of this case. Conceding

that the National Government is one of enumerated powers to be exerted only for the limited objects defined in the Constitution, and that Congress has no power, except as given by that instrument either expressly or by necessary implication, it is yet said that a new territory, acquired by treaty or conquest, cannot become *incorporated* into the United States without the consent of Congress. What is meant by such incorporation we are not fully informed, nor are we instructed as to the precise mode in which it is to be accomplished. Of course, no territory can become a State in virtue of a treaty or without the consent of the legislative branch of the Government; for only Congress is given power by the Constitution to admit new States. But it is an entirely different question whether a domestic " territory of the United States," having an organized civil government, established by Congress, is not, for all purposes of government by the Nation, under the complete jurisdiction of the United States and therefore a part of, and incorporated into, the United States, subject to all the authority which the National Government may exert over any territory or people. If Porto Rico, although a territory of the United States, may be treated as if it were not a part of the United States, then New Mexico and Arizona may be treated as not parts of the United States, and subject to such legislation as Congress may choose to enact without any reference to the restrictions imposed by the Constitution. The admission that no power can be exercised under and by authority of the United States except in accordance with the Constitution is of no practical value whatever to constitutional liberty if, as soon as the admission is made—as quickly as the words expressing the thought can be uttered—the Constitution is so liberally interpretated as to produce the same results as those which flow from the theory that Congress may go outside of the Constitution in dealing with newly acquired territories, and give them the benefit of that instrument only when and as it shall direct.

Can it for a moment be doubted that the addition of Porto Rico to the territory of the United States in virtue of the treaty with Spain has been recognized by direct action upon the part of Congress? Has it not legislated in recognition of that treaty

and appropriated the money which it required this country to pay?

If,. by virtue of the ratification of the treaty with Spain, and the appropriation of the amount which that treaty required this country to pay, Porto Rico could not become a part of the United States so as to be embraced by the words "throughout the United States," did it not become "incorporated" into the United States when Congress passed the Foraker act? 31 Stat. 77, c. 191. What did that act do? It provided a civil government for Porto Rico, with legislative, executive and judicial departments; also, for the appointment by the President, by and with the advice and consent of the Senate of the United States, of a "governor, secretary, attorney general, treasurer, auditor, commissioner of the interior and a commissioner of education." §§ 17–25. It provided for an executive council, the members of which should be appointed by the President, by and with the advice and consent of the Senate. § 18. The governor was required to report all transactions of the government in Porto Rico to the President of the United States. § 17. Provision was made for the coins of the United States to take the place of Porto Rican coins. § 11. All laws enacted by the Porto Rican legislative assembly were required to be reported to the Congress of the United States, which reserved the power and authority to amend the same. § 31. But that was not all. Except as otherwise provided, and except also the internal revenue laws, the statutory laws of the United States, not locally inapplicable, are to have the same force and effect in Porto Rico as in the United States. § 14. A judicial department was established in Porto Rico, with a judge to be appointed by the President, by and with the advice and consent of the Senate. § 33. The court, so established, was to be known as the District Court of the United States for Porto Rico, from which writs of error and appeals were to be allowed to this court. § 34. All judicial process, it was provided, "shall run in the name of the United States of America, and the President of the United States." § 16. And yet it is said that Porto Rico was not "incorporated" by the Foraker act into the United States so as to be part of the United States within the

meaning of the constitutional requirement that all duties, imposts and excises imposed by Congress shall be uniform "throughout the United States."

It would seem, according to the theories of some, that even if Porto Rico is in and of the United States for many important purposes, it is yet not a part of this country with the privilege of protesting against a rule of taxation which Congress is expressly forbidden by the Constitution from adopting as to any part of the "United States." And this result comes from the failure of Congress to use the word "incorporate" in the Foraker act, although by the same act all power exercised by the civil government in Porto Rico is by authority of the United States, and although this court has been given jurisdiction by writ of error or appeal to reëxamine the final judgments of the District Court of the United States established by Congress for that territory. Suppose Congress had passed this act: "*Be it enacted by the Senate and House of Representatives in Congress assembled,* That Porto Rico be and is hereby incorporated into the United States as a territory," would such a statute have enlarged the scope or effect of the Foraker act? Would such a statute have accomplished more than the Foraker act has done? Indeed, would not such legislation have been regarded as most extraordinary as well as unnecessary?

I am constrained to say that this idea of "incorporation" has some occult meaning which my mind does not apprehend. It is enveloped in some mystery which I am unable to unravel.

In my opinion Porto Rico became, at least after the ratification of the treaty with Spain, a part of and subject to the jurisdiction of the United States in respect of all its territory and people, and Congress could not thereafter impose any duty, impost or excise with respect to that island and its inhabitants, which departed from the rule of uniformity established by the Constitution.